## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| NICHOLAS NUTTER, | : | CIVIL CASE NUMBER_____ |
| DUNYASHA YETTS, | : | |
| ERIC SMITH, | : | |
| ADAM DISABATO, | : | |
| MARK COLEMAN, | : | JUDGE_____ |
| WILLIAM KNIGHT, | : | |
| JACK CAHILL, | : | |
| MICHAEL RODRIGUEZ, | : | **JURY TRIAL DEMANDED** |
| SCOTT OVERHOLT, | : | |
| ELMER LONG, | : | |
| JOHN DOE 1, | : | |
| JOHN DOE 2, | : | |
| JOHN DOE 3, | : | |
| JOHN DOE 4, | : | |
| JOHN DOE 5, and | : | |
| JOHN DOE 6, | : | |
| | : | |
| PLAINTIFFS, | : | |
| | : | |
| | : | |
| -VS- | : | |
| | : | |
| | : | |
| | : | |
| THE OHIO STATE UNIVERSITY | : | |
| | : | |
| DEFENDANTS. | : | |

## COMPLAINT

Now comes the Plaintiffs, Nicholas Nutter, Dunyasha Yetts, Eric Smith, Adam DiSabato,

Mark Coleman, William Knight, Jack Cahill, Michael Rodriguez, Scott Overholt, Elmer Long,

John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, and John Doe 6, by and through

Counsel, and state and aver as follows for their complaint against the above named Defendant:

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331

and 1334 as the claims are matters in controversy that arise under the laws of the United States of

America.  Specifically, the claims are asserted under Title IX of the Education Amendments of

1972, 20 U.S.C. § 1681, *et seq.*

2.     Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b) as the

events giving rise to the Plaintiffs' claims occurred within this Court's district.

## PRELIMINARY STATEMENT

3.     This is a civil rights lawsuit being brought by former students of The Ohio State

University ("OSU") that are among the estimated 1,500 to 2,500 male students that were

sexually assaulted, abused, molested, and/or harassed by their OSU Physician and Athletic Team

Doctor, Dr. Richard Strauss, M.D.

4.     At OSU, Dr. Strauss was an employee, tenured faculty member, and the Associate

Director of OSU's sports medicine program.  He served as a physician in both the athletic

department and the OSU student health center.

5.     Dr. Strauss' OSU career spanned over nineteen (19) years from approximately 1979

through 1998.  Throughout his approximate nineteen (19) years at OSU as both a physician in

the athletic department and in the student health center, Dr. Strauss used his position of trust and

confidence as a physician to sexually molest, sexually assault, sexually abuse, and/or sexually

harass countless OSU male student-athletes and students.

6.     The Plaintiffs consented to receiving medical treatment from Dr. Strauss while student-

athletes and students at OSU.  However, these student-athletes and students never consented to

Dr. Strauss' sexual molestation, sexual assault, sexual abuse, and/or sexual harassment as Dr.

2

Strauss frequently went beyond the stated medical purpose of their examinations, and their examinations often were not consistent with the standard of care for medical examinations.

7.     Dr. Strauss was designated the team physician for many sports centered out of Larkins Hall, including men's wrestling.  As such, student-athlete wrestlers were susceptible to Dr. Strauss, if they wanted to receive medical treatment.

8.     Larkins Hall was home to the OSU Varsity Wrestling Team as their practice facility.  The wrestling locker room was located on the main floor, inside the general men's locker room.  The wrestling locker room had a separate locked area with lockers located around the perimeter of the room.  Also, the wrestlers shared a shower area, toilet area, and sauna area with the general OSU population that included students, employees, faculty members, and staff of OSU.  Further, the wrestlers would walk across a hallway to access their training room, which was located on the main floor of Larkins Hall.  This training area had approximately six (6) training tables, approximately two whirlpools, and a private office area where the athletes would meet with Dr. Strauss.  Further, most wrestlers accessed the wrestling room by walking up a private spiral staircase located at the end of the hallway that separated the locker room and training room.  This spiral staircase ascended to the third floor wrestling room.

9.     After wrestling practice, the wrestlers would shower in the first floor general shower area.  Here, wrestlers were often harassed not only by Dr. Strauss, but also by numerous students, employees, faculty members, and/or staff.  These individuals harassed the wrestlers by leering and/or voyeuristically staring at the wrestlers while they showered.  These individuals sometimes would shower with the wrestlers, stare at the wrestlers, and excessively lather their genital area.  Moreover, some individuals became erect in the shower area and even masturbated while in the shower area.  Also, some individuals voyeuristically stared at the wrestlers from

3

inside a bathroom stall by looking through a crack in the door or by voyeuristically looking over the bathroom stall door.

10.     The wrestlers would frequently use the sauna facilities at Larkins Hall, which was part of the general men's locker room. While using the sauna facilities, Dr. Strauss and other students, employees, faculty members, and/or staff would voyeuristically watch the wrestlers.

11.     In the locker room, shower area, toilet area, and/or sauna facilities, wrestlers were solicited for dates and sexual encounters.

12.     Members of the wrestling team and coaching staff consistently discovered male on male sexual encounters in the locker room, bathroom, sauna facilities, spiral staircase, and wrestling room.

13.     Further, each wrestler had to participate in a pre-season physical before the wrestler was cleared to participate in their sport. Many times, these pre-season physicals were held in the training room at the Woody Hayes Athletic Center. During the pre-season physicals, wrestlers would participate in a number of stations that included a station for blood pressure, a station to check your reflexes, a station to make a mouthpiece, etc. The final station would be a hernia examination with Dr. Strauss.

14.     As students progressed through the stations, the hernia station always took the longest. Here, Dr. Strauss would excessively fondle and inspect the genitals and anuses of wrestlers. These exams lasted approximately five (5) to fifteen (15) minutes.

15.     Dr. Strauss would give explanations for the prolonged need for his medical exams. Frequently, Dr. Strauss would tell wrestlers that he was just being thorough, needed to check their lymph nodes, needed to check for STDs, and/or that he was checking for testicular cancer.

4

16.     Typically for a pre-season physical, Dr. Strauss would ask the wrestler to enter the room. Dr. Strauss would shut the door and ask the wrestler to undress. Dr. Strauss would exam the wrestler from his shoulders to his groin area. Dr. Strauss would closely look at the wrestler's skin, lifting the wrestler's arms and running his hands down the wrestler's chest. Then, Dr. Strauss would grab a stool on wheels and roll up to the wrestlers groin area so the wrestler's penis was at the height of Dr. Strauss' facial area. Sometimes, Dr. Strauss would turn off the lights and would use a purplish light headlamp to examine the wrestler. Either way, Dr. Strauss' face was close enough that the wrestler could feel his breath on his penis and testicles. Typically, Dr. Strauss would hold the wrestler's testicles in his left hand and he gently massaged the wrestler's testicles. With his right hand, Dr. Strauss would hold the wrestler's penis and move the wrestler's penis in different directions as to appear to be examining the shaft of the wrestler's penis. Dr. Strauss would continue this examination with the wrestler for approximately five (5) to fifteen (15) minutes. Once completed, occasionally, Dr. Strauss would ask the wrestler to turn around. Dr. Strauss would instruct the wrestler to put his hands on his buttocks and spread the wrestler's buttocks. Then, Dr. Strauss would instruct the wrestler to cough. During this anus examination, Dr. Strauss would still be on his stool with the wrestler's buttocks approximately one (1) foot from Dr. Strauss' face. Dr. Strauss failed to use examination gloves during the pre-season physicals.

17.     In April 2018, OSU authorized an independent investigation into the allegations of sexual abuse levied against Dr. Strauss. The law firm of Perkins Coie, LLP conducted approximately a yearlong independent investigation that interviewed over five hundred (500) individuals with a cost to OSU of over six (6) million dollars. On May 15, 2019, Perkins Coie, LLP issued findings from its independent investigation that found Dr. Strauss sexually abused at least 177 male

student-patients that he was charged with treating as a University Physician. Also, Perkins Coie, LLP found that University personnel had knowledge of Strauss' sexually abusive treatment of male student-patients as early as 1979, but that complaints and reports about Strauss' conduct were not elevated beyond the Athletics Department or Student Health until 1996.

18. On May 17, 2019, OSU President Dr. Michael Drake and OSU Board of Trustees Chair Michael Gasser issued a letter to The Ohio State University Community that stated the findings of the independent investigation were shocking and painful to comprehend. Also, the two OSU leaders offered their profound regret and sincere apologies to each person that endured Strauss' abuse, and for OSU's fundamental failure at the time to prevent the abuse.

19. Plaintiffs believe that at least five (5) other lawsuits are pending before this Honorable Court. See, e.g., *John Doe 1 et. al. v. The Ohio State University*, Case No. 2:18-cv-00692-MHW-EPD (S.D. Ohio); *Brian Garrett et. al. v. The Ohio State University*, Case No. 2:18-cv-00692-MHW-EPD (S.D. Ohio); *Steve Synder-Hill et. al. v. The Ohio State University*, Case No. 2:18-cv-00736-MHW-EPD (S.D. Ohio); *John Doe M.B. et. al. v. The Ohio State University*, Case No. 2:19-cv-01911-GCS-CMV (S.D. Ohio); and *Michael Disabato, et. al. v. The Ohio State University*, Case No. 2:19-cv-02237-MHW-EPD.

20. Plaintiffs John Does 1-6 have filed anonymously in this action due to the highly personal nature of the circumstances giving rise to their claims.

21. Plaintiffs take no pleasure in bringing this lawsuit. OSU is an esteemed institution of higher learning and a large majority of the Plaintiffs continue to love OSU dearly and remain devoted members of The Buckeye Nation. As such, Plaintiffs have an extremely difficult time understanding how "the state up north" can fully acknowledge and compensate the

6

victims/survivors of sexual abuse, whereas a leading Big 10 institution such as OSU has struggled to do so.

22.     Plaintiffs were honored to represent OSU in competitive NCAA Division I athletics and did their best to continue the University's tradition of excellence.

23.     Plaintiffs honorably attended OSU expecting the University would provide them with a safe and supportive environment that would help them perform both academically and athletically.

24.     Plaintiffs believed that OSU Team Physicians like Dr. Strauss hold a special relationship of trust and confidence with their student-patients. These physicians become even more important to a NCAA Division I athlete as the student-athlete requires immediate treatment in order to compete in the rigors of their respective sport.

25.     Plaintiffs trusted OSU to act in their best interests when selecting, training, and supervising the team physicians on its faculty, which included the need to regularly and competently evaluate the quality of care and the integrity of the medical services that Dr. Strauss provided to OSU's students and student-athletes.

26.     Plaintiffs trusted that OSU personnel would not conceal, disclose, or disregard known circumstances that raised a substantial likelihood that Plaintiffs would be sexually molested, sexually assaulted, sexually abused, and/or sexually harassed by Dr. Strauss. Likewise, the Plaintiffs trusted that OSU personnel would not conceal, disclose, or disregard known circumstances that raised a substantial likelihood that Plaintiffs would be sexually harassed and sexually abused at their athletic facility of Larkins Hall.

27.     At all times relevant to this complaint, OSU officials with the authority to institute corrective measures actively concealed, failed to disclose, and showed deliberate indifference

towards circumstances that indicated Dr. Strauss was sexually abusing male student-athletes and students.

28. At all times relevant to this complaint, OSU personnel failed to implement corrective measure despite having actual knowledge Dr. Strauss was sexually abusing students and Larkins Hall presented a sexually hostile environment to male student-athletes.

29. OSU officials knowingly, intentionally, and/or recklessly aided, abetted, and/or concealed Dr. Strauss' sexual predation on its student-athletes and students. OSU ignored complaints and disregarded commonly known information and improper and/or inappropriate practices used by Dr. Strauss over his nineteen (19) year career.

## PARTIES

30. The Plaintiffs hereby incorporate by reference the allegations set forth and contained in paragraphs one (1) through twenty-nine (29) as if fully written herein.

31. Defendant The Ohio State University was at all relevant times contained herein and presently continues to be a public university organized and existing under the laws of the State of Ohio.

32. Defendant OSU received at all relevant times contained herein and presently continues to receive federal financial assistance, which subjects OSU to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq*.

33. At all relevant times herein, Plaintiffs were enrolled at OSU as students during Dr. Strauss' employment with OSU.

34. Plaintiff wrestlers participated in NCAA Division I intercollegiate athletics, while enrolled at OSU as members of OSU's Varsity Wrestling Team.

8

35.     Plaintiff Nicholas Nutter is a resident of Medina, Ohio. He is a 1992 graduate of

Buckeye High School, where he was on the merit roll, prom king, an All-Ohio Football middle

linebacker, U.S. Junior National Champion in Freestyle and Greco-Roman, U.S. High School

National Champion, a 1992 OHSAA State Champion, and a 1991 OHSAA State Runner-up.

36.     Plaintiff Nutter attended OSU from the years of 1992-1997, graduating with a Bachelor

of Science degree in Sociology with a minor in Psychology in 1997. While at OSU, Mr. Nutter

was a five (5) year member of the varsity wrestling team, earning NCAA All-American honors

in 1996. Also, Mr. Nutter placed fifth (5th) in the Big Ten in 1996, was an Espoir National

Champion in Greco-Roman and an Espoir National Runner-up in Freestyle. In 1997, Mr. Nutter

placed fourth (4th) in the Big Ten and was a University National Champion in Greco-Roman and

a Brazilian Vale Tudo World Champion.

37.     Plaintiff Nutter believes that he was examined approximately twenty (20) times by Dr.

Strauss for a physical injury and/or sickness and Dr. Strauss sexually assaulted Mr. Nutter

approximately nineteen (19) times.

38.     In the fall of 1996, Mr. Nutter went to visit his father in a rural part of Ohio and helped

his father perform some work outside where Mr. Nutter was exposed to poison ivy. Mr. Nutter

urinated prior to washing his hands and approximately three (3) days later his genital area was

swollen and blistering from the poison ivy reaction. On a Friday night at approximately 10:30

p.m., Mr. Nutter called Dr. Strauss, who insisted on seeing Mr. Nutter immediately. Mr. Nutter

asked if the two should meet in the training room at Larkins Hall, however, Dr. Strauss insisted

that Mr. Nutter should just come over to Dr. Strauss' residence. Dr. Strauss suggested that he

look at Mr. Nutter's rash and Mr. Nutter started to remove his pants in Dr. Strauss' living room.

Dr. Strauss suggested that the two should go up the Dr. Strauss' bedroom to evaluate the rash.

9

Mr. Nutter followed Dr. Strauss to his bedroom, which was dimly lit by a few candles. Dr. Strauss removed a clean white sheet from his closet and draped it onto his bed. Dr. Strauss asked Mr. Nutter to lay on the bed so Dr. Strauss could get a better view. Mr. Nutter pulled down his pants to lay back on the bed and Dr. Strauss suggested that Mr. Nutter should remove all his clothing including his socks. As Mr. Nutter laid on the bed, he could view a bunch of black and white photos of bare-chested males on his walls. Dr. Strauss went to his nightstand and grabbed a battery powered flashlight. While using the flashlight, Dr. Strauss, without the use of examination gloves, completed the most thorough genital exam that Mr. Nutter had ever experienced. Mr. Nutter felt the examination lasted for hour, even though the examination took approximately fifteen (15) minutes. After the approximately fifteen (15) minute examination, Mr. Nutter was told that he had a severe reaction to poison ivy, which needed immediate medication. Mr. Nutter assumed that he would be receiving a medical prescription from Dr. Strauss. Instead, Dr. Strauss reached into his kitchen cabinet, removed a couple pill bottles, poured a few pills on the counter and started crushing the pills into dust. Then, Dr. Strauss mixed the dust from the pills with some orange juice and told Mr. Nutter to drink the mixture in order to heal quicker. Mr. Nutter drank the mixed drink as prepared by Dr. Strauss, abruptly ended the conversation, left Dr. Strauss' residence, and ran to his car.

39.     Mr. Nutter recalls that every physical and/or exam, except one as to Mr. Nutter's dislocated elbow, involved genital groping and sometimes breast exams. On a few occasions, Dr Strauss sexually assaulted Mr. Nutter to the point where Mr. Nutter was near erection.

40.     Plaintiff Dunyasha Yetts is from Steubenville, Ohio. He graduated from Steubenville High School in 1989, where Mr. Yetts was a two-time OHSAA State Champion.

10

41. Plaintiff Yetts attended OSU from the years 1992-1994, graduating with a Bachelor of Science degree in Education in 1994. Also, in 1994, Mr. Yetts was the wrestling team captain, a Big Ten champion, and earned NCAA All-American honors by placing third (3rd) at the NCAA Wrestling Championships.

42. Plaintiff Yetts was examined by Dr. Strauss on at least eight (8) occasions and sexually assaulted on each occasion. Mr. Yetts would receive prolonged genital exams conducted by Dr. Strauss that centered around his penis, even when Mr. Yetts' chief complaint was a knee or thumb injury. Also, Dr. Strauss would fail to use any type of latex gloves during said exams.

43. Plaintiff Yetts spoke directly to his coaches as well as high ranking athletic department officials concerning Dr. Strauss' actions as well as the overall problems in Larkins Hall.

44. Plaintiff Eric Smith is a resident of Tampa, Florida. He graduated from Wayne High School in Huber Heights, Ohio in 1991. While in high school, Mr. Smith was an OHSAA third place finisher, Freestyle State Champion and three time (3x) Freestyle State Placer.

45. Plaintiff Smith attended OSU from the years 1991-1996, graduating with a degree in Business Risk Management in 1996. While competing for OSU, Mr. Smith earned All-American honors in 1995 and 1996. Also, Mr. Smith was a two-time (2x) Team Captain.

46. Plaintiff Smith states that he was seen between thirty (30) and forty (40) times by Dr. Strauss. Further, he believes that Dr. Strauss sexually assaulted him approximately ten (10) to twenty (20) times. Mr. Smith states that when getting a physical, Dr. Strauss would play with the shaft of his penis by continuously moving it around as if he wanted Mr. Smith to get aroused. Mr. Smith believes that Dr. Strauss sexually abused him to the point where he reached a near erection approximately ten (10) times and he was given one (1) unnecessary rectal exam.

47.     Plaintiff Adam DiSabato is resident Columbus, Ohio. He graduated from Bishop Ready High School in Columbus, Ohio in 1988. While in high school, Mr. DiSabato was a four-time (4x) OHSAA State Placer, two-time (2x) OHSAA State Champion, and High School All-American.

48.     Plaintiff DiSabato attended OSU from the years 1988-1993 and graduated with a Bachelor of Arts in Recreational Education. While at OSU, Mr. DiSabato was a three-time (3x) All-American, four-time Big Ten Placer, four-time NCAA National Qualifier, three-time (3x) Team Captain, two-time University National Champion in Freestyle, 1995 Pan American Runner-up, three-time (3x) Olympic Trials Qualifier, and a 2006 OSU Athletic Hall of Fame Inductee. Also, Mr. DiSabato was an Assistant Wrestling Coach at the University of Illinois and Ohio University.

49.     Plaintiff DiSabato was examined by Dr. Strauss approximately forty (40) times. Moreover, Mr. DiSabato was sexually assaulted by Dr. Strauss approximately twelve (12) times. Mr. DiSabato states that Dr. Strauss fondled his genitals during his examinations and Dr. Strauss would have his face near Mr. DiSabato's genital area. A few times, Mr. DiSabato would ask Dr. Strauss, "what are you looking for?" Dr. Strauss was visibly shocked that DiSabato asked this question and abruptly ended Mr. DiSabato's examination. In approximately in the fall of 1992, during pre-season physicals, Dr. Strauss was one of two doctors from OSU that were examining individuals for their yearly sports physical. Dr. Strauss was taking longer than his colleague. The other doctor started to examine the athletes that had been in line to see Dr. Strauss. Dr. Strauss stormed out of the examination room and was visibly upset that the athletes in his line waiting to be examined had diminished.

50.    Plaintiff Mark Coleman is a resident of Galloway, Ohio. He graduated from Fremont St. Joseph Central Catholic High School in 1983. While in high school, Mr. Coleman was a two-time OHSAA State Champion, a State Runner-up, an All-Ohio football middle linebacker, and a merit roll recipient.

51.    Plaintiff Coleman attended OSU from the years 1986-1988, graduating with a Bachelor of Science degree in Recreational Education in 1988. Also, Mr. Coleman was an OSU Assistant Wrestling Coach from 1989-1993. While competing for OSU, Mr. Coleman was a 1988 NCAA National Champion. Further, he was a Pan American Champion in 1990, 1991, and 1992, a Runner-up at the 1991 FILA Wrestling World Championships and a 1992 U.S. Olympian. Additionally, Mr. Coleman was the UFC 10 and UFC 11 Tournament Champion, the first UFC Heavyweight Champion, the Pride Fighting Championships 2000 Open Weight Grand Prix Champion, and a UFC Hall of Fame Member.

52.    Plaintiff Coleman was examined by Dr. Strauss approximately fifty (50) times and was sexually assaulted by Dr. Strauss on approximately thirty (30) occasions. Dr. Strauss would unnecessarily examine Mr. Coleman's penis, while holding his testicles in his other hand. Moreover, Mr. Coleman believes he was sexually abused to the point of near erection on a few occasions. Mr. Coleman believed Dr. Strauss was overly fascinated with his upper body.

53.    Plaintiff William Knight is a resident of Cleveland, Ohio. He graduated from Shaker Heights High School in 1991. While in high school, Mr. Knight was a wrestling team captain and the President of the Minority Achievement Committee.

54.    Plaintiff Knight attended OSU from the years of 1991 to 1996, graduating with a Bachelor of Arts in Humanities in 1996. Mr. Knight was a five (5) year varsity wrestler, placing

13

in the Big Ten twice. In 1996, Mr. Knight finished third (3rd) in the Big Ten, making him an NCAA Qualifier.

55.     Plaintiff Knight was examined by Dr. Strauss over twenty (20) times and believes that he was sexually assaulted by Dr. Strauss over (20) times as well. During his sophomore year, Mr. Knight was seen by Dr. Strauss for infected tonsils. Dr. Strauss began the examination by checking Mr. Knight's neck area and ended the examination with a penis grab. Mr. Knight believes that Dr. Strauss manipulated his penis during several exams that ended in Mr. Knight nearly reaching an erection in those exams.

56.     In 1995, Plaintiff Knight and another teammate met with an OSU athletic director to discuss the sexual harassment that the OSU Varsity Wrestling Team was receiving on a daily basis in Larkins Hall. Further, Mr. Knight addressed these problems with the OSU coaching staff and believed the OSU coaching staff were trying to get the team moved out of Larkins Hall for their safety.

57.     For a long time, Mr. Knight believed that Dr. Strauss liked to look at the white wrestlers on the wrestling team and feel up the black wrestlers on the team.

58.     Plaintiff Jack Cahill is a resident of Columbus, Ohio. He graduated from Worthington Kilbourne High School in 1994. While in high school, Mr. Cahill was a multiple time scholar athlete, member of the Ohio National Team in wrestling, All-Ohio team in lacrosse, and featured as Channel 4 "athlete of the week."

59.     Plaintiff Cahill attended OSU from the years of 1994-2000, graduating with a double major of Criminology and Sociology in 2000. Mr. Cahill competed at OSU in Varsity Lacrosse for one (1) year and Varsity Wrestling for four (4) years, becoming a Varsity Letterman in Wrestling.

14

60.     Over his career, Mr. Cahill was examined by Dr. Strauss in excess of fifty (50) times. In all examinations, Mr. Cahill believes Dr. Strauss was inappropriate and sexually assaulted him by consistently requiring that Dr. Strauss examine Mr. Cahill's lymph nodes. This lymph node examination would consist of an examination of Mr. Cahill's testicles, penis, and the surrounding area of his groin. These examinations would last approximately ten (10) minutes and Dr. Strauss would rarely wear any type of latex gloves.

61.     On one occasion, as Mr. Cahill was leaving wrestling practice, Dr. Strauss stopped Mr. Cahill and asked if Mr. Cahill had wrestled with a teammate who Mr. Cahill commonly practiced. When Mr. Cahill affirmatively answered that he had practiced with the teammate in question, Dr. Strauss stated that he needed to examine Mr. Cahill for crabs. Dr. Strauss had Mr. Cahill lie naked on an examination table in the dark for approximately fifteen (15) minutes, while Dr. Strauss examined Mr. Cahill's body using a pen light. Finally, Mr. Cahill exited the examination room over Dr. Strauss' disapproval. Mr. Cahill immediately confronted his teammate, who indicated that he did not have crabs. Consequently, Mr. Cahill went to confront Dr. Strauss, who in turn, told Mr. Cahill that he must have been mistaken.

62.     Plaintiff Michael Rodriguez is a resident of Columbus, Ohio. He is a 1990 graduate of Revere High School in Richfield, Ohio, where he was a 1990 OHSAA State Runner-up.

63.     Plaintiff Rodriguez attended OSU and was on the OSU Varsity Wrestling Team from the years of 1990-1992, leaving OSU in the winter quarter of 1992. Mr. Rodriguez received his Bachelor of Arts degree in Communications from the University of Pittsburgh in 1996.

64.     Plaintiff Rodriguez was examined by Dr. Strauss between five (5) to ten (10) times and was sexually assaulted by Dr. Strauss on approximately five (5) different occasions.

65.     During the winter of 1992, Plaintiff Rodriguez contracted crabs and called Dr. Strauss for medicated shampoo. Dr. Strauss asked Mr. Rodriguez to come to his residence because Dr. Strauss had some medicated shampoo to give to Mr. Rodriguez. Mr. Rodriguez went to Dr. Strauss' residence and entered his front room. Dr. Strauss asked Mr. Rodriguez to show him the infected area. Mr. Rodriguez pulled down his pants and Dr. Strauss proceeded to examine Mr. Rodriguez's groin area. Dr. Strauss manipulated Mr. Rodriguez's penis with his hand in a stroking motion that Mr. Rodriguez described as a "hand job." After several minutes of Dr. Strauss manipulation, Mr. Rodriguez's penis became erect. Dr. Strauss continued to stroke Mr. Rodriguez's penis. Dr. Strauss' face was directly in front of Mr. Rodriguez's penis and Mr. Rodriquez was frozen with terror. Mr. Rodriguez thought about whether he was inviting the action by Dr. Strauss and began to worry that Dr. Strauss may start to perform oral sex upon him. Mr. Rodriguez had to lean back and pull his penis from the grasp of Dr. Strauss' hand. Looking down, Mr. Rodriguez asked Dr. Strauss for the medicated shampoo, which Dr. Strauss left the room to retrieve. As Dr. Strauss left the room, Mr. Rodriguez quickly pulled up his pants and stood by the door. When Dr. Strauss returned to the room, Mr. Rodriquez asked for the shampoo. Dr. Strauss tossed him the bottle and Mr. Rodriguez quickly left the residence.

66.     Further, Mr. Rodriguez had a skin infection that would breakout on his forehead. Upon examination, Dr. Strauss would cup Mr. Rodriguez's face and Dr. Strauss would put his face uncomfortably close to Mr. Rodriguez's face so that they were basically nose to nose. Dr. Strauss would bend his neck toward Mr. Rodriguez in a simulated "kiss type" motion during the examination.

67.    Plaintiff Scott Overholt is a resident of Akron, Ohio. Mr. Overholt graduated from Walsh Jesuit High School in 1995, where he was a OHSAA State Champion, OHSAA State Runner-up, and an All-American in Freestyle.

68.    Plaintiff Overholt attended OSU in the years 1995-1997. He was a Varsity Letterman and starter on the OSU Wrestling Team during the 1996-1997 season.

69.    Plaintiff Overholt was sexually assaulted by Dr. Strauss during his physical examination for the 1995-1996 season. During this physical, Dr. Strauss positioned himself on a stool so that Dr. Strauss' face was directly in front of Mr. Overholt's genitals. Dr. Strauss' cupped Mr. Overholt's testicles with one hand and stroked his penis with the other in an overhand manner several times before repositioning it straight up and looking closer as Dr. Strauss moved his face very close to Mr. Overholt's penis.

70.    Plaintiff Elmer Long is a resident of Columbus, Ohio. Mr. Long graduated from Akron Butchel in 1992. While in high school, Mr. Long was a three (3) time City Wrestling Champion, two (2) time Sectional Wrestling Champion, three (3) time District Wrestling Qualifier, and academically achieved the Merit Roll Club.

71.    Plaintiff Long attended OSU from the years 1992-1998, graduating with a Bachelor of Science Degree in Psychology in 1998. From 1993-1994, Mr. Long became a Varsity Letterman in the sport of wrestling.

72.    Plaintiff Long was examined by Dr. Strauss approximately three (3) to four (4) times with Dr. Strauss sexually assaulting Mr. Long on each occasion. Dr. Strauss would perform a hernia examination on Mr. Long. Dr. Strauss would hold Mr. Long's testicles with one hand and Mr. Long's penis with the other. Dr. Strauss would feel around his testicle for a period as he

positioned his face close to Mr. Long's penis. Further, Dr. Strauss would not wear any type of examination gloves and the examination always extended beyond Mr. Long's medical problems.

73.     Plaintiff John Doe 1 is a resident of Columbus, Ohio. He graduated ninth (9th) out of an approximate three hundred and sixty-five (365) students from high school in 1991 and was a multiple time scholar-athlete. He was a two-time (2x) OHSAA State Qualifier and an OHSAA State Placer finishing fourth (4th)

74.     Plaintiff John Doe 1 attended OSU from the years 1991-1998 and earned a Bachelor of Science degree. While at OSU, John Doe 1 was Academic All-Big Ten, a four (4) year Varsity letterman, Team Captain, a three-time (3x) NCAA Qualifier, a three time (3x) Big Ten Placer, U.S. Espoir National Runner-Up in Freestyle, University Nationals Placer, and U.S. Olympic Trials Placer.

75.     Plaintiff John Doe 1 was examined by Dr. Strauss approximately twenty-five (25) to thirty (30) times. Dr. Strauss sexually assaulted John Doe 1 approximately fifteen (15) to twenty (20) times. John Doe 1 states that Dr. Strauss would examine his genital areas for routine cold symptoms, i.e. sore throat, common cough, and/or runny nose. Also, on a few occasions, Dr. Strauss fondled John Doe 1's penis to the initial stages of an erection during his examination.

76.     Plaintiff John Doe 2 is a resident of Cardwell, Montana. He graduated from Dayton High School in Dayton, Oregon in 1994. While in high school, John Doe 2's overall high school record was 136-2. He was a four (4x) time State Finalist, a two (2x) time State Champ, Cadet National Runner-up, a fourth (4th) place finisher at Junior Nationals, and a two (2x) time third (3rd) place finisher at Espoir Nationals.

77.     Plaintiff John Doe 2 attended OSU from the years 1994-1995 and was a member of the OSU Varsity Wrestling Team.

78. Plaintiff John Doe 2 was examined by Dr. Strauss on approximately four (4) occasions. On all four (4) occasions, he was sexually assaulted by Dr. Strauss. During his last examination for strep throat, Dr. Strauss made John Doe 2 pull down his pants to examine if John Doe 2's lymph nodes were swollen. Dr. Strauss moved John Doe 2's testicles around his hand for approximately ten (10) minutes while keeping direct eye contact with John Doe 2.

79. Moreover, during another examination, Dr. Strauss deemed it necessary to perform a lymph node examination of John Doe 2's groin, even though his chief complaint was a bad cauliflower ear.

80. Plaintiff John Doe 3 is a resident of Akron, Ohio and graduated from Akron Springfield High School in 1994. While in high school, John Doe 3 was Ohio Mr. Football Runner-up, a two-time (2x) OHSAA State Champion, OHSAA State Runner-up, and a High School National Champ.

81. Plaintiff John Doe 3 attended OSU from the years 1994-1998. He was a two-time (2x) Big Ten Placer and a two-time (2x) NCAA Qualifier.

82. Plaintiff John Doe 3 saw Dr. Strauss approximately seven (7) times and was sexually abused approximately three (3) times. John Doe 3 states that Dr. Strauss would cup his testicles with one hand and move his penis side to side. Dr. Strauss would fondle John Doe 3 until John Doe 3 almost had an erection.

83. Plaintiff John Doe 4 is a resident of Mt. Hood Parkdale, Oregon. He graduated from Grandville, Michigan in 1993 where he was a Scholar Athlete and State Champion in wrestling.

84. Plaintiff John Doe 4 attended OSU from the years 1993-1998. He received his Bachelor of Arts and Science degree in 1998 graduating with Cum Laude honors. Also, John Doe 4 was a

four-time (4x) Academic All-American, four-time (4x) Academic All-Big Ten, and a Big Ten
Medal of Honor Nominee.

85.    Plaintiff John Doe 4 saw Dr. Strauss approximately twelve (12) times and was sexually
abused by Dr. Strauss every time. John Doe 4 states that Dr. Strauss would fondle and finger his
penis and testicles as well as caress his stomach area. Further, John Doe 4 states that Dr. Strauss
appeared to be in a trance like he could not hear John Doe 4's plea to "knock it off."

86.    Plaintiff John Doe 5 is a resident of Hilliard, Ohio. He graduated from Willard High
School in 1990. While in high school, John Doe 5 earned six (6) varsity letters in Cross Country
and Track and Field and was a two-time (2x) Academic All-NOL.

87.    Plaintiff John Doe 5 attended OSU from the years 1990-1994. He was a student at OSU
and did not participate in OSU varsity athletics.

88.    Plaintiff John Doe 5 was examined by Dr. Strauss twice and was sexually abused by Dr.
Strauss during one (1) examination. John Doe 5 was examined by Dr. Strauss for a chest cold
and was told to pull down his pants and underwear so he could check John Doe 5's glands. Dr.
Strauss cupped John Doe 5's genitals in his hands and massaged them for a few minutes. Dr.
Strauss did not wear examination gloves during the exam.

89.    Plaintiff John Doe 6 is a resident of Columbus, Ohio. He graduated from Columbus
Centennial in 1998 and was a member of the National Honor Society.

90.    Plaintiff John Doe 6 attended OSU from the years of 1988-1995. He graduated with his
Bachelors of Arts degree in Geological Sciences in 1993. Plaintiff John Doe 6 did not
participate in OSU varsity athletics.

91.    Plaintiff John Doe 6 was sexually abused by Dr. Strauss during one (1) examination.
John Doe 6 was examined for ringworm that appeared on a couple small spots on his lower back.

John Doe 6 made it clear to Dr. Strauss that the ringworm was limited to his back area. Yet, Dr. Strauss had John Doe 6 pull down his pants and Dr. Strauss inspected, held, and rubbed his penis and scrotum using both of his hands. John Doe 6 could feel his breath on his genitals and the exam lasted several minutes. Dr. Strauss failed to use examination gloves during the exam.

## FACTS

92.     The Plaintiffs hereby incorporate by reference the allegations set forth and contained in paragraphs one (1) through ninety-one (91) as if fully written herein.

93.     Defendant OSU employed Dr. Richard Strauss, M.D., as a faculty member from approximately September 1978 until approximately March 1, 1998.

94.     In approximately September 1978, Dr. Strauss started with OSU as an Assistant Professor in the College of Medicine. Months later, Dr. Strauss was volunteering with the University Athletics Department as a team physician for several teams located in Larkins Hall.

95.     By approximately 1980, Dr. Strauss was serving as an Associate Director of the Sports Medicine program.

96.     By approximately 1981, Dr. Strauss began an appointment in the Athletics Department, including medical responsibilities at the Sports Medicine Clinic located in the University's Student Health Services.

97.     Over the years, Dr. Strauss' responsibilities as a team physician expanded beyond Larkins Hall to other athletic facilities, which included: the Woody Hayes Athletic Center, Ernie Biggs Athletic Training Facility, and St. John Arena. Moreover, Dr. Strauss treated patients at Student Health Services.

98.     Dr. Strauss was granted tenure by OSU as an associate professor in approximately 1983.

99.     Dr. Strauss was granted a full professorship with tenure by OSU in approximately 1992.

100.    In addition to his above duties, in approximately 1994, Dr. Strauss also began a part-time appointment treating students on the third floor of Wilce Student Health Center.

101.    In approximately March 1998, Dr. Strauss voluntarily retired and was granted Emeritus Status by the OSU Board of Trustees in the School of Public Health.  Dr. Strauss' Emeritus Status was bestowed upon him despite the lack of review or approval from the Dean of the College of Medicine and Public Health.

102.    Over his career, Dr. Strauss treated male student-athletes in the following sports: swimming, diving, wrestling, gymnastics, fencing, lacrosse, hockey cheerleading, volleyball, soccer, track, golf, baseball, tennis, water polo, and football

103.    During the above stated times and/or years and while working for Defendant OSU, Dr. Strauss sexually abused the Plaintiffs and other OSU Students under the guise of medical treatment during their medical examination in one or more of the following ways:

        a.      Dr. Strauss extremely manipulated or stimulated his student-patient's genitals, which included unwanted oral sex and fondling that caused ejaculation or near ejaculation.

        b.      Dr. Strauss fondled the student-patient to the point of erection or near erection.

        c.      Dr. Strauss performed prolonged and/or medically unnecessary genital and rectal exams.

        d.      Dr. Strauss committed other inappropriate and abusive practices toward his student-patients such as unnecessary nudity of the student-patient, excessive touching and/or groping of the student-patient, verbal commentary and inappropriate questions, lack of examination gloves, inappropriate physical position and/or invasion of space of the student-patient, performing treatments outside of a clinical setting, and "quid pro quo" arrangements with the student-patient.

e.  Dr. Strauss inappropriately showered alongside student-patients, loitered in student-athletes locker rooms, engaged in voyeuristic behavior, and initiated fraternization with student-patients by calling their residences, inviting and paying for their meals, and asking to take pictures for the student-patients to help them start a modeling career.

104.  Strauss committed the above-mentioned acts of sexual abuse and sexual harassment consistently on an almost daily basis as an OSU faculty member and OSU athletic team physician.

105.  As set forth below, Plaintiffs as student-patients were vulnerable to Strauss' sexual abuse and many student-patients were not able to identify Strauss' conduct as sexual abuse when it occurred.

106.  Plaintiffs were treated by Dr. Strauss in his official capacity as their OSU Team Physician and/or medical doctor working for OSU.

107.  Plaintiffs had little and/or no experience with medical doctors and/or examinations without their parents being present. Plaintiffs were taught to respect their elders and were under the belief that their OSU Team Physician had their best health interest in mind during their examination.

108.  The Plaintiff wrestlers attributed and/or rationalized Dr. Strauss' inappropriate behavior as being the thoroughness needed for participation in NCAA Division I Athletics, which Plaintiffs knew they had to undergo a pre-season physical in order to participate.

109.  Plaintiffs were sexually assaulted and/or abused by Dr. Strauss under the guise of legitimate medical examinations.

110.  Plaintiff wrestlers were compliant with the Dr. Strauss as their OSU Team Physician in order to regain their good health to compete and/or represent OSU to the best of their ability.

111.    Plaintiff wrestlers were not educated nor taught that male sexual abuse could exist within the confines of the OSU Athletic Department. Further, male sexual abuse was not a commonly acknowledged problem or commonly discussed among non-educators or people outside the medical field.

112.    Dr. Strauss preyed upon Plaintiffs with his superior medical knowledge and was able to dispel any of the Plaintiffs' objections with this knowledge. Plaintiffs did not have the education and/or experience in the medical field to limit Dr. Strauss' physical contact during their examinations.

113.    Plaintiffs believed and trusted OSU. Plaintiffs believed OSU would protect, inform, and/or remove them from harmful situations, even if it involved their Team Physician and/or an OSU medical doctor.

114.    Plaintiff wrestlers believed that accusing an OSU Professor and/or Team Physician of committing sexual assault would risk their status on the team and/or their athletic scholarship as well as their status as a student at OSU. Plaintiffs, John Doe 5 and John Doe 6, believed that accusing an OSU Professor and/or Team Physician of committing sexual assault would risk their status as a student at OSU.

115.    Plaintiffs feared being ridiculed and/or ostracized if they complained to their teammates and the teammates failed to report similar experiences. Plaintiffs, John Doe 5 and John Doe 6, feared being ridiculed and/or ostracized if they complained to other students, who did not have similar experiences.

116.    Plaintiffs had no options in their treatment. OSU provided their medical staff and facilities. Plaintiffs needed to see Dr. Strauss not only to heal quickly, but also, to save time, and/or money.

24

117.    OSU led Plaintiffs to believe that Strauss' sexually abusive examinations, methods, and statements were medically acceptable behavior and/or practices.

118.    Not until within the past two years have Plaintiffs had a reasonable basis for believing that OSU had actual knowledge Dr. Strauss was sexually abusing male students in a clinical setting.

119.    Not until within the past two years have Plaintiffs had a reasonable basis for believing that OSU concealed or remained deliberately indifferent to the substantial risk that Dr. Strauss was sexually abusing them and other OSU male students.

120.    Plaintiffs had no reasonable way of knowing that OSU had actual knowledge that Dr. Strauss was sexually abusing male student-athletes and students in a clinical setting. Plaintiffs had no way of learning what and when OSU knew about Dr. Strauss and/or how OSU chose to permit continued sexual abuse by Dr. Strauss. Plaintiffs could not have exercised reasonable due diligence that would have revealed how OSU's acts and omissions caused Plaintiffs to suffer independent injuries from the injuries caused by Dr. Strauss.

121.    OSU had a deliberate indifference toward Dr. Strauss' conduct as student-athletes, students, and OSU staff reported and referred complaints about Dr. Strauss to various OSU employees throughout Dr. Strauss' career.

122.    At all relevant times in regard to this Complaint, and on information and belief, OSU staff and/or employees with authority to stop Dr. Strauss' access to patients, prevent Dr. Strauss from sexually abusing patients in a clinical setting, and/or implement other corrective measures as OSU had actual knowledge that there was a substantial likelihood that Strauss was sexually assaulting and abusing male student-athletes and male students. Moreover, OSU had actual knowledge that Dr. Strauss posed a substantial risk of sexual abuse as early as 1979.

123.    OSU employees in the Sports medicine program and the Athletics Department had actual knowledge that Dr. Strauss was conducting prolonged genital exams and that Dr. Strauss refused to allow athletic training staff to be present during such exams.

124.    OSU, through its own administrators, faculty, and staff, had actual notice of Dr. Strauss' sexual abuse of male student-athletes and students. Yet, OSU denied, dismissed, disregarded, minimized, refuted, silenced, and even concealed complaints about Dr. Strauss' sexual misconduct. Even though OSU had evidence that Dr. Strauss was a substantial risk to their male student-athletes and male students, OSU failed to act. On Plaintiffs information and belief, OSU willfully allowed Dr. Strauss to prey amongst its male student-athletes and male students, even though many high ranking officials such as Athletic Directors, Assistant Athletic Directors, Associate Athletic Directors, Head Team Physicians, Team Physicians, and Athletic Trainers could have taken action to prevent this systemic sexual abuse.

125.    Further, the nurses at Student Health Services made various complaints regarding Dr. Strauss. These complaints were that Dr. Strauss showed up unannounced to treat patients, performed prolonged examinations behind closed doors, and failed to chart and/or fill out medical records, which was and continues to be a standard medical practice in order to document a patients medical history and provide follow-up care.

126.    Plaintiffs believe this lack of medical documentation is troubling and OSU allowed Dr. Strauss to continue to disregard charting and/or filling out of important medical documentation. This lack of documentation allowed Dr. Strauss to misrepresent the nature of a patient's visit and/or allowed Dr. Strauss to deny whether he even examined the said patient.

127.    OSU failed to direct Strauss to stop showering and/or sharing a locker room with their male student-athletes, failed to direct a third person from the training staff to be present when

treating their male student-athletes, failed to properly investigate any of reports and/or rumors, and failed to have a meaningful sexual abuse policy for its students.

128.    Simply put, OSU failed its male student-athletes and male students from the years 1979-1998 as OSU had actual knowledge that their employee and faculty member, Dr. Strauss, was a sexual predator and OSU was deliberately indifferent to these facts.

129.    Additionally, OSU failed to address the sexual harassment in its athletic facility at Larkins Hall.

130.    Larkins Hall was home to many sports such as swimming, diving, gymnastics, fencing and wrestling.

131.    In Larkins Hall, the OSU Varsity Wrestlers were victims of a harassing environment that allowed OSU's faculty, staff, and students to voyeuristically leer and/or stare at these wrestlers as they showered or used the sauna facilities.

132.    Further, male on male sexual interactions were frequent in areas of Larkins Hall that were frequented by the OSU wrestling team. There were instances of male on male sexual encounters in the bathroom, the sauna, the private winding stairwell entrance to the wrestling room, the wrestling room, and the bathroom in the hallway outside of the wrestling room.

133.    The OSU Wrestling Coaches repeatedly tried to secure a separate shower facility for their wrestlers and/or move their wrestlers into a separate facility. Further, in approximately 1995, Plaintiff Knight and another teammate approached the Athletic Director with schematic drawings to separate the wrestlers into their own space. The OSU Athletic Director reported to the wrestlers that these plans would be too expensive. As a concession, the OSU Athletic Department cleaned the wrestling locker room carpets that week.

134. The wrestling coaches consistently asked for better accommodations as the Larkins Hall sexual harassment environment seriously impacted the psyche and morale of the OSU Wrestling Team. The coaches would even address the team as to this issue and continually informed the wrestlers that the coaching staff was doing everything the staff could do to remove the team from the sexual harassment.

135. Dr. Strauss was a part of the sexual harassment environment of Larkins Hall. Dr. Strauss took long showers with the wrestling team. During these showers, Dr. Strauss would voyeuristically stare at the wrestlers. After his shower, Dr. Strauss would enter the wrestling locker room and position himself to leer at the wrestlers as he patted himself dry. Additionally, he would use the sauna facilities with the wrestlers and voyeuristically watch them. Dr. Strauss' showering obsession was to the point that he would sometimes reduce his examination times to allow him to shower. Moreover, many wrestlers saw Dr. Strauss take more than one shower in a short amount of time, which allowed Dr. Strauss to voyeuristically gaze at his "favorite wrestlers."

136. OSU had actual knowledge that their Varsity Wrestling Team was being sexually harassed in Larkins Hall and OSU was deliberately indifferent to these facts. Even though OSU knew of Larkins Hall's sexually hostile environment, OSU took zero steps to protect their student-athletes.

137. OSU had actual knowledge that their employee and faculty member, Dr. Strauss, was showering and using the wrestling locker room as well as other male sports' locker rooms in Larkins Hall and OSU was deliberately indifferent to these facts.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION – VIOLATIONS OF TITLE IX 20 U.S.C. §1681(a), *et seq*.

### Heightened Risk Claim

138.    The Plaintiffs hereby incorporate by reference the allegations set forth and contained in paragraphs one (1) through one hundred and thirty-seven (137) as if fully written herein.

139.    Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1631(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...."

140.    Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment, including sexual assault, by school employees, students, and third parties.

141.    Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when either:

a.  the conduct is made as a term or condition of an individual's employment, education, living environment or participation in a University community.

b.  the acceptance or refusal of such conduct is used as the basis or a factor in decisions affecting an individual's employment, education, living environment, or participation in a University community.

c.  the conduct unreasonably impacts an individual's employment or academic performance or creates an intimidating, hostile or offensive environment for that individual's employment, education, living environment, or participation in a University community.

142.    At all relevant times contained herein, while OSU was acting under Title IX, OSU

subjected Plaintiffs to a deprivation of their rights, privileges, and immunities secured by the

Constitutions and laws of the United States and the State of Ohio.

143.    At all relevant times contained herein, OSU received federal financial assistance. As a

result, OSU is subject to Title IX. Pursuant to Title IX 20 U.S.C. §1681(a), *et seq.*, the OSU

owed Plaintiffs duties to act prudently and with reasonable care, and otherwise to promptly

investigate all allegations of sexual harassment, sexual assault, and sexual abuse regarding Dr.

Strauss as he was an OSU employee, faculty member, and Team Physician.

144.    OSU subjected the Plaintiffs to Dr. Strauss, who sexually molested, assaulted, abused,

and harassed the Plaintiffs. This included, but is not limited to, the following: fondling of the

their testicles, fondling of their penises, digitally penetrating their anuses, rubbing his genitals on

their bodies during an examination, voyeuristically staring at them while they showered, making

sexual comments toward them, calling them at their residences, inviting them to dinner, and

asking the Plaintiffs to take semi-nude photographs were all acts of sexual discrimination under

Title IX.

145.    OSU had actual knowledge of the consistent sexual molestation, assault, abuse, and

harassment.

146.    From approximately 1979-1998, male student-athletes, male students, and coaches

conveyed complaints and concerns regarding Dr. Strauss' inappropriate sexual conduct to OSU

administrators.

147.    OSU willfully allowed Dr. Strauss to prey amongst its male student-athletes and male

students, even though many high-ranking officials such as Athletic Directors, Assistant Athletic

Directors, Associate Athletic Directors, Head Team Physicians, Team Physicians, and Athletic Trainers could have acted to prevent this systemic sexual abuse.

148.    OSU failed to respond promptly and adequately to address the sexual misconduct of Dr. Strauss and to protect its male student-athletes and male students, which is a blatant violation of Title IX.

149.    OSU, through its acts and omissions, acted with deliberate indifference to the sexual molestation, assault, abuse, and harassment that the Plaintiffs as well as other male OSU students endured.  OSU failed to respond to the sexual misconduct of Dr. Strauss and their inaction was clearly unreasonable in light of the known circumstances.

150.    OSU's failure to promptly respond, investigate, and act to complaints and then remedy the situation created by their employee, faculty member, and Team Physician, Dr. Strauss, caused the Plaintiffs to experience further sexual molestation, assault, abuse, and harassment and/or made the Plaintiffs more vulnerable to it into the future.

151.    OSU's failure to promptly respond, investigate, and act concerning the complaints and then remedy the situation created by their employee, faculty member, and Team Physician, Dr. Strauss, created a sexually hostile environment that effectively denied Plaintiffs access to educational opportunities and benefits at OSU, including appropriate medical care.  OSU's deliberate indifference was so severe, pervasive, and objectively offensive that it deprived the Plaintiffs of access to the educational opportunities or benefits provided by OSU.

152.    As a direct and proximate cause of OSU's blatant violation of Title IX as well as the rights bestowed to Plaintiff's under Title IX, Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem,

and loss of enjoyment of life, which will continue into the future. Also, Plaintiffs were prevented from and continue to be prevented from obtaining the full enjoyment of life. Plaintiffs have sustained and continue to sustain loss of earnings and earning capacity. Finally, Plaintiffs have incurred various personal expenses.

## SECOND CAUSE OF ACTION – VIOLATIONS OF TITLE IX 20 U.S.C. §1681(a), *et seq.*

### Hostile Environment Claim

153.    The Plaintiffs hereby incorporate by reference the allegations set forth and contained in paragraphs one (1) through one hundred and fifty-two (152) as if fully written herein.

154.    At all times previously mentioned herein, Plaintiff wrestlers, trained mainly for their respective sport in Larkins Hall. As such, the Plaintiffs were entitled to use the athletic facilities at Larkins Hall free from sexual molestation, assault, abuse, and harassment.

155.    OSU owed the Plaintiffs a duty to investigate and remedy the conditions that made Larkins Hall a sexually hostile and abusive environment.

156.    OSU had actual knowledge of the hostile sexual environment at Larkins Hall. The Athletic Director, Assistant Athletic Directors, Associate Athletic Directors, and/or Building Supervisor had actual knowledge of the hostile environment and these individuals had the authority to take corrective action as individuals using the facility were required to be students, faculty, staff, and/or employees of OSU. Yet, these individuals failed any opportunity to rectify the hostile environment at Larkins Hall.

157.    Also, OSU was deliberately indifferent to this hostile environment even though OSU exercised substantial control. In fact, this environment was so severe, pervasive, and objectively offensive that it deprived the Plaintiffs of access to the educational opportunities and/or benefits provided by OSU.

32

158.    The hostile environment at Larkins Hall effectively barred the Plaintiffs from access to numerous educational opportunities and benefits, which include, but is not limited to, full use and enjoyment of the wrestling practice facilities, shower room, locker room, sauna, and all other Larkins Hall equipment and facilities.

159.    OSU violated Title IX by failing to remedy the sexually hostile and abusive environment in Larkins Hall.

160.    As a direct and proximate cause of OSU's violation of the Plaintiffs rights under Title IX, the Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame humiliation, loss of self-esteem, and loss of enjoyment of life.

161.    As a direct and proximate cause of OSU's violation of Plaintiffs rights under Title IX, the Plaintiffs were prevented and continue to be prevented from obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity, and incurred various personal expenses.

## THIRD CAUSE OF ACTION – VIOLATIONS OF TITLE IX 20 U.S.C. §1681(a), *et seq.*
### Unlawful Retaliation Claim

162.    The Plaintiffs hereby incorporate by reference the allegations set forth and contained in paragraphs one (1) through one hundred and sixty-one (161) as if fully written herein.

163.    Retaliatory conduct is within the broad prohibition of discrimination made unlawful by Title IX.

164.    Plaintiffs stated that they engaged in the protective activity of reporting and disclosing the rampant sexual molestation, assault, abuse, and harassment that occurred from the years

33

1979-1998 at OSU by OSU employee, faculty member, and Team Physician, Dr. Strauss. Also, the Plaintiffs exposed the sexually hostile environment that existed at Larkins Hall.

165.     OSU had knowledge of the Plaintiffs reports and disclosures of the rampant sexual molestation, assault, abuse, and harassment to the extent that OSU hired an independent law firm, Perkins Coie L.L.P., to investigate the Plaintiffs allegations.

166.     OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU recklessly, willfully, intentionally, and/or deliberately tried to disparage the Plaintiffs and/or silence their voices so the Plaintiffs reports and disclosures of the rampant sexual molestation, assault, abuse, and harassment regarding OSU would not come to light.

167.     In July 2018, one current OSU employee gave a public interview on Columbus radio station QFM 96.3. During his interview, the OSU employee tried to paint a derogatory picture of the Plaintiffs and similarly situated Plaintiffs as he stated that the reports concerning Dr. Strauss and OSU were basically a money grab. Also, the OSU employee pointed out that OSU would not simply lay down the way Michigan State had done.

168.     In the summer of 2018, OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU emailed, texted, and/or called the Plaintiffs and similarly situated Plaintiffs in order to get the Plaintiffs and similarly situated Plaintiffs to not reveal their individual stories and/or silence them.

169.     Further, OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU emailed, texted, and/or called the Plaintiffs and similarly situated Plaintiffs in order to assess the extent of the damage that Defendant OSU could face in a possible lawsuit.

170.     On information and belief, OSU has not taken disciplinary action against these OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU that

emailed, texted, and/or called the Plaintiffs and similarly situated Plaintiffs. As such, OSU has ratified these individuals' actions and independently violated Title IX.

171.    As a direct and proximate result of OSU's retaliation, the Plaintiffs have suffered and continued to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame humiliation, loss of self-esteem, and loss of enjoyment of life.

172.    As a direct and proximate cause of OSU's violation of Plaintiffs rights under Title IX, the Plaintiffs were prevented and continue to be prevented from obtaining the full enjoyment of life, and have sustained and continue to sustain loss of earnings and earning capacity, and incurred various personal expenses.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully requests that this Honorable Court:

a.      Enter judgment in favor of Plaintiffs on their first, second, and third causes of action under Title IX 20 U.S.C. §1681(a), *et seq*. against Defendant The Ohio State University;

b.      Declare Defendant The Ohio State University's conduct in violation of Title IX of the Education Amendments of 1972;

c.      Award Plaintiffs compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiffs' medical and other expenses incurred as a consequence of the sexual abuse and/or harassment and The Ohio State University's deliberate indifference; damages for deprivation of equal access to the educational opportunities and benefits provided by The Ohio State University; and damages for past, present, and future emotional pain and suffering, ongoing mental anguish, loss of past, present and future enjoyment of life, and loss of future earnings and earning capacity;

d.      Award Plaintiffs pre-judgment and post-judgment interest;

e.      Award Plaintiffs their court costs and expenses, including attorney's fees,

pursuant to 42 U.S.C. § 1988 (b); and

f.      Grant such other relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues in the above mentioned Complaint.


Respectfully Submitted,


J.C. Ratliff (#0027898)
Attorney for Plaintiffs
200 West Center Street
Marion, Ohio 43302
Telephone:  740/383-6023
Fax:  740/383-2066
Email:  attorney.ratliff@gmail.com