**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| NICHOLAS NUTTER, | : | CIVIL CASE NUMBER 2:19-cv-02462 |
| DUNYASHA YETTS, ERIC SMITH, | : | |
| ADAM DISABATO, MARK COLEMAN, | : | |
| WILLIAM KNIGHT, JACK CAHILL, | : | JUDGE MICHAEL H. WATSON |
| MICHAEL RODRIGUEZ, | : | |
| SCOTT OVERHOLT, ELMER LONG, | : | |
| RYAN HENRY, MICHAEL GLANE, | : | **JURY TRIAL DEMANDED** |
| CHRISTOPHER PERKINS, | : | |
| MICHAEL CALDWELL, TOM ROEHLIG, | : | |
| BRIAN ROSKOVICH, | : | |
| MATTHEW DALGLEISH, RICK MONGE, | : | |
| THOMAS LISY, VINCENT DISABATO, | : | |
| ANASTACIO TITO VAZQUEZ, JR., | : | |
| JOHN MACDONALD, JR. | : | |
| MAROON MONDALEK, | : | |
| LEO DISABATO, PETER NATHANSON, | : | |
| JEFFREY LADROW, | : | |
| ANTHONY SENTIERI, and | : | |
| JOHN DOES 1-19 | : | |
| | : | |
| PLAINTIFFS, | : | |
| | : | |
| -VS- | : | |
| | : | |
| THE OHIO STATE UNIVERSITY | : | |
| | : | |
| DEFENDANT. | : | |

---

**AMENDED COMPLAINT**

Now comes the Plaintiffs, Nicholas Nutter, Dunyasha Yetts, Eric Smith, Adam DiSabato,

Mark Coleman, William Knight, Jack Cahill, Michael Rodriguez, Scott Overholt, Elmer Long,

Ryan Henry, Michael Glane, Christopher Perkins, Michael Caldwell, Tom Roehlig, Brian

Roskovich, Matthew Dalgleish, Rick Monge, Thomas Lisy, Vincent DiSabato, Anastacio Tito

Vazquez, Jr., John MacDonald, Jr., Maroon Mondalek, Leo DiSabato, Peter Nathanson, Jeffrey

1

Ladrow, Anthony Sentieri, and John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 7, John Doe 8, John Doe 9, John Doe 10, John Doe 11, John Doe 12, John Doe 13, John Doe 14, John Doe 15, John Doe 16, John Doe 17, John Doe 18, and John Doe 19 by and through Counsel, and state and aver as follows for their Amended Complaint against the Defendant The Ohio State University:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1334 as the claims are matters in controversy that arise under the laws of the United States of America.  Specifically, the claims are asserted under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq* and the Civil Rights Act, 42 U.S.C. § 1983, *et seq*.

2.      Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b) as the events giving rise to the Plaintiffs' claims occurred within this Court's district.

## PRELIMINARY STATEMENT

3.      This is a civil rights lawsuit being brought by former students of The Ohio State University ("OSU") that are among the estimated 1,500 to 2,500 male students that were sexually assaulted, abused, molested, and/or harassed by their OSU Physician and Athletic Team Doctor, Dr. Richard Strauss, M.D.

4.      At OSU, Dr. Strauss was an employee, tenured faculty member, and the Associate Director of OSU's sports medicine program.  He served as a physician in both the athletic department and the OSU student health center.

5.      Dr. Strauss' OSU career spanned over nineteen (19) years from approximately 1979 through 1998.  Throughout his approximate nineteen (19) years at OSU as both a physician in the athletic department and in the student health center, Dr. Strauss used his position of trust and

confidence as a physician to sexually molest, sexually assault, sexually abuse, and/or sexually harass countless OSU male student-athletes and students.

6.      The Plaintiffs consented to receiving medical treatment from Dr. Strauss while student-athletes and students at OSU.  However, these student-athletes and students never consented to Dr. Strauss' sexual molestation, sexual assault, sexual abuse, and/or sexual harassment as Dr. Strauss frequently went beyond the stated medical purpose of their examinations, and their examinations often were not consistent with the standard of care for medical examinations.

7.      Dr. Strauss was designated the team physician for many sports centered out of Larkins Hall, including men's wrestling.  As such, student-athlete wrestlers were susceptible to Dr. Strauss if they wanted to receive medical treatment.

8.      Larkins Hall was home to the OSU Varsity Wrestling Team as their practice facility.  The wrestling locker room was located on the main floor, inside the general men's locker room.  The wrestling locker room had a separate locked area with lockers located around the outside walls of the room.  Also, the wrestlers shared a shower area, toilet area, and sauna area with the general OSU population that included students, employees, faculty members, and staff of OSU.  Further, the wrestlers would walk across a hallway to access their training room which was located on the main floor of Larkins Hall.  This training area had approximately six (6) training tables, approximately two whirlpools, and a private office area where the wrestlers would meet with Dr. Strauss.  Further, most wrestlers accessed the wrestling room by walking up a private spiral staircase located at the end of the hallway that separated the locker room and training room.  This spiral staircase ascended to the third floor wrestling room.

9.      After wrestling practice, the wrestlers would shower in the first floor general shower area.  Here, wrestlers were often harassed not only by Dr. Strauss, but also by numerous

students, employees, faculty members, and/or staff.  These individuals harassed the wrestlers by leering and/or voyeuristically staring at the wrestlers while they showered.  These individuals sometimes would shower with the wrestlers, stare at the wrestlers, and excessively lather their genital area.  Moreover, some of these individuals became erect in the shower area and even masturbated while in the shower area.  Also, some individuals voyeuristically stared at the wrestlers from inside a bathroom stall by looking through a crack in the door or by voyeuristically looking over the bathroom stall door.

10.     The OSU wrestlers would frequently use the sauna facilities at Larkins Hall, which was part of the general men's locker room.  While using the sauna facilities, Dr. Strauss and other students, employees, faculty members, and/or staff would voyeuristically watch the wrestlers.

11.     In the locker room, shower area, toilet area, and/or sauna facilities, wrestlers were solicited for dates and sexual encounters.

12.     Members of the OSU wrestling team and OSU coaching staff consistently discovered male on male sexual encounters in the locker room, bathroom, sauna facilities, spiral staircase, and wrestling room.

13.     Further, each wrestler had to participate in a pre-season physical before the wrestler was cleared to participate in their sport.  Many times, these pre-season physicals were held in the training room at the Woody Hayes Athletic Center.  During the pre-season physicals, wrestlers would participate in a number of stations that included a station for blood pressure, a station to check their reflexes, a station to make a mouthpiece, etc.  The final station would be a hernia examination with Dr. Strauss.

14.    As students progressed through the stations, the hernia station always took the longest. Here, Dr. Strauss would excessively fondle and inspect the genitals and anuses of wrestlers. These exams lasted approximately five (5) minutes to fifteen (15) minutes.

15.    Dr. Strauss would give explanations for the prolonged need for his medical exams. Frequently, Dr. Strauss would tell wrestlers that he was just being thorough, needed to check their lymph nodes, needed to check for STDs, and/or that he was checking for testicular cancer.

16.    Typically for a pre-season physical, Dr. Strauss would ask the wrestler to enter the room. Dr. Strauss would shut the door and ask the wrestler to undress. Dr. Strauss would exam the wrestler from his shoulders to his groin area. Dr. Strauss would closely look at the wrestler's skin, lifting the wrestler's arms and running his hands down the wrestler's chest. Then, Dr. Strauss would grab a stool on wheels and roll up to the wrestlers groin area so the wrestler's penis was at the height of Dr. Strauss' facial area. Sometimes, Dr. Strauss would turn off the lights and would use a purplish light headlamp to examine the wrestler. Either way, Dr. Strauss' face was close enough that the wrestler could feel his breath on his penis and testicles. Typically, Dr. Strauss would hold the wrestler's testicles in his left hand and he gently massaged the wrestler's testicles. With his right hand, Dr. Strauss would hold the wrestler's penis and move the wrestler's penis in different directions so as to appear to be examining the shaft of the wrestler's penis. Dr. Strauss would continue this examination with the wrestler for approximately five (5) minutes to fifteen (15) minutes. Once completed, occasionally, Dr. Strauss would ask the wrestler to turn around. Dr. Strauss would instruct the wrestler to put his hands on his buttocks and spread the wrestler's buttocks. Then, Dr. Strauss would instruct the wrestler to cough. During this anus examination, Dr. Strauss would still be on his stool with the

wrestler's buttocks approximately one (1) foot from Dr. Strauss' face. Dr. Strauss failed to use examination gloves during the pre-season physicals.

17.      In April 2018, OSU authorized an independent investigation into whether Strauss had sexually abused students-athletes, and if so, the extent to which OSU knew about Strauss' conduct. The law firm of Perkins Coile, LLP conducted approximately a yearlong independent investigation that interviewed over five hundred (500) individuals with a cost to OSU of over six (6) million dollars. On May 15, 2019 Perkins Coie, LLP issued a report with findings from its independent investigation into Struass' acts of sexual abuse and the degree to which OSU knew of or permitted Strauss to abuse OSU students, titled, *Sexual Abuse Committed by Dr. Richard Strauss at the Ohio State University*, issued on May 15, 2019. This report substantiated many of the facts that are pled in this Complaint and the previous Consolidated Complaints pending before this Court. The Perkins Coie report found that Dr. Strauss had sexually abused at least 177 male student-patients that he was charged with as a University Physician and that the University personnel had knowledge of Strauss' sexually abusive treatments of male student-patients as early at 1979, but that complaints and reports about Strauss' conduct were not elevated beyond the Athletics Department or Student Health until 1996.

18.      The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (known as the Clery Act) signed in 1990 is a federal statute codified at U.S.C.§ 1092 with implementing regulations in the U.S. Code of Federal Regulations at 34 C.F.R. 668.46. This federal statute requires U.S. colleges and universities participating in federal financial aid programs to maintain and disclose campus crime statistics and security information on or around their campuses. The Act is enforced by the U.S. Department of Education. As a result of the Clery Act, OSU has been required to file annual security reports since 1991. Even though OSU

6

Team Doctor and Employee Dr. Strauss had been sexually harassing and molesting OSU male athletes and male students since 1979, OSU never reported these sexual abuses till 2019 when OSU reported in 2018 that there were thirty (30) incidents of rape on campus by Dr. Strauss and nine hundred ninety two (992) incidents of fondling on the OSU campus by Dr. Strauss.

19.     The Clery Act also requires universities to send timely warnings to their university community when there are known risks to public safety on campus.  By October of each year, universities must publish and distribute their annual campus security report.  This report is required to provide crime statistics for the prior three years, policy statements regarding various safety and security measures, campus crime prevention program descriptions and procedures to be followed in the investigation and prosecution of alleged sex offenses.

20.     As categorized by the Perkins Coie Report issued on May 15, 2019, Strauss abused Plaintiffs and other OSU students in one or more of the following ways:

   a. In the context of a medical examination that caused the student to reach ejaculation or nearly ejaculation;

   b. In the context of a medical examination that caused the student to reach erection or near erection;

   c. Unnecessary fondling or groping of the genitals in the context of a medical examination, or medically unnecessary examinations of the genitals or rectum;

   d. Examination techniques that included: unnecessary nudity, excessive touching of non-genital/ non-rectal areas of the student's body; inappropriate verbal commentary or sexually charged questioning; lack of medical gloves for genital examinations; unnecessarily invasive physical positions; medical treatment outside of a clinical setting; and *quid pro quo* arrangements; and

e. Inappropriate and sexually abusive conduct outside of the examination room, including showering alongside student-patients, loitering in student athlete's locker rooms and engaging in voyeuristic behavior, and initiating fraternization with patients. (See Perkins Coie Report p. 40).

21. Even though the Perkins Coie Report released on May 15, 2019 reflects the significant number of OSU people in 2018 and 2019 who admitted to the investigators that they knew about Dr. Strauss' disgusting sexual tendencies, there are nonetheless many other OSU employees and agents who did not admit to knowing about Dr. Strauss due to memory lapses, death, mental disability, selective amnesia, or a failure to cooperate with the investigators of Perkins Coie for the fear of their own potential personal liability for failure to report or disclose the abusive or sexual misconduct by Dr. Strauss.

22. The Perkins Coie investigation and report disclosed that at least the following OSU officials received reports about Dr. Strauss. Two (2) OSU Athletic Directors, Two (2) OSU Head Team Physicians, Six (6) OSU Assistant Athletic Directors, Five (5) OSU Team Physicians, Twenty-Two (22) OSU Coaches, One (1) OSU Athletic Training Director, Four (4) OSU Athletic Trainers, Eighteen (18) OSU Student Trainers, Four (4) OSU Student Health Officials and , Three (3) OSU Student Health Employee. In addition, there was an unknown number of OSU personnel executives, lawyers, trustees, and/or OSU officials that were aware of the complaints against Strauss.

23. The name of the OSU officials that received reports or student complaints about the sexual conduct of Dr. Strauss include but are not limited to the following:

    a.    OSU Athletic Director, Jim Jones;

    b.    OSU Athletic Director and Assistant University Vice President, Andy Geiger;

c.      OSU Assistant Athletic Director Kate Riffee;

d.      OSU Head Medical Director and Head Team Physician Dr. John Lombardo;

e.      Assistant OSU Athletic Director Archie Griffith;

f.      Assistant OSU Athletic Director Larry Romanoff;

g       OSU Vice President David Williams;

h.      OSU Head Team Physician and Director of Sports Medicine Dr. Bob Murphy;

i.      Associate OSU Athletic Director Paul Krebs;

j.      OSU Student Health Director Dr. Forrest Smith;

k.      OSU Tennis Team Physician Trent Sickles;

l.      OSU Student Health Center Sports Medicine Clinic Director David Henderson;

m.      OSU Director of Athletic Training Bill Davis;

n.      OSU Director of Student Dr. Ted Grace;

o.      OSU Head Fencing Coach Charlotte Remenyik;

p.      OSU Head Wrestling Coach Russ Hellickson;

q.      OSU Head Assistant Wrestling Coach Jim Jordan;

r.      OSU Head Trainer Vince O'Brien;

s.      OSU Track and Field Coach Frank Zubovich;

t.      OSU Swimming Coach Dick Sloan;

u.      OSU Athletic Director Hugh Hindman;

v.      OSU Assistant Athletic Director Richard Delaney;

w.      OSU Co-Head Athletic Trainer Billy Hill

x.      OSU Athletic Academic Counselor James Hall

z.      OSU Head Basketball Trainer Mike Bordner.

9

24.     On May 17, 2019 OSU President Dr. Michael Drake and OSU Board of Trustees Chair Michael Gasser issued a letter to members of The Ohio State University that stated the findings of the independent investigation were shocking and painful to comprehend. The two OSU leaders offered their profound regret and sincere apologies to each person that endured Dr. Strauss' abuse, and for the OSU's fundamental failure at the time to prevent the abuse. They further stated that university personnel at the time had knowledge of complaints and concerns about Dr. Strauss' conduct, as early as 1979 but failed to investigate or act meaningfully. In addition, they stated that "On behalf of the university, we offer our profound regret and sincere apologizes to each person who endured Dr. Strauss' abuse and for our institution's fundamental failure at the time to prevent the abuse."

25.     Once the Perkins Coie Investigative report was released on May 15, 2019 and the letter from the OSU President Dr. Michael Drake and OSU Board of Trustees Chair Michael Gasser was released on May 17, 2019 which resulted in extensive nationwide media coverage, the Plaintiffs came to the following realizations:

   a.    Dr. Strauss' conduct during the physical and medical examinations was not medically necessary and was in fact sexual assault;

   b.    There was a tremendous magnitude and widespread scope of sexual abuse to OSU students by Dr. Strauss;

   c.    OSU had knowledge of Dr. Strauss' sexual abuse of male students for decades and chose to ignore this sexual abuse;

d.  OSU had received repeated and numerous complaints about Dr. Strauss and his

prolonged genital examinations and other disturbing sexual inclinations and proclivities but

OSU took no actions against him;

e.  OSU Athletic Directors Assistant, Assistant Athletic Directors, Coaches, Trainers,

Administrators, Physicians, Deans and other OSU employees all knew about the complaints

and reports made by OSU students and did nothing; and

f.  The plaintiffs were not the only ones sexually molested and sexually assaulted but many,

many other OSU students had been sexually assaulted, raped, sodomized, groped, fondled,

masturbated, digitally penetrated, and emotionally scarred between 1979-1998 due to OSU's

total and deliberate indifferences to the actions of Dr. Straus. As stated in the OSU Letter of

May 17, 2019 there was a "fundamental failure at the time to prevent the abuse"

26.  Plaintiff John Does 1-19 have filed anonymously in this action due to the highly personal

nature of the circumstances giving rise to their claims.

27.  Plaintiffs take no pleasure in bringing this lawsuit. OSU is an esteemed institution of the

higher learning and a large majority of the Plaintiffs continue to love OSU dearly and remain

devoted members of The Buckeye Nation. As such, Plaintiffs have an extremely difficult time

understanding how the state up north can fully acknowledge and compensate the victims/

survivors of sexual abuse, whereas a leading Big 10 institution such as OSU has struggled to do

so.

28.  Plaintiffs who were OSU athletes were honored to represent OSU in competitive NCAA

Division I athletics and did their best to continue the University's tradition of excellence.

29.     Plaintiffs honorably attended OSU expecting the University would provide them with a safe and supportive environment that would help them perform both academically and athletically.

30.     Plaintiffs believed that OSU Team Physicians like Dr. Strauss hold a special relationship of trust and confidence with their student-patients.  These physicians become even more important to a NCAA Division I athlete as student-athlete requires immediate treatment in order to compete in the rigors of their respective sport.

31.     Plaintiffs trusted OSU to act in their best interests when selecting, training, and supervising the team physicians on its faculty, which included the need to regularly and competently evaluate the quality of care and the integrity of the medical services that Dr. Strauss provided to OSU's students and athletes.

32.     Plaintiffs trusted that OSU personnel would not conceal, disclose, or disregard known circumstances that raised a substantial likelihood that Plaintiffs would be sexually molested, sexually assaulted, sexually abused, and/or sexually harassed by Dr. Strauss.  Likewise, the Plaintiffs trusted that OSU personnel would not conceal, disclose, or disregard known circumstances that raised a substantial likelihood that Plaintiffs would be sexually harassed and sexually abused at the athletic facility of Larkins Hall.

33.     However, instead of taking action to stop Dr. Strauss' sexual abuse, OSU not only turned a blind eye to his sexual abuse, but facilitated the abuse, and concealed the abuse.  OSU required its student-athletes to see Dr. Strauss for annual physicals and medical treatment in order to participate in university sports and maintain their athletic scholarships, even after student-athletes complained to their coaches about the ways Dr. Strauss touched them during medical

examinations. At least one coach threatened athletes with having to see Dr. Strauss if they did not listen to the coach.

34.    OSU administrators and employees of Student Health Services also facilitated and concealed Dr. Strauss' abuse. For example, after a student lodged a complaint detailing Dr. Strauss's inappropriate sexual touching and comments during an examination, the Director of Student Health Services legitimized the abuse and concealed the abuse by telling the student that no one had complained about Dr. Strauss before and that Dr. Strauss had said the examination was medically appropriate.

35.    At all times relevant to this complaint, OSU officials with the authority to institute corrective measures actively concealed, failed to disclose, and showed deliberate indifference towards circumstances that indicated Dr. Strauss was sexually abusing male student-athletes and students.

36.    At all times relevant to this complaint, OSU personnel failed to implement corrective measure despite having actual knowledge Dr. Strauss was sexually abusing students and Larkins Hall presented a sexually hostile environment to male student athletes.

37.    OSU officials knowingly, intentionally, and/or recklessly aided, abetted, and/or concealed Dr. Strauss' sexual predation on its student-athletes and students. OSU ignored complaints and disregarded commonly known information and improper and/or inappropriate practices used by Dr. Strauss over his nineteen (19) year career.

**PARTIES**

38.    The Plaintiffs hereby incorporate by reference the allegations set forth and contained in Paragraphs One (1) through Paragraphs Thirty-Seven (37) as if fully written herein.

39. Defendant The Ohio State University (hereinafter referenced as OSU) was at all relevant times contained herein and presently continues to be a public university organized and existing under the laws of the State of Ohio.

40. Defendant OSU received at all relevant times contained herein and presently continues to receive federal financial assistance, which subjects OSU to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq.* and the Civil Rights Act, 42 U.S.C. § 1983, *et seq.*

41. At all relevant times herein, Plaintiffs were enrolled at OSU as students during Dr. Strauss' employment with OSU.

## NICHOLAS NUTTER

42. Plaintiff Nicholas Nutter is a resident of Medina, Ohio. He is a 1992 graduate of Buckeye High School, where he was on the merit roll, a prom king, an All-Ohio Football middle linebacker, U.S. Junior National Champion in Freestyle and Greco-Roman, U.S. High School National Champion, a 1992 OHSAA State Champion, and a 1991 OHSAA State Runner-Up.

43. Plaintiff Nutter attended OSU from the years of 1992-1997, graduating with a Bachelor of Science degree in Sociology with a minor in Psychology in 1997. While at OSU, Plaintiff Nutter was a five (5) year scholarship member of the varsity wrestling team, earning NCAA All-American honors in 1996. He placed fifth (5th) in the Big Ten in 1996, was an Espoir National Champion in Greco-Roman and an Espoir National Runner-up in Freestyle. In 1997, Mr. Nutter placed fourth (4th) in the Big Ten and was a University National Champion in Greco-Roman as well as a Brazilian Vale Tudo World Champion.

44. Plaintiff Nutter believes that he was examined approximately twenty (20) times by Dr. Strauss for a physical injury and/or sickness and Dr. Strauss sexually assaulted him

approximately nineteen (19) times. During these sexual assaults, Dr. Strauss examined Plaintiff

Nutter's chest, groped his genitals, and masturbated or attempted to masturbate him. These

assaults occurred at the Woody Hayes Sports Complex, the Larkins Hall Training Room, as well

as Dr. Strauss' personal residence.

45.     In the fall of 1996, Plaintiff Nutter went to visit his father in a rural part of Ohio and

helped his father perform some work outside where Plaintiff Nutter was exposed to poison ivy.

Plaintiff Nutter urinated prior to washing his hands and approximately three (3) days later his

genital area was swollen and blistering from the poison ivy reaction. On a Friday night at

approximately 10:30 p.m., he called Dr. Strauss for medical treatment and Dr. Strauss insisted on

seeing Plaintiff Nutter immediately. Plaintiff Nutter asked if the two should meet in the training

room at Larkins Hall. However, Dr. Strauss insisted that he should come over to Dr. Strauss'

residence. Dr. Strauss suggested that he look at Plaintiff Nutter's outbreak of poison ivy and

Plaintiff Nutter started to remove his pants in Dr. Strauss' living room. Dr. Strauss suggested

that the two should go up the Dr. Strauss' bedroom to evaluate the outbreak of poison ivy.

Plaintiff Nutter followed Dr. Strauss to his bedroom, which was dimly lit by a few candles. Dr.

Strauss removed a clean white sheet from his closet and draped it onto his bed. Dr. Strauss asked

him to lay on the bed so Dr. Strauss could get a better view. Plaintiff Nutter pulled down his

pants to lay back on the bed and Dr. Strauss suggested that he should remove all his clothing

including his socks. As Plaintiff Nutter laid on the bed, he saw a bunch of black and white

photos of bare-chested males on Dr. Strauss' walls. Dr. Strauss went to his nightstand and

grabbed a battery powered flashlight. While using the flashlight, Dr. Strauss, without the use of

examination gloves, completed the most thorough genital exam that Plaintiff Nutter had ever

experienced. The examination seemed to last for hour, but in reality the examination probably

15

took about fifteen (15) minutes.  After the approximately fifteen (15) minute examination, Plaintiff Nutter was told that he had a severe reaction to poison ivy, which needed immediate medication.  He assumed that he would be receiving a medical prescription from Dr. Strauss. Instead, Dr. Strauss reached into his kitchen cabinet, removed a couple pill bottles, poured a few pills on the counter and started crushing the pills into dust.  Then, Dr. Strauss mixed the dust from the pills with some orange juice and told Plaintiff Nutter to drink the mixture in order to heal quicker.  He drank the mixed drink as prepared by Dr. Strauss, abruptly ended the conversation, left Dr. Strauss' residence, and ran to his car.

46.     Plaintiff Nutter states that Dr. Strauss showered in Larkins Hall with the wrestlers, would go into the sauna facilities with the wrestlers, and had a locker in the wrestling locker room. This locker arrangement allowed Dr. Strauss to voyeuristically watch the wrestlers.

47.     Plaintiff Nutter recalls that he had conversations with Head Wrestling Coach Russ Hellickson about the awkwardness of the exams.  Further, Plaintiff Nutter spoke with many of his teammates about Dr. Strauss' exams and they would "joke" about Dr. Strauss' exams to "get it off their chests."

48.     Plaintiff Nutter states that Dr. Strauss did not use medical gloves during any of his examinations.

49.     Dr. Strauss offered to buy lunch and dinner for Plaintiff Nutter on multiple occasions and he accepted some of these offers.

50.     Plaintiff Nutter was aware of teammates that proposed ideas to the OSU Athletic Department and OSU Athletic Director Andy Geiger to reduce the voyeurism and sexual leering that the wrestlers suffered in Larkins Hall.

## **DUNYASHA YETTS**

51.     Plaintiff Dunyasha Yetts is from Steubenville, Ohio.  He graduated from Steubenville

High School in 1989, where Plaintiff Yetts was a two-time OHSAA State Champion.

52.     Plaintiff Yetts attended OSU from the years 1992-1994, was a scholarship member of

Varsity Wrestling Team and graduated with a Bachelor of Science Degree in Education in 1994.

Also, in 1994, Plaintiff Yetts was the OSU wrestling team captain, a Big Ten champion, and

earned NCAA All-American honors by placing third (3rd) at the NCAA Wrestling

Championships.

53.     Plaintiff Yetts was examined by Dr. Strauss on at least eight (8) occasions and was

sexually assaulted on each occasion.  Dr. Strauss masturbated or attempted to masturbate

Plaintiff Yetts on several occasions even when his chief complaint was a knee or thumb injury.

Moreover, on Plaintiff Yetts' first physical, Dr. Strauss performed an extensive rectal examine

and digitally penetrated Plaintiff Yetts' anus.  Also, Dr. Strauss failed to use any type of latex

gloves during any of said exams. Plaintiff Yetts was typically examined in Larkins Hall Training

room.

54.     Plaintiff Yetts complained directly to Head Wrestling Coach Russ Hellickson and Head

Assistant Wrestling Coach Jim Jordan about the abuse he received by Dr. Strauss during his first

physical.  After receiving Plaintiff Yetts' complaint regarding Dr. Strauss, Head Wrestling

Coach Russ Hellickson and Head Assistant Wrestling Coach Jim Jordan took Plaintiff Yetts into

the Larkins Hall Training Room and confronted Dr. Strauss.  Eventually, Plaintiff Yetts was

asked to wait outside the Training Room Office door as Head Wrestling Coach Russ Hellickson

and Head Assistant Wrestling Coach Jim Jordan continued to confront Dr. Strauss about Plaintiff

Yetts' physical.  While outside the door, Plaintiff Yetts could hear Head Wrestling Coach Russ

Hellickson yelling at Dr. Strauss about the mistreatment of Plaintiff Yetts as well as other wrestlers. Head Wrestling Coach Russ Hellickson stated to Dr. Strauss that he was being too "hands on" with the wrestlers. Dr. Strauss replied to Head Coach Russ Hellickson that he was just being thorough.

55. Plaintiff Yetts also spoke to Head Wrestling Coach Russ Hellickson and Head Assistant Wrestling Coach Jim Jordan on many occasions about Dr. Strauss' actions and the sexual deviancy occurring in Larkins Hall.

56. Plaintiff Yetts states that in 1993, Head Wrestling Coach Russ Hellickson and Assistant Wrestling Coach Jim Jordan addressed the team in a team meeting before practice in the Wrestling Room at Larkins Hall. During the meeting, Head Wrestling Coach Russ Hellickson told the team that the OSU Athletic Department was putting the wrestlers on notice that the wrestlers were not to yell, scream, touch, and/or fight any of the individuals in Larkins Hall or Dr. Strauss, even in light of their sexually deviant behaviors. In fact, Head Coach Russ Hellickson stated that the OSU Athletic Department would remove any wrestler from the wrestling team as well as the University that addressed this sexually deviant behavior. This would include the loss of any scholarship money the wrestler was receiving as well as the wrestler's inability to get an athletic release from the OSU Athletic Department to go to any other institution to participate in the sport of wrestling. At this meeting, several athletes including OSU Wrestling Captain Kevin Randleman and Plaintiff Yetts, spoke out against this Athletic Department announcement by Head Coach Russ Hellickson. These athletes asked Head Wrestling Coach Russ Hellickson, "Well who is protecting us?"

57. In 1994, after winning the Big Ten title, Plaintiff Yetts received a letter from Associate OSU Athletic Director Archie Griffin. Plaintiff Yetts went to the OSU Athletic Department to

18

thank Associate OSU Athletic Director Griffin for his letter.  While at the OSU Athletic Department Office, he spoke to Associate OSU Athletic Director Archie Griffin and an Attorney representing the OSU Athletic Department.  Plaintiff Yetts, as a Senior Captain, was worried about leaving the younger wrestlers in the sexual deviant environment of Larkins Hall. Moreover, at the same meeting, Plaintiff Yetts addressed his concerns about Dr. Strauss' examinations as well as his grooming of the younger athletes.  Associate OSU Athletic Director Archie Griffin and an Attorney representing the OSU Athletic Department were made aware by Plaintiff Yetts that Dr. Strauss was asking wrestlers to lunch and dinner, was asking to help start modeling careers for wrestlers and was taking their photographs for their potential modeling careers, as well as  inviting and meeting with wrestlers at his personal residence.

58.     Plaintiff Yetts states that Dr. Strauss and other men would shower in Larkins Hall with the wrestlers.  These individuals would excessively lather their genitals and touch their genitals in front of the wrestlers.

59.     Plaintiff Yetts states that Dr. Strauss would go into the sauna area in Larkin's hall with the wrestlers with only a towel.  Dr. Strauss would sit and position himself with his legs open in order to expose his genitals to the wrestlers that were using the sauna to rehabilitate and/or lose weight.

60.     Plaintiff Yetts states that he received Creatine as well as "Animal Juice" from and/or at the direction of Dr. Strauss.  These substances were given to Plaintiff Yetts without Plaintiff Yetts being counseled as to the side effects and/or potential problems that these drugs posed to his physical health and future health.

## ERIC SMITH

61.     Plaintiff Eric Smith is a resident of Tampa, Florida.  He graduated from Wayne High School in Huber Heights, Ohio in 1991.  While in high school, Plaintiff Smith was an OHSAA third place finisher, Freestyle State Champion and three-time (3x) Freestyle State Placer.

62.     Plaintiff Smith attended OSU from the years 1991-1996, graduating with a degree in Business Risk Management in 1996.  While competing for OSU, he earned a scholarship and All-American honors in 1995 and 1996.  Also, he was a two-time (2x) OSU Wrestling Team Captain.

63.     Plaintiff Smith states that he was seen between thirty (30) and forty (40) times by Dr. Strauss.  Further, he believes that Dr. Strauss sexually assaulted him approximately ten (10) to twenty (20) times.  He states that when getting a physical, Dr. Strauss would play with the shaft of his penis by continuously moving it around as if he wanted him to get aroused in order to masturbate him.  Mr. Smith believes that Dr. Strauss sexually abused him to the point where he reached a near erection approximately ten (10) times.  Dr. Strauss performed one (1) unnecessary rectal exam on him and digitally penetrated his anus.

64.     Plaintiff Smith states that Dr. Strauss never wore medical gloves during any of his examinations.

65.     Plaintiff Smith states that the wrestlers constantly talked about Dr. Strauss' exams in the locker room with Head Wrestling Coach Russ Hellickson and Head Wrestling Assistant Coach Jim Jordan present.

66.     Plaintiff Smith states that Dr. Strauss would shower with the team in the Larkins Hall shower area, even though Dr. Strauss did not workout with the team.  During this time, Dr. Strauss would be voyeuristically watching the wrestlers.

67.     Plaintiff Smith states that men would masturbate to the sight of wrestlers showering, while these men were in the toilet area of Larkins Hall.  Also, the wrestlers would almost have to fight to defend themselves from the sexual deviant men watching the wrestlers in the shower area of Larkins Hall.

68.     Plaintiff Smith states other men would masturbate to the sight of the wrestlers in the sauna while the wrestlers were attempting to use the sauna facilities to rehabilitate and/or lose weight.  Further, Plaintiff Smith states there were occasions when the OSU Wrestling Coaches were with their wrestlers in the sauna when this sexual deviant behavior occurred.

69.     Plaintiff Smith states that wrestlers caught two men having sex in the OSU Wrestling Room at Larkins Hall before wrestling practice.

70.     Plaintiff Smith states that he received Creatine as well as "Animal Juice" from and/or at the direction of Dr. Strauss.  These substances were given to Plaintiff Smith without him being counseled as to the side effects and/or potential problems these drugs posed to his physical health and future health.

## ADAM DISABATO

71.     Plaintiff Adam DiSabato is a resident of Columbus, Ohio.  He graduated from Bishop Ready High School in Columbus, Ohio in 1988.  While in high school, Mr. DiSabato was a four-time (4x) OHSAA State Placer, two-time (2x) OHSAA State Champion, and High School All-American.

72.     Plaintiff DiSabato attended OSU from the years 1988-1993 and graduated with a Bachelor of Arts Degree in Recreational Education.  While at OSU, Plaintiff DiSabato was a scholarship wrestler, a three-time (3x) All-American, four-time Big Ten Placer, four-time NCAA National Qualifier, three-time (3x) Team Captain, two-time University National Champion in

Freestyle, 1995 Pan American Runner-up, and three-time (3x) Olympic Trials Qualifier.  Also, he was an Assistant Wrestling Coach at the University of Illinois and Ohio University.

73.     Plaintiff DiSabato was examined by Dr. Strauss approximately forty (40) times. Moreover, he was sexually assaulted by Dr. Strauss approximately twelve (12) times.  He states that Dr. Strauss fondled his genitals during his examinations and Dr. Strauss would have his face near his genital area.  A few times, Plaintiff DiSabato would ask Dr. Strauss, "what are you looking for?"  Dr. Strauss was visibly shocked that he asked this question and abruptly ended his examination.  During several of his visits Dr. Strauss manipulated Plaintiff DiSabato to the point of near erection and attempted to masturbate Plaintiff DiSabato on approximately four (4) different occasions.

74.     Plaintiff DiSabato remembers standing in line during his freshman year for his physical and the upper classmen committing about the fact that Dr. Strauss was gay and that he liked to play with an athlete's testicles and rub his penis.

75.     Plaintiff DiSabato remembers receiving stitches around his eye.  While he was receiving the stitches from Dr. Strauss, Dr. Strauss was maintaining an erection and rubbing his clothed penis against him.  Plaintiff DiSabato states that one of the student trainers witnessed this occurrence.

76.     Plaintiff DiSabato remembers that in approximately the fall of 1992, during pre-season physicals, Dr. Strauss was one of two doctors from OSU that were examining individuals for their yearly sports physical.  Dr. Strauss was taking longer than his colleague.  The other doctor started to examine the athletes that had been in line to see Dr. Strauss.  Dr. Strauss stormed out of the examination room and was visibly upset that the athletes in his line waiting to be examined had diminished.

77.    Plaintiff DiSabato states that Larkins Hall was filled with male predators that would make their way into the showers to stare at the wrestler.  These men would stare at the wrestlers while they showered or went into the sauna. Some of these men would have an erect penis and masturbate while looking at the OSU wrestlers.

78.    Plaintiff DiSabato states that Strauss was always one of the first men in the showers at Larkins Hall and one of the last ones out of the showers.  Dr. Strauss would excessively lather his groin area with soap while watching the wrestlers take showers.

79.    Plaintiff DiSabato would receive telephone calls in his dorm room from men that would ask to lick his toes and would pant on the other end of the phone.  Plaintiff DiSabato states that these male predators had to be receiving his telephone number from the OSU Directory.

80.    Plaintiff DiSabato remembers OSU Head Wrestling Coach Russ Hellickson and OSU Head Assistant Wrestling Coach Jim Jordan telling Plaintiff DiSabato and the other wrestlers that they were trying to get the wrestling team moved out of Larkins Hall.  The OSU Coaches told the wrestlers to keep their mouths shut, do not touch anyone in Larkins Hall, and be happy about where the wrestlers were.

81.    Plaintiff DiSabato states that he received powder Ephedrine from Dr. Strauss and was instructed by Dr. Strauss to mix the powder ephedrine with coffee and aspirin to help him cut weight.  According to Dr. Strauss, this "stack" would allow his body to continually burn calories in order to make weight.  After Plaintiff DiSabato made weight, Dr. Strauss would occasionally inject him with an unknown substance to make him feel better and in order to help him perform better on the mat.  Further, Plaintiff DiSabato was given Clenbuterol by Dr. Strauss to help his performance as a wrestler at OSU.  These substances were given to Plaintiff DiSabato without

him being counseled as to the side effects and/or potential problems these drugs posed to his physical health and future health.

## MARK COLEMAN

82.     Plaintiff Mark Coleman is a resident of Galloway, Ohio.  He graduated from Fremont St. Joseph Central Catholic High School in 1983.  While in high school, Mr. Coleman was a two-time OHSAA State Champion, a State Runner-up, an All-Ohio football middle linebacker, and a merit roll recipient.

83.     Plaintiff Coleman attended OSU from the years 1986-1988, graduating with a Bachelor of Science degree in Recreational Education in 1988.  Also, he was an OSU Assistant Wrestling Coach from 1989-1993.  While competing for OSU, he was a scholarship wrestler and 1988 NCAA National Champion.  Further, he was a Pan American Champion in 1990, 1991, and 1992, a Runner-Up at the 1991 FILA Wrestling World Championships and a 1992 U.S. Olympian.  Additionally, Plaintiff was the UFC 10 and UFC 11 Tournament Champion, the first UFC Heavyweight Champion, the Pride Fighting Championships 2000 Open Weight Grand Prix Champion, and a UFC Hall of Fame Member.

84.     Plaintiff Coleman was examined by Dr. Strauss approximately fifty (50) times and was sexually assaulted by Dr. Strauss on approximately thirty (30) occasions.  Dr. Strauss would unnecessarily examine his penis, while holding his testicles in his other hand.  Moreover, Plaintiff Coleman believes he was sexually abused to the point of near erection on approximately three (3) occasions as Dr. Strauss attempted to masturbate him.  Also, he believes Dr. Strauss was overly fascinated with his upper body. Finally, Plaintiff Coleman received one rectal examination in which Dr. Strauss digitally penetrated his anus.

85.     Plaintiff Coleman believes that he was vocal about the sexually deviant behavior at Larkins Hall.  He voiced his concerns and displeasure many times to the male predators that were masturbating while looking at him in the showers.  On one occasion, Plaintiff Coleman confronted a male predator for masturbating in the shower and the male predator stated that he was going to get his gun and shoot Plaintiff Coleman.

86.     Plaintiff Coleman states that he caught males having sex in the spiral staircase that led to the OSU wrestling room and in the bathroom directly outside the wrestling room.

## WILLIAM KNIGHT

87.     Plaintiff William Knight is a resident of Cleveland, Ohio.  He graduated from Shaker Heights High School in 1991.  While in high school, Mr. Knight was a wrestling team captain and the President of the Minority Achievement Committee.

88.     Plaintiff Knight attended OSU from the years of 1991 to 1996, graduating with a Bachelor of Arts Degree in Humanities in 1996.  He was a five (5) year varsity wrestler, placing in the Big Ten twice.  In 1996, he finished third (3rd) in the Big Ten, making him an NCAA Qualifier.

89.     Plaintiff Knight was examined by Dr. Strauss over twenty (20) times and believes that he was sexually assaulted by Dr. Strauss over (20) times as well.  For example, during his sophomore year, he was seen by Dr. Strauss for infected tonsils.  Dr. Strauss began the examination by checking his neck area and ended the examination by manipulating his penis. Plaintiff Knight believes that Dr. Strauss manipulated his penis during several exams to a point that ended in him nearly reaching an erection in those exams.  Further, Plaintiff Knight states that Dr. Strauss attempted to masturbate him during three (3) physicals and/or examinations.

90.     Also, Plaintiff Knight states that in order to get the expensive type dry skin lotion, Dr. Strauss would insist on examining his entire body for dry skin.

91.     Plaintiff Knights states that the wrestlers were being stalked by male predators at Larkins Hall on a daily basis.  During one incident, Plaintiff Knight caught a male masturbating behind him in the sauna as he voyeuristically stared at Plaintiff Knight.

92.     Plaintiff Knight states that Dr. Strauss would shower in Larkins Hall and stare at the wrestlers frequently.  Also, Plaintiff Knight states that Dr. Strauss would stare at wrestlers in the locker room as he dried himself off with his towel.

93.     Plaintiff Knight states that Dr. Strauss would also go into the sauna in Larkins Hall nude and stare at the OSU wrestlers as they were using the sauna for therapy or to lose weight.

94.     In 1995, Plaintiff Knight and another teammate, Plaintiff John Doe 6, met with an OSU Athletic Director Andy Geiger to discuss the sexual harassment that the OSU Varsity Wrestling Team was receiving on a daily basis in Larkins Hall.  Further, Mr. Knight addressed these problems with the OSU coaching staff and believed the OSU coaching staff was trying to get the team moved out of Larkins Hall for the wrestlers safety.  Specifically, Plaintiff Knight would ask OSU Head Wrestling Coach Russ Hellickson, "when was he going to get Dr. Strauss out of the locker room?"

95.     For a long time, Mr. Knight believed that Dr. Strauss liked to look at the white wrestlers on the OSU wrestling team and feel up the black wrestlers on the team.

96.     Plaintiff Knight states that he received Creatine as well as "Animal Juice" from and/or at the direction of Dr. Strauss.  These substances were given to Plaintiff Knight without him being counseled as to the side effects and/or potential problems these drugs posed to his physical health and future health.

## JACK CAHILL

97. Plaintiff Jack Cahill is a resident of Columbus, Ohio. He graduated from Worthington Kilbourne High School in 1994. While in high school, Mr. Cahill was a multiple time scholar athlete, member of the Ohio National Team in wrestling, All-Ohio team in lacrosse, and featured as Channel 4 "athlete of the week."

98. Plaintiff Cahill attended OSU from the years of 1994-2000, graduating with a double major of Criminology and Sociology in 2000. Plaintiff Cahill competed at OSU in Varsity Lacrosse for one (1) year and Varsity Wrestling for four (4) years, becoming a Varsity Letterman in Wrestling.

99. Over his career, Plaintiff Cahill was examined by Dr. Strauss in excess of fifty (50) times. In all examinations, Plaintiff Cahill believes Dr. Strauss was inappropriate and sexually assaulted him by consistently requiring that he examine Plaintiff Cahill's lymph nodes. This lymph node examination would consist of an examination of Plaintiff Cahill's testicles, penis, and the surrounding area of his groin. These examinations would last approximately ten (10) minutes and Dr. Strauss would rarely wear any type of medical gloves.

100. Plaintiff Cahill states that for any injury that occurred, Dr. Strauss would insist on a lymph node exam, even for injuries such as a twisted ankle or a spot of ringworm.

101. Plaintiff Cahill states that for approximately ten (10) of his above-mentioned examinations, Dr. Strauss was manipulating his penis in an attempt to masturbate him.

102. On one occasion, as Plaintiff Cahill was leaving wrestling practice, Dr. Strauss stopped Plaintiff Cahill and asked if he had wrestled with a teammate who Mr. Cahill commonly practiced. When Plaintiff Cahill affirmatively answered that he had practiced with the teammate in question, Dr. Strauss stated that he needed to examine Plaintiff Cahill for crabs. Dr. Strauss

had him lie naked on an examination table in the dark for approximately fifteen (15) minutes, while Dr. Strauss examined his body using a pen light. Finally, Plaintiff Cahill exited the examination room over Dr. Strauss' disapproval. Plaintiff Cahill immediately confronted his teammate, who indicated that he did not have crabs. Consequently, Plaintiff Cahill went to confront Dr. Strauss, who in turn, told Plaintiff Cahill that Dr. Strauss must have been mistaken.

103.    Plaintiff Cahill was usually examined at the Larkins Hall Training Room during wrestling season and at the Woody Hayes Athletic Complex for yearly physicals and during lacrosse season.

104.    Plaintiff Cahill states that Dr. Strauss would constantly shower with the wrestling team. Plaintiff Cahill estimates that he conservatively took approximately two hundred (200) showers in the Larkins Hall shower area while Dr. Strauss voyeuristically looked at Plaintiff Cahill and the other OSU wrestlers.

105.    Plaintiff Cahill states that Dr. Strauss would often discuss his photography hobby. Dr. Strauss requested Plaintiff Cahill allow him to photograph Plaintiff Cahill at his personal residence. Even though he persistently asked, Plaintiff Cahill refused all of Dr. Strauss' requests.

106.    Dr. Strauss asked Plaintiff Cahill to lunch and/or dinner on several occasions. Plaintiff Cahill states that he accepted one invitation to Wendy's on High Street by Lane Avenue by the OSU campus. Although Plaintiff Cahill never again accepted Dr. Strauss' invitation, he would call and leave messages for Plaintiff Cahill for the next four (4) years.

## MICHAEL RODRIGUEZ

107.    Plaintiff Michael Rodriguez is a resident of Columbus, Ohio. He is a 1990 graduate of Revere High School in Richfield, Ohio, where he was a 1990 OHSAA State Runner-up.

108.     Plaintiff Rodriguez attended OSU and was on the OSU Varsity Wrestling Team from the years of 1990-1992, leaving OSU in the winter quarter of 1992. He received his Bachelor of Arts Degree in Communications from the University of Pittsburgh in 1996.

109.     Plaintiff Rodriguez was examined by Dr. Strauss between five (5) to ten (10) times and was sexually assaulted by Dr. Strauss on approximately five (5) different occasions.

110.     Plaintiff Rodriguez states that in the wrestling training room, Dr. Strauss performed routine hernia examinations that instead of lasting seconds, would last several minutes.  Dr. Strauss would sit on a stool and lower his head so Plaintiff Rodriguez's penis would be at Dr. Strauss' eye level.  Then, Dr. Strauss would poke, prod, and massage his penis and scrotum.  At any time, if Dr. Strauss was questioned, Dr. Strauss would medically explain what he was looking for.  Moreover, Dr. Strauss would talk about Plaintiff Rodriguez's glands or lumps that could develop on his testicles.  Dr. Strauss always explained to him that he was being thorough.

111.     Further, Plaintiff Rodriguez had a skin infection that would breakout on his forehead. Upon examination, Dr. Strauss would cup Plaintiff Rodriguez's face and Dr. Strauss would put his face uncomfortably close to Plaintiff Rodriguez's face so that they were basically nose to nose.  Dr. Strauss would bend his neck toward Plaintiff Rodriguez in a simulated "kiss type" motion during the examination.

112.     During the winter of 1992, Plaintiff Rodriguez contracted crabs and called Dr. Strauss for medicated shampoo.  Dr. Strauss asked Plaintiff. Rodriguez to come to his residence because he had some medicated shampoo to give to Plaintiff. Rodriguez.  Plaintiff Rodriguez went to Dr. Strauss' residence and entered his front room.  Dr. Strauss asked Plaintiff Rodriguez to show him the infected area.  Plaintiff Rodriguez pulled down his pants and Dr. Strauss proceeded to examine Plaintiff Rodriguez's groin area.  Dr. Strauss manipulated Plaintiff Rodriguez's penis

with his hand in a stroking motion that Plaintiff Rodriguez describes as a "hand job." After several minutes of Dr. Strauss manipulation, Plaintiff Rodriguez's penis became erect. Dr. Strauss continued to stroke his penis. Dr. Strauss' face was directly in front of his penis and Plaintiff Rodriquez was frozen with terror. Plaintiff Rodriguez thought about whether he was inviting the action by Dr. Strauss and began to worry that Dr. Strauss might start to perform oral sex upon him. Plaintiff Rodriguez had to lean back and pull his penis from the grasp of Dr. Strauss' hand. Looking down at the floor, Plaintiff Rodriguez asked Dr. Strauss for the medicated shampoo, which Dr. Strauss left the room to retrieve. As Dr. Strauss left the room, Plaintiff Rodriguez quickly pulled up his pants and stood by the door. When Dr. Strauss returned to the room, Plaintiff. Rodriquez asked for the shampoo. Dr. Strauss tossed him the bottle and he quickly left the residence.

113.    Shortly after Plaintiff Rodriguez was masturbated by Dr. Strauss at Dr. Strauss' residence, he stopped going to wrestling practice, class, and left OSU as well as the State of Ohio.

114.    Plaintiff Rodriguez states that Dr. Strauss would regularly shower in Larkins Hall with the OSU wrestling team, regardless of whether or not Dr. Strauss had "worked out." Further, Dr. Strauss would spend approximately a half an hour in the shower and be in there with several groups of wrestlers as they showered after practice. Dr. Strauss would stare at the wrestlers and excessively soap his genital area.

## **SCOTT OVERHOLT**

115.    Plaintiff Scott Overholt is a resident of Akron, Ohio. Mr. Overholt graduated from Walsh Jesuit High School in 1995, where he was a OHSAA State Champion, OHSAA State Runner-Up, and an All-American in Freestyle.

30

116.     Plaintiff Overholt attended OSU in the years 1995-1997.  He was a Varsity Letterman, scholarship athlete, and starter on the OSU Wrestling Team during the 1996-1997 season.

117.     Plaintiff Overholt was sexually assaulted by Dr. Strauss at the Woody Hayes Athletic Complex during his initial physical examination as an incoming Freshman for the 1995-1996 season at the Woody Hayes Athletic Complex.

118.     During this physical, Dr. Strauss closed the door and had Plaintiff Overholt undress.  Dr. Strauss positioned himself on a stool so that Dr. Strauss' face was directly in front of Plaintiff Overholt's genitals.  Dr. Strauss' cupped Plaintiff Overholt's testicles with one hand and stroked his penis with the other in an overhand manner several times before repositioning his penis straight up and looking closer as he moved his face very close to Plaintiff Overholt's penis.  Dr. Strauss continued this process for several minutes attempting to arouse him.  Plaintiff Overholt feels that this was a test to see if he enjoyed being touched.

119.     Plaintiff Overholt left the examine embarrassed and refused to see Dr. Strauss for any further examinations.

120.     Plaintiff Overholt's upper-class teammates told Plaintiff Overholt that Dr. Strauss was a homosexual and that Dr. Strauss would attempt to grope him during his physical.

121.     Plaintiff Overholt was also told by his upper-class teammates that Dr. Strauss would look for reasons to have a wrestler drop his pants and check his genitals.

122.     Plaintiff Overholt was told by the upper-classmen that Dr. Strauss would be showering at Larkins Hall with the team.

123.     Plaintiff Overholt states all the above was common knowledge amongst the OSU wrestlers and the OSU wrestling coaches.

124.    In 1996, Plaintiff Overholt remembers Head Wrestling Coach Russ Hellickson being very frustrated with Dr. Strauss in the shower area as Coach Hellickson told Dr. Strauss not to be looking at the OSU wrestlers.

125.    Plaintiff Overholt states that Dr. Strauss and many other male predators would be in the showers with the OSU wrestlers at Larkins Hall.  These male predators seemed to know when the OSU wrestling practices would end and would wait for the wrestlers to shower.  Often times, these male predators would have erections and spend a significant amount of time washing their genitals, basically masturbating while watching the wrestlers shower.

126.    Plaintiff Overholt states that Dr. Strauss was a regular in the Larkins Hall showers. Sometimes he would see Dr. Strauss showering before wrestling practice and then Dr. Strauss would shower a second time after wrestling practice.

127.    Further, Plaintiff Overholt states that Dr. Strauss would dry himself off while watching the wrestlers and continue to watch the wrestlers as Dr. Strauss applied lotion to himself.

128.    Plaintiff Overholt states that the sexual deviant environment was so bad, he stopped showering during his Sophomore year and would wait till he got home.  Even then, Plaintiff Overholt would still see these male predators in Larkins Hall after practice.

129.    Plaintiff Overholt states that the OSU Wrestling Coaches experienced the presence of these male predators as well.  Plaintiff Overholt remembers Plaintiff Coleman walking in and disrupting two men having sex in an upstairs bathroom at Larkins Hall that was right next to the OSU Wrestling Room.

130.    Plaintiff Overholt states that in 1996 he attended summer school and moved into a house with three (3) other wrestlers.  On several occasions, Dr. Strauss would appear on their caller ID.

If Plaintiff Overholt answered the phone, Dr. Strauss would hang up the phone. This led Plaintiff Overholt to believe that Dr. Strauss was calling for other wrestlers in the house.

## ELMER LONG

131. Plaintiff Elmer Long is a resident of Columbus, Ohio. Plaintiff Long graduated from Akron Butchel in 1992. While in high school, Mr. Long was a three (3) time City Wrestling Champion, two (2) time Sectional Wrestling Champion, three (3) time District Wrestling Qualifier, and academically achieved the Merit Roll Club.

132. Plaintiff Long attended OSU from the years 1992-1998, graduating with a Bachelor of Science Degree in Psychology in 1998. During 1993-1994, Plaintiff Long was an OSU Varsity Wrestling Letterman.

133. Plaintiff Long was examined by Dr. Strauss approximately four (4) times with Dr. Strauss sexually assaulting him on each occasion. Dr. Strauss would perform a hernia examination on Plaintiff Long. Dr. Strauss would hold Plaintiff Long's testicles with one hand and his penis with the other. Dr. Strauss would feel around his testicles for a period of time and manipulate Mr. Long's penis as Dr. Strauss positioned his face close to Plaintiff Long's penis. Plaintiff Long states that Dr. Strauss was attempting to arouse Plaintiff Long so he could masturbate him.

134. Further, Dr. Strauss would not wear any type of examination gloves and Dr. Strauss' examination always extended beyond Mr. Long's medical problems.

## RYAN HENRY

135. Plaintiff Ryan Henry is a resident of Cardwell, Montana. He graduated from Dayton High School in Dayton, Oregon in 1994. While in high school, his overall high school wrestling record was 136-2. He was a four (4x) time Oregon State Finalist, a two (2x) time Oregon State

Champ, Cadet National Runner-up, a fourth (4th) place finisher at Junior Nationals, and a two (2x) time third (3rd) place finisher at Espoir Nationals.

136.     Plaintiff Henry attended OSU from the years 1994-1995 and was a member of the OSU Varsity Wrestling Team.

137.     Plaintiff Henry was examined by Dr. Strauss on approximately seven (7) different occasions.  During all seven examinations, Plaintiff Henry was sexually assaulted by Dr. Strauss. During at least five (5) of these examinations, Dr. Strauss attempted to masturbate him.  Also, during at least three (3) of these examinations, Dr. Strauss performed a rectal examination on Plaintiff Henry and digitally penetrated Plaintiff Henry's anus.

138.     Plaintiff Henry's first interaction with Dr. Strauss occurred in the Woody Hayes Sports Complex.  During his first physical, Dr. Strauss started to perform a routine hernia examination on him.  Dr. Strauss then cupped his testicles and started to maneuver Plaintiff Henry's penis with his other hand.  Plaintiff Henry states that Dr. Strauss was manipulating his penis in an attempt to masturbate him as Plaintiff Henry reached near erection.  Moreover, Dr. Strauss told him to turn around and bend over.  Dr. Strauss told him to spread his buttocks apart with his hands.  Then, Dr. Strauss inserted his finger into Plaintiff Henry's anus and moved his finger around for what seemingly felt like several minutes.

139.     Moreover, during another examination, Dr. Strauss deemed it necessary to perform a lymph node examination of Plaintiff Henry's groin, even though his chief complaint was a bad cauliflower ear.

140.     During Plaintiff Henry's last examination, which was for strep throat, Dr. Strauss made him pull down his pants to examine his lymph nodes.  Plaintiff Henry objected, but Dr. Strauss told him if didn't allow him to perform an examination of his lymph nodes, Dr. Strauss would

not be able to give him any medications.  Since Plaintiff Henry had been sick for a number of

days, he allowed Dr. Strauss to perform the examination.  During the examination, Dr. Strauss

moved Plaintiff Henry's testicles around in his hand for approximately ten (10) minutes while all

the time keeping direct eye contact with Plaintiff Henry.

141.    Previously, Plaintiff Henry had told OSU Head Wrestling Coach Russ Hellickson that he

didn't want to see Dr. Strauss, but Plaintiff Henry was told by Coach Hellickson that he had too

because he was sick.  Also, Plaintiff Henry told OSU Head Trainer at Larkins Hall, Vince

O'Brien, that he didn't want to see Dr. Strauss, but he was the only doctor available.

142.    Plaintiff Henry states that Dr. Strauss showered with the wrestlers everyday in Larkins

Hall and does not believe Dr. Strauss ever missed a post wrestling practice shower with the

wrestlers.

## MICHAEL GLANE

143.    Plaintiff Mike Glane is a resident of Mt. Hood Parkdale, Oregon.  He graduated from

Grandville, Michigan in 1993 where he was a Scholar Athlete and State Champion in wrestling.

144.    Plaintiff Glane attended OSU from the years 1993-1998.  He received his Bachelor of

Arts and Science Degree in 1998 graduating with Cum Laude honors.  He also was a four-time

(4x) Academic All-American, four-time (4x) Academic All-Big Ten, and a Big Ten Medal of

Honor Nominee.

145.    Plaintiff Glane saw Dr. Strauss approximately twelve (12) times and was sexually abused

by Dr. Strauss every time.  Plaintiff Glane states that Dr. Strauss fondled and groped his penis

and scrotum during every exam.  Further, for at least six (6) of these examinations, Dr. Strauss

would manipulate Plaintiff Glane's penis in an attempt to masturbate him.  Also, as Dr. Strauss

manipulated Plaintiff Glane's penis, Plaintiff Glane reached erection and/or near erection.

146.     Plaintiff Glane was seen by Dr. Strauss one (1) time in the Woody Hayes Athletic Complex, but the rest of Plaintiff Glane's examinations occurred in the Training Room at Larkins Hall.

147.     Plaintiff Glane states that each time Dr. Strauss would fondle and finger his penis and testicles as well as caress his stomach area.

148.     Further, Plaintiff Glane states that Dr. Strauss appeared to be in a trance as it appeared that Dr. Strauss could not hear his plea to "knock it off" and it appeared that Dr. Strauss not could help himself.

149.     Plaintiff Glane states that at Larkins Hall, Dr. Strauss would shower when the OSU wrestling team would shower.  Dr. Strauss would watch the wrestlers as he touched himself in his own genital area.

150.     Plaintiff Glane states that at Larkins Hall, there were other gay men in the shower and sauna area that would consistently voyeuristically watch the wrestlers and sometimes masturbate.

151.     Plaintiff Glane states that the wrestlers openly discussed Dr. Strauss and the sexually hostile environment of Larkins Hall.

152.     Also, Plaintiff Glane states that he remembers Plaintiff Yetts and other teammates having discussions with the OSU Head Wrestling Coach Russ Hellickson and OSU Head Assistant Wrestling Coach Jim Jordan regarding Dr. Strauss and the sexually hostile environment of Larkins Hall.

153.     Plaintiff Glane states that Dr. Strauss prescribed him Creatine in powder form to mix with his drinks.  Dr. Strauss told Plaintiff Glane to take the Creatine powder as it would boost his athletic performance. However, Plaintiff Glane was never counseled by Dr. Strauss as to why he

was being prescribed the Creatine powder or what any potential side effects of the Creatine powder might be.

154.    Plaintiff Glane took the Creatine powder as prescribed by Dr. Strauss until his father found the powder and told him to stop taking it.

### CHRISTOPHER S. PERKINS

155.    Plaintiff Christopher S. Perkins is a resident of Hilliard, Ohio.  He graduated from Willard High School in 1990.  While in high school, John Doe 5 earned six (6) varsity letters in Cross Country and Track and Field and was a two-time (2x) Academic All-NOL.

156.     Plaintiff Perkins attended OSU from the years 1990-1994.  He was a student at OSU and did not participate in OSU varsity athletics.

157.    Plaintiff Perkins was examined by Dr. Strauss twice and was sexually abused by Dr. Strauss during one (1) examination in the St. John's Arena Training Room.  Perkins was examined by Dr. Strauss for a chest cold and was told to pull down his pants and underwear so he could check his glands.  Dr. Strauss cupped his genitals in his hands, squeezed his scrotum and massaged his scrotum for a few minutes.  Plaintiff Perkins states that Dr. Strauss manipulation of his penis was an attempt to masturbate him.  Dr. Strauss conducted this examination of Plaintiff Perkins by sitting on a stool and placing his face approximately three (3) inches away from his penis.  Dr. Strauss did not wear examination gloves during the exam.

158.    Plaintiff Perkins verbally told OSU Head Basketball Trainer Mike Bordner about the above described incident.  Trainer Bordner laughed it off and told Plaintiff Perkins that Dr. Strauss was just being thorough and to not worry about it.

159.    Approximately one year later, Plaintiff Perkins went to the St. John Arena Training Room in order to receive treatment for a head cold.  Plaintiff Perkins saw that Dr. Strauss was

covering the training room that day and he started to feel sick at the sight of Dr. Strauss, so Plaintiff Perkins exited the hallway to the court.  At this time, Plaintiff Perkins saw OSU Head Basketball Trainer Mike Bordner.  Mike Bordner asked Plaintiff Perkins if he was alright and Plaintiff Perkins told Trainer Border that he wanted to see a doctor for his head cold but Dr. Strauss was the attending physician that day.  Trainer Bordner told Plaintiff Perkins not to worry about it because he would go into the examination with Plaintiff Perkins and would not let Dr. Strauss sexually assault him again.  Trainer Bordner accompanied Plaintiff Perkins into the St. John's Training Room to see Dr. Strauss.  Trainer Bordner stayed with Plaintiff Perkins during this examination and this examination occurred without incident.

## MICHAEL CALDWELL

160.    Plaintiff Michael Caldwell is a resident of Columbus, Ohio.  He graduated from Columbus Centennial in 1998 and was a member of the National Honor Society.

161.    Plaintiff Caldwell attended OSU as a student from the years of 1988-1995.  He graduated with his Bachelors of Arts Degree in Geological Sciences in 1993 and continued to take graduate classes until approximately 1995.  Plaintiff Caldwell did not participate in OSU varsity athletics.

162.    Plaintiff Caldwell was sexually abused by Dr. Strauss during one (1) examination in the training room of Larkins Hall.  Plaintiff Caldwell was examined for ringworm that appeared on a couple small spots on his lower back.  Since it was common knowledge how Dr. Strauss' conducted his examinations, Plaintiff Caldwell made it clear to Dr. Strauss that the ringworm was limited to his back area.  Yet, Dr. Strauss had Plaintiff Caldwell pull down his pants and Dr. Strauss inspected, held, and rubbed his penis and scrotum using both of his hands.  Dr. Strauss would lift Plaintiff Caldwell's penis and examine it from approximately two (2) to three (3) inches away.  Plaintiff Caldwell could feel Dr. Strauss' breath on his genitals and the exam lasted

38

several minutes. Dr. Strauss continued to manipulate Plaintiff Caldwell's penis in an attempt to masturbate him. Dr. Strauss failed to use any medical examination gloves during the exam.

163. Plaintiff Caldwell states that a few years after his examination with Dr. Strauss, Plaintiff Caldwell met with OSU Trainer Bill Davis in a classroom at the Biggs Athletic Facility. OSU Trainer Bill Davis asked Plaintiff Caldwell questions about his examination with Dr. Strauss. Plaintiff Caldwell answered Trainer Davis' questions and Trainer Davis took handwritten notes of the interview.

164. Plaintiff Caldwell states that it was common knowledge and a running joke that Dr. Strauss was performing very extensive exams on the athletes.

## **TOM ROEHLIG**

165. Plaintiff Tom Roehlig is a resident of Massillon, Ohio. He is a 1989 graduate of Massillon Washington High School, where he was an OHSAA Wrestling State Placer.

166. Plaintiff Roehlig attended OSU from the years of 1989-1993. While at OSU, he was a three (3) year member of the OSU varsity wrestling team.

167. Plaintiff Roehlig was a Freestyle All-American at the University Nationals and a Tour De Monde Team Member.

168. Plaintiff Roehlig believes that he was examined approximately twelve (12) times by Dr. Strauss for a physical injury and/or sickness and Dr. Strauss sexually assaulted him approximately ten (10) times.

169. Plaintiff Roehlig believes that he was examined approximately twelve (12) times by Dr. Strauss for a physical injury and/or sickness and Dr. Strauss sexually assaulted him approximately ten (10) times. He recalls that Dr. Strauss sexually assaulted him to the point

where he was near erection several times and Dr. Strauss attempted to masturbate him on at least two (2) occasions.

170.     During his freshman year, Plaintiff Roehlig was seen by Dr. Strauss in the Larkins Hall Training Room for a rash/infection on his face. The rash eventually turned into impetigo.  After three (3) weeks of missing wrestling practice, Plaintiff Roehlig was told by Dr. Strauss the reason it was not healing was because Plaintiff Roehlig was taking the wrong medication, which Dr. Strauss had prescribed.   Plaintiff Roehlig underwent periodic checkups with Dr. Strauss in the Larkins Hall Training Room as to his impetigo.  During these check-ups, Dr. Strauss told him that he needed to check and see if the rash had spread anywhere else on his body.  Dr. Strauss had Plaintiff Roehlig take off his clothes and examined his entire body.  Further, Dr. Strauss examined his penis and scrotum.  Dr. Strauss moved Plaintiff's Roehlig's penis in different directions for several minutes in an attempt to arouse and masturbate him.

171.     Plaintiff Roehlig was also checked in the same manner as described above when he experienced neck and back soreness with the eventual diagnosis being a pulled muscle.  This exam lasted approximately between twenty (20) to thirty (30) minutes.

172.     Plaintiff Roehlig states that all of Dr. Strauss' sexual assaults against him and the two (2) occasions that Dr. Strauss tried to masturbate him occurred in the Larkins Hall Training Room.

173.     Dr. Strauss did not wear any medical gloves during any of Plaintiff Roehlig's examinations.

174.     Plaintiff Roehlig states that Dr. Strauss would shower with the OSU wrestling team daily. This was frequently joked about in the locker room in front of the OSU wrestling coaches.  The OSU upper classmen would also object to Dr. Strauss being at the weigh-ins and skin checks.

## BRIAN ROSKOVICH

175.    Plaintiff Brian Roskovich is resident of Miamisburg, Ohio.  He graduated from Bridgeport High School in 1995 as the Class Valedictorian.  Also, he was a four time OHSAA State Placer, a 1995 OHSAA Division III State Champion, and 1995 Outstanding Wrestler Award Recipient.

176.    Plaintiff Roskovich attended OSU for seven (7) years starting in 1995, graduating with a Bachelor of Arts Degree in History and a Masters of Education.  Also, he was a Big Ten Conference Medal of Honor Finalist, five (5) time Academic All-Big Ten, four (4) time Varsity Letter Winner, and National Tournament Qualifier.

177.    Plaintiff Roskovich was examined by Dr. Strauss on approximately (3) occasions and sexually assaulted on at least one (1) occasion.  He received a prolonged genital exam conducted by Dr. Strauss that centered around his genital area.

178.    Plaintiff Roskovich states that Dr. Strauss would ask him various questions about his sex life and dorm life as Dr. Strauss was fondling his genitals.

179.    Plaintiff Roskovich recalls downplaying his injuries from wrestling and/or not telling the training staff about his injuries in order to avoid being seen by Dr. Strauss.

180.    Plaintiff Roskovich states that Dr. Strauss would regularly take showers with the OSU wrestlers even though Dr. Strauss did not appear to have participated in any sort of workout. Also, Dr. Strauss would sit naked in the sauna with the wrestlers as they were trying to lose weight.

## MATTHEW DALGLEISH

181.    Plaintiff Matthew Dalgleish is a resident of Medina, Ohio.  He graduated from Medina Buckeye High School in 1993.  While in high school, he was a Cadet Greco All-American.

182.     Plaintiff Dalgleish attended OSU from the years 1995-1998, graduating with a degree in Psychology in 1997 and a Masters in Elementary Education in 1998.  Mr. Dalgleish was a member of the OSU Varsity Wrestling team for two (2) years.

183.     Plaintiff Dalgleish states that he was examined by Dr. Strauss for a physical and/or injury/illness approximately two (2) times.  During both examinations, Dr. Strauss sexually assaulted and/or groped him. However, during his physical in 1995 at the Woody Hayes Sports Complex, Dr. Strauss was sitting in a stool slightly to the side of the Plaintiff Dalgleish. Dr. Strauss massaged Plaintiff Dalgleish's testicles and then manipulated his penis for almost five (5) minutes. Plaintiff Dalgleish states that it felt like Dr. Strauss was massaging his penis like rolling a breadstick, as Dr. Strauss tried to masturbate him.

184.     Plaintiff Dalgleish states that Dr. Strauss as well as other male predators stared at the wrestlers daily while they were using the shower, bathroom, and sauna areas of Larkins Hall.

## RICK MONGE

185.     Plaintiff Rick Monge is resident of Irvine, California.  He graduated from Mater Dei High School in 1990.  While in high school, Mr. Monge was a 1990 California State High School Wrestling Champion.

186.     Plaintiff Monge attended OSU from the years 1992-1995 and graduated with a Bachelor of Science Degree in Electrical Engineering in 1995.  While at OSU, Plaintiff Monge was a three (3) year member of the Varsity Wrestling Team.

187.     Plaintiff Monge was examined by Dr. Strauss approximately ten (10) times.  Moreover, Plaintiff Monge was sexually assaulted by Dr. Strauss approximately four (4) times and on at least one (1) occasion, Dr. Strauss attempted to masturbate Plaintiff Monge.

188.    Plaintiff Monge states that Dr. Strauss first explained to Plaintiff Monge that he had to conduct a thorough examination of his genitals due to sexually transmitted diseases.  Dr. Strauss cupped Plaintiff Monge's testicles and manipulated his penis in multiple directions for several minutes.  During his other examinations, Dr. Strauss asked him to drop his shorts and underwear to check his lymph nodes since he was being seen for cold/flu symptoms.  All of Plaintiff Monge's inappropriate examinations occurred in the Larkins Hall Training Room.

189.    Plaintiff Monge remembers OSU wrestlers not getting checked for illnesses because Dr. Strauss was the only doctor available.

190.    Plaintiff Monge states that Dr. Strauss frequently took showers with the OSU wrestlers and would leer at them in the shower at Larkins Hall.

191.    Plaintiff Monge states that he participated in many conversations regarding Dr. Strauss' behavior in the wrestling locker room and Dr. Strauss inappropriate exams were a topic frequently discussed in the OSU wrestling locker room in front of the OSU wrestling coaches.

## THOMAS LISY

192.    Plaintiff Lisy is a resident of Bay Village, Ohio.  He graduated from St. Edward High School in 1986.  He was a 1985 Freestyle State Champ, 1985 AAU Nationals third (3) place finisher, and a 1985 Member of the Ohio Junior National Team.

193.    Plaintiff Lisy attended OSU from 1986-1991, graduating with a Bachelor of Arts Degree in Economics.  While at OSU, Plaintiff Lizy was a member of the OSU Varsity Wrestling Team for one (1) year and Dr. Strauss was the leading cause of Plaintiff Lisy leaving the team.

194.    Plaintiff Lisy was examined by Dr. Strauss approximately five (5) times and was sexually assaulted by Dr. Strauss on approximately three (3) occasions.  Dr. Strauss would unnecessarily

examine Plaintiff Lisy's penis.  Moreover, Plaintiff Lisy was sexually abused to the point of erection on at least one occasion and near erection on another.

195.    Plaintiff Lisy states that his first encounter with Dr. Strauss was during a physical in the fall of 1986.  Dr. Strauss sat on a short rolling stool with his penis at Dr. Strauss' eye level.  Dr. Strauss positioned Plaintiff Lisy with his back to the examination table.  Dr. Strauss manipulated his penis and testicles.  At one point, Plaintiff Lisy could feel Dr. Strauss breath on his testicles.  Dr. Strauss manipulated his penis for a very long time, Plaintiff Lisy's penis became partially erect, and Dr. Strauss attempted to masturbate Plaintiff Lisy.

196.    Plaintiff Lisy was also seen by Dr. Strauss for cauliflower ear which needed drained.  To examine his right ear, Dr. Strauss had Plaintiff Lisy sit on a stool as he stood next to Plaintiff Lisy.  As Dr. Strauss examined his ear, Dr. Strauss cradled his head and was rubbing Plaintiff Lisy's neck.  When he protested, Dr. Strauss said that he was checking Plaintiff 's lymph nodes.  Dr. Strauss stroked his neck and collar bone.  At one point, Dr. Strauss was rubbing his ear lobe between his fingers.  Dr. Strauss was leaning his pelvis into the side of Plaintiff Lisy's latissimus muscle.  Dr. Strauss told him that his lymph nodes were swollen and that he needed to check the lymph nodes in his groin.  Dr. Strauss proceeded to grope his testicles and penis.  Plaintiff Lisy's penis became erect and Dr. Strauss started to stroke his penis.  Plaintiff Lisy pushed away, was very upset and wanted to leave.  Dr. Strauss told him to not be concerned as that happened all the time.  After Plaintiff Lisy calmed down, Dr. Strauss drained his ear.

197.    Plaintiff Lisy states that Dr. Strauss was a fixture in the OSU wrestling locker room and maintained a locker that was next to the OSU Wrestling coaches.  Dr. Strauss was permitted to loiter in the locker room and openly stare at the OSU wrestlers as the OSU wrestlers changed.

On numerous occasions, Plaintiff Lisy would look over as he was changing clothes and Dr. Strauss would just be staring at him.  Dr. Strauss would just smile and continue to stare at him.

198.    Plaintiff Lisy states that Dr. Strauss would frequently shower with the OSU wrestlers and witnessed Dr. Strauss shower multiple times in the same day.

199.    Plaintiff John Doe 1 states that he witnessed OSU wrestling coaches roll their eyes at Dr. Strauss' behavior, turn away, and make jokes when confronted with Dr. Strauss' actions.  OSU Wrestling Coaches were present when Dr. Strauss was acting inappropriately.

200.    Plaintiff Lisy states that during the beginning of the 1986-1987 season, Dr. Strauss and a colleague were photographing the OSU wrestlers as they were working out.  It was explained to the wrestlers that Dr. Strauss was conducting a study of the subcultures of sports teams.  The wrestlers were given photocopies of some of the photos.  At some point in time before the season began, Dr. Strauss and his colleague stopped photographing the OSU wrestlers but the wrestlers were not informed of the reasons.

201.    Plaintiff Lisy states that Dr. Strauss asked him about his sex life on numerous occasions. Given his position and status with the team, Plaintiff Lisy felt that he had to be nice to Dr. Strauss and answer his questions.  On a daily basis, Dr. Strauss would initiate a conversation with someone in the wrestling locker room and Plaintiff Lisy was relieved when Dr. Strauss approached someone other than him.

202.    Plaintiff Lisy states that OSU wrestlers were subject to unannounced drug tests. However, Dr. Strauss would tell the wrestlers days before the drug test would be administered and would volunteer to the wrestlers how to alter the PH in their urine to render a passing drug test.

45

203.    Plaintiff Lisy states that Larkins Hall had a communal shower and communal sauna.  The

public locker room, shower, and sauna were known for deviant sexual behavior.  It was common

for men to stare and/or proposition the OSU wrestlers.

## VINCENT DISABATO

204.    Plaintiff DiSabato is a resident of Hillard, Ohio.  He graduated from high school in 1979

and was a two (2) time OHSAA State Champion.

205.    Plaintiff DiSabato attended OSU from 1979-1984 and was a four (4) year Varsity

wrestler.

206.    Plaintiff DiSabato was examined by Dr. Strauss over twenty (20) times and believes that

he was sexually assaulted by Dr. Strauss on several occasions.  During one examination, Dr.

Strauss conduct a full physical on Plaintiff DiSabato that lasted approximately twenty (20)

minutes.  During this examination, Dr. Strauss cupped and massaged Plaintiff DiSabato's

testicles.  Also, Dr. Strauss manipulated Plaintiff DiSabato's penis in an attempt to masturbate

him.

207.    Plaintiff DiSabato verbally complained to OSU Head Wrestling Coach Chris Ford, his

OSU Assistant Wrestling Coaches, and OSU Medical Staff, including Dr. Jack Unverferth and

Dr. Leach as well as OSU Assistant Athletic Director Larry Romanoff.

208.    Plaintiff DiSabato states that Larkins Hall was a cesspool of male predators.  Gay males

lined the shower stalls after OSU wrestling practices.  Other males masturbated in the bathroom

stalls while the wrestlers showered.  Also, Plaintiff DiSabato would receive calls to his apartment

from male predators, who explained their fantasies to him.

## ANASTACIO TITO VAZQUEZ, JR.

209.   Plaintiff Anastacio Tito Vazquez, Jr. is a resident of Cleveland Heights, Ohio.  He is a 1987 graduate of Shaker Heights High School, where he was a Sectional Runner-up, District Qualifier, and three (3) year Varsity letter winner in the sport of wrestling.

210.   Plaintiff Vazquez attended OSU from the years of 1988-1990 and was a member of the OSU Varsity Wrestling Team.

211.   Plaintiff Vazquez believes that he was examined at the Larkins Hall Training Room approximately ten (10) times by Dr. Strauss for a physical injury and/or sickness.

212.   Dr. Strauss sexually assaulted Plaintiff Vazquez at least five (5) times as Dr. Strauss tried to masturbate him. On one of these occasions, Plaintiff Vazquez was sent to the Larkins Hall Training Room for a bloody nose as he was bleeding out of both nostrils.  Once in the training room, Dr. Strauss instructed him to pinch his nose to stop the bleeding.  Plaintiff Vazquez was given two nose plugs, wiped his face, and was instructed by Dr. Strauss to lower his shorts.  Dr. Strauss thoroughly examined his genital area, while moving his penis in different directions in an attempt to arouse him.  Plaintiff Vazquez recalls that Dr. Strauss' hands were cold.  After several minutes, Dr. Strauss instructed Plaintiff Vazquez to continue to use the nose plugs as he was sent back to practice.

213.   After returning to practice, Plaintiff Vazquez told a small group of OSU Wrestling teammates as well as OSU Head Assistant Wrestling Coach Jim Jordan that "Dr. Strauss' hands were cold as 'shit.'"   He also stated that Dr. Strauss must have "examined every hair on my nuts."  OSU Head Assistant Wrestling Coach Jim Jordan replied that he wanted nothing to do with that and the group went back to practice.

214.    Dr. Strauss never used medical gloves during any of the examinations of Plaintiff Vazquez.

215.    Plaintiff Vazquez states that Dr. Strauss regularly showered alongside the wrestlers, loitered in the Wrestling Locker Room and leered at the wrestlers as Dr. Strauss had a locker in the Wrestling Locker Room.

216.    Plaintiff Vazquez states that Dr. Strauss' exams and behaviors were constantly discussed among teammates and in front of OSU Head Wrestling Coach Russ Hellickson and OSU Head Assistant Wrestling Coach Jim Jordan.

217.    Plaintiff Vazquez states that other men regularly watched the OSU wrestlers shower, touched themselves in front of the wrestlers, and masturbated in front of the wrestlers in the general locker room and shower area at Larkins Hall.  Also, these same men would roam the general locker room and engage in sexually voyeuristic and/or leering behavior directed at wrestlers.

218.    Plaintiff Vazquez verbally complained to OSU Head Coach Russ Hellickson, OSU Head Assistant Coach Jim Jordan, and his teammates about men regularly leering at OSU wrestlers in the general locker room area, shower area, and sauna area of Larkins Hall.

## JOHN MACDONALD, JR.

219.    Plaintiff John MacDonald, Jr. is resident of San Antonio, Texas.  He graduated from Strongsville Senior High School in 1994.

220.    Plaintiff MacDonald attended OSU from 1994-2000 and was a member of the Varsity Wrestling team for three (3) years under OSU Head Wrestling Coach Russ Hellickson and OSU Head Assistant Wrestling Coach Jim Jordan in 1994-1995.  In the 1995 season, the OSU Head Assistant Wrestling Coach became Ken Ramsey.

221.    Plaintiff MacDonald was examined by Dr. Strauss over ten (10) times and sexually assaulted on at least four (4) occasions.

222.    During his freshman year physical, the OSU upperclassmen wrestlers explained to Plaintiff MacDonald that Dr. Strauss was going to perform a thorough examination on him.  In turn, Dr. Strauss conducted the most intrusive physical that Plaintiff MacDonald had ever received.  Dr. Strauss fondled him during his hernia examination by groping his penis and testicles.

223.    Also, Plaintiff MacDonald recalls receiving a genital examination from Dr. Strauss for folliculitis infection on his thigh.  Dr. Strauss had Plaintiff MacDonald remove his clothing and inspected his groin area even though his inflammation was just above his knee.

224.    Plaintiff MacDonald tried to avoid being seen by Dr. Strauss due to Dr. Strauss' actions.

225.    On numerous occasions, Dr. Strauss would attend OSU wrestling practice at Larkins Hall, while Dr. Strauss ate his brown bagged lunch.  As wrestling practice concluded, Dr. Strauss would head to the wrestling locker room and shower with the OSU wrestlers even though Dr. Strauss failed to work out or perform any activities that would necessitate a shower.

226.    In the shower and locker room areas, Dr. Strauss voyeuristically watched the OSU wrestlers.  In fact, Dr. Strauss would stare at the wrestlers while he excessively lathered his own genital area.

227.    Plaintiff MacDonald states that other men would lurk in the Larkins Hall shower area to voyeuristically watch the OSU wrestlers shower.

228.    Plaintiff MacDonald states that OSU Head Wrestling Coach Russ Hellickson addressed the OSU wrestling team and stated that he had brought the Larkins Hall environment issue to the attention of his superiors and was trying to get the OSU wrestling team into their own space.

229.     Plaintiff MacDonald states that Dr. Strauss asked him out to lunch on campus in an attempt to further groom him and he declined.

**MAROON MONDALEK**

230.     Plaintiff Maroon Mondalek is a resident of Cleveland, Ohio.  He is a 1995 Dublin High School graduate.  While in high school, Plaintiff Mondalek was an OHSAA State Wrestling Qualifier.

231.     Plaintiff Mondalek attended OSU from 1995-2001 and graduated with a Bachelors of Science Degree in Family Financial Management in 2001.  While at OSU, Plaintiff Mondalek participated on the OSU Varsity Wrestling Team for four (4) years.

232.     Plaintiff Mondalek was examined by Dr. Strauss approximately six (6) times and Dr. Strauss attempted to masturbate Plaintiff Mondalek on two (2) different occasions.  Plaintiff Mondalek was groped/fondled by Dr. Strauss even though he was only being treated for a rib injury.

233.     Plaintiff Mondalek states that his initial meeting with Dr. Strauss was at the Woody Hayes Complex for a physical.  Plaintiff Mondalek waited in a short line that lasted a very long time in order to see Dr. Strauss.  Once he entered the examination room, Dr. Strauss had him put his pants on the table.  Dr. Strauss examined his genitals for approximately eight (8) to ten (10) minutes.  During this examination, Dr. Strauss' face and head were less than twelve (12) inches from his penis for several minutes.  Then, Dr. Strauss manipulated Plaintiff Mondalek's penis in various directions attempting to arouse him.  Plaintiff Mondalek walked out of the examination room and an upperclassman in line at the examination door stated, "Doc is gonna need a cigarette after that exam."  Plaintiff Mondalek was mortified.

234.    Midway through his Freshman wrestling season, Plaintiff Mondalek separated his ribs in wrestling practice.  The pain was sharp and intense, and he was having trouble breathing. He was scared.  Plaintiff Mondalek went to see Dr. Strauss in the Larkins Hall Training room.  Dr. Strauss inspected the area around his ribs as he used a stethoscope and asked him to deeply breathe.  Then, Dr. Strauss started to touch Plaintiff Mondalek's face and lymph node area, felt his lower back and instructed him to drop his pants.  Plaintiff Mondalek asked Dr. Strauss, "what for?"  Dr. Strauss aggravatingly retorted, "the body is an entire system, let me do my job."  Reluctantly, he dropped his pants and Dr. Strauss started manipulating his penis as Dr. Strauss fondled his testicles in an attempt to arouse him.  Plaintiff Mondalek pulled back and Dr. Strauss stated, "ok you're all done."  He quickly pulled up his pants and left the training room mortified.

235.    Plaintiff Mondalek states that Dr. Strauss would shower with the OSU wrestling team almost daily, even though Dr. Strauss did not workout.  While in the shower, Dr. Strauss would voyeuristically watch the OSU wrestlers shower.

236.    Plaintiff Mondalek states that he complained about the sexually deviant environment of Larkins Hall and its shower area to OSU Athletic Director Andy Geiger at the OSU wrestling team's mandatory sensitivity training.

237.    Dr. Strauss asked Plaintiff Mondalek to dinner on at least ten (10) different occasions after practice, which he always declined.

### LEO DISABATO

238.    Plaintiff Leo DiSabato is a resident of Grove City, Ohio.  Leo DiSabato graduated high school in 1980 from Bishop Ready High School and was a two (2) time OHSAA State Wrestling Champion.

239.    Plaintiff DiSabato attended OSU from 1980-1984 and was a scholarship athlete and three (3) year OSU Varsity Wrestling Letterman.

240.    Plaintiff DiSabato was examined by Dr. Strauss on approximately ten (10) to fifteen (15) different occasions and was sexually assaulted by Dr. Strauss during these physical examinations.  Further, on approximately three (3) occasions, Dr. Strauss manipulated Plaintiff DiSabato's penis in various directions over a prolonged period of approximately ten (10) to fifteen (15) minutes in an attempt to masturbate Plaintiff DiSabato.

241.    Plaintiff DiSabato states that Dr. Strauss would inappropriately hold his genitals for a long period of time as Dr. Strauss would lean his face close to his penis.  Dr. Strauss would excessively exam his penis for an uncomfortable amount of time.  Dr. Strauss would stand extremely close in order to touch or grope non-injured areas of his body.

242.    Plaintiff DiSabato complained to Head Wrestling Coach Chris Ford and told Head Coach Ford that Dr. Strauss was taking an excessive amount of time to conduct physical examinations.  Also, Plaintiff DiSabato states that Dr. Strauss did not wear medical gloves during any of his examinations.

243.    Plaintiff DiSabato states that Dr. Strauss constantly asked him about his sexual activity.

244.    Plaintiff DiSabato states that Dr. Strauss was always in the showers at Larkins Hall with the OSU wrestling team and would voyeuristically watch the wrestlers shower.  Also, Dr. Strauss would leer at the wrestlers while they changed in the locker room.

245.    Plaintiff DiSabato states that everyday naked non-athlete males would walk around the OSU wrestling locker area and shower area in Larkins Hall in order to leer at the OSU wrestlers.

246.    Plaintiff DiSabato asked Head Wrestling Coach Chris Ford why naked non-athlete males were allowed to leer at the wrestlers in their locker room.

## PETER NATHANSON

247.    Plaintiff Peter Nathanson is a resident of University Heights, Ohio.  He is a 1992 graduate of Shaker Heights High School, where he was a 1992 OHSAA State Wrestling Champion.

248.    Plaintiff Nathanson attended OSU from the years 1994-1997 and earned his Bachelor of Science Degree in Accounting in 1997.  While at OSU, he was a member of the OSU Varsity Wrestling Team for one (1) year and was a Big Ten Academic All-American.

249.    Plaintiff Nathanson states that he saw Dr. Strauss on approximately two (2) occasions for physical sickness/injury and on both occasions, Dr. Strauss sexually assaulted him.

250.    Plaintiff Nathanson states that he broke his ribs during wrestling practice and went to see Dr. Strauss in the Larkins Hall Training Room.  While examining Plaintiff Nathanson, Dr. Strauss conducted a series of tests, which included a hernia exam.  Dr. Strauss put his hands on Plaintiff Nathanson's genitals and was asking Plaintiff Nathanson to cough.  Plaintiff Nathanson's pain was exacerbated by trying to cough for Dr. Strauss.  Finally, Plaintiff Nathanson was fitted with a wrap by Dr. Strauss.

251.    Approximately a week later, Plaintiff Nathanson had a follow-up appointment where Dr. Strauss performed a hernia exam.  Dr. Strauss fondled Plaintiff Nathanson's scrotum for an extended period of time.

252.    Plaintiff Nathanson states that Dr. Strauss would regularly shower with the OSU wrestlers, loiter in the locker rooms, and voyeuristically watch the wrestlers shower and change.

## JEFFREY LADROW

253.    Plaintiff Jeffrey Ladrow is a resident of Rye, New York.  He is a 1986 graduate of Sylvania Northview High School, Toledo, Ohio, where he was on the honor roll and achieved various athletic awards.

254.    Plaintiff Ladrow attended OSU from 1986-1990 and graduated with a Bachelor of Science Degree in Business.  While at OSU, he was a four (4) year member of the OSU Men's Varsity Ice Hockey Team, and he earned three (3) Varsity Letters.  Originally, he was a walk-on Varsity Hockey Athlete and eventually earned a scholarship.

255.    Plaintiff Ladrow saw Dr. Strauss approximately twenty-four (24) times for physical sickness/injury and Dr. Strauss sexually assaulted Plaintiff Ladrow during approximately twelve (12) of these examinations.  On approximately four (4) occasions, Dr. Strauss tried to manipulate Plaintiff Ladrow's penis in an attempt to masturbate him.  In addition, Plaintiff Ladrow was sexually assaulted when he was examined by Dr. Strauss for ailments such as a sore shoulder, sore throat, and shin splints. Anytime Plaintiff Ladrow needed medication, Dr. Strauss would perform an entire physical and grope his genitals.  These examinations occurred in the Larkins Hall Facility, the Football Facility, and St. John's Arena Training Room.

256.    Plaintiff Ladrow states that Dr. Strauss would always try to have the examination entail a genital examination regardless of his physical ailment.

257.    Plaintiff Ladrow states that Dr. Strauss did not wear any medical gloves during any of his examinations.

258.    Plaintiff Ladrow states that it was common knowledge that Strauss fondled student-athletes.

259.    Dr. Strauss would constantly loiter in the Men's Ice Hockey Locker room.

260.    Plaintiff Ladrow had a conversation with Dr. Strauss regarding ANABOLIC STEROIDS, and Dr. Strauss told Plaintiff Ladrow that he could get him ANABOLIC STEROIDS to help him perform and make the team.  Plaintiff Ladrow states that he did not take steroids or accept Dr. Strauss' offer, but confirms Dr. Strauss was offering to help OSU athletes with ANABOLIC STEROIDS while engaging in college sports.

## ANTHONY SENTIERI

261.    Plaintiff Anthony Sentieri is resident of Marion, Ohio.  He is a 1993 graduate of Marion Harding High School, where he was a district qualifier and member of the Ohio Junior Greco Team.

262.    Plaintiff Sentieri attended OSU from 1995-1997 after transferring during his Junior year from Cuyahoga Community College.  He was a member of the OSU Varsity Wrestling Team during the 1995-1996 season.

263.    Plaintiff Sentieri states that he saw Dr. Strauss approximately three (3) times for physical sickness/injury and on one (1) occasion, Dr. Strauss groped his genitals.  This occurred in 1995 during Plaintiff Sentieri's pre-season physical at the Woody Hayes Sports Complex.  During this physical, Plaintiff Sentieri states that Dr. Strauss groped his scrotum for over five (5) minutes.

264.    Plaintiff Sentieri states that Dr. Strauss would regularly shower with the OSU wrestlers and voyeuristically watch the wrestlers in the locker room as they changed clothes..

265.    Plaintiff Sentieri states that other male predators took showers with OSU wrestlers and excessively lathered their genital area while voyeuristically watching the wrestlers shower.  Also, males would voyeuristically watch over the bathroom stalls as wrestlers showered.  These men appeared to be masturbating while watching the wrestlers in the showers.

266.    Plaintiff Sentieri states that males were caught having sex in the bathroom immediately next to the OSU Wrestling Room.

## JOHN DOE 1

267.    Plaintiff John Doe 1 is a resident of Columbus, Ohio. He graduated ninth (9th) out of an approximate three hundred and sixty-five (365) students from high school in 1991 and was an honor roll student. He was a three-time (3x) OHSAA State Qualifier and an OHSAA State Placer finishing fourth (4th)

268.    Plaintiff John Doe 1 attended OSU from the years 1991-1998 and earned a Bachelor of Science degree. While at OSU, he was Academic All-Big Ten, a four (4) year Varsity Wrestling Letterman, Team Captain, a three-time (3x) NCAA Qualifier, a three time (3x) Big Ten Placer, U.S. Espoir National Runner-Up in Freestyle, Jr. Olympic Team Member, and an Olympic Trials Placer.

269.    Plaintiff John Doe 1 was examined by Dr. Strauss approximately twenty-five (25) to thirty (30) times. Dr. Strauss sexually assaulted him approximately fifteen (15) to twenty (20) times. Also, on a few occasions, Dr. Strauss fondled his penis to the initial stages of an erection during his examination as Dr. Strauss was attempting to masturbate John Doe 1.

270.    Plaintiff John Doe 1 states that Dr. Strauss would examine his genital areas for routine cold symptoms, i.e. sore throat, common cough, and/or runny nose. During these examinations, Dr. Strauss would check his lymph nodes in his neck area. After Dr. Strauss checked the lymph nodes in his neck, he was asked to drop his shorts by Dr. Strauss. Dr. Strauss explained to him that he needed to examine the lymph nodes in John Doe 1's genital area for swelling. This would always result in a hernia type examination.

271.    During many of Plaintiff John Doe 1's exams, Dr. Strauss would place himself so close to Plaintiff John Doe 1's body, that Dr. Strauss would rub his genital areas across Plaintiff John Doe 1's leg.

272.    Plaintiff John Doe 1's had a few physicals performed at the Woody Hayes Sports Complex Training Room, but a majority of his examinations with Dr. Strauss occurred in the Larkins Hall Training Room.

273.    Plaintiff John Doe 1 states that Dr. Strauss did not wear any medical gloves during any of his examinations.

274.    Plaintiff John Doe 1 states that Dr. Strauss would be in the shower in Larkins Hall and/or shower area for an excessive period of time.  Sometimes, Dr. Strauss would be in the shower area from the first wrestler till the last wrestler had showered.  While in the shower, Dr. Strauss would place himself with his back turned toward the showerhead so he could observe the OSU wrestlers showering. Dr. Strauss's would watch the OSU wrestlers, while lathering and groping himself excessively and pretending to shower.

275.    Plaintiff John Doe 1 states that Dr. Strauss had routine inappropriate sauna usage.  It was standard practice to enter the sauna in Larkins Hall with a towel or some type of clothing on the lower half of the body.  However, Dr. Strauss would always enter the sauna without a towel or only with a towel covering his upper body.  In turn, Dr. Strauss would stretch while naked and commonly act in a manner to display his genitals while the OSU wrestlers were attempting to cut weight.

276.    Plaintiff John Doe 1 states that it was common knowledge of Dr. Strauss' inappropriate actions and activities.  Also, from late August to May, male predators who became the common

"cast of characters", would hang around the areas that the OSU wrestling team used for training. These individuals were constantly voyeuristically watching the OSU wrestlers.

277.    Plaintiff John Doe 1 states that Dr. Strauss offered his telephone number to him on a business card.  Dr. Strauss mentioned that it was to allow him to reach Dr. Strauss after hours or if he ever felt sick.

278.    Plaintiff John Doe 1 states that his concerns as well as other OSU wrestlers concerns were voiced to the OSU Wrestling Staff level and he believes that the OSU Athletic Administration was informed.  Plaintiff John Doe 1 states that the OSU Wrestling Staff was trying to get the OSU wrestlers moved to another location due to the sexually deviant Larkins Hall environment.

279.    Plaintiff John Doe 1 states that Dr. Strauss' activities were constantly being played down by the OSU Wrestling Coaching Staff, the OSU Athletic Administration, and the OSU Training Staff as they said Dr. Strauss was just being thorough and looking out for the wrestlers best interest and/or keeping the wrestlers healthy and able to compete.

280.    Plaintiff John Doe 1 remembers several wrestlers were taking "animal juice" to enhance their performance.

## JOHN DOE 2

281.    Plaintiff John Doe 2 is a resident of Akron, Ohio and graduated from Akron Springfield High School in 1994.  While in high school, he was Ohio Mr. Football Runner-up, a two-time (2x) OHSAA State Wrestling Champion, OHSAA State Wrestling Runner-up, and a High School National Champ.

282.    Plaintiff John Doe 2 attended OSU from the years 1994-1998.  He was a two-time (2x) Big Ten Placer and a two-time (2x) NCAA Qualifier.

283.     Plaintiff John Doe 2 saw Dr. Strauss approximately seven (7) times and was sexually abused three (3) times. John Doe 2 states that Dr. Strauss would cup his testicles with one hand and move his penis side to side. Dr. Strauss would fondle his penis until he almost had an erection. During his physical, Plaintiff John Doe 2 eventually grabbed his shorts and pulled them up. Then, he asked Dr. Strauss, "am I cleared, are we done?" John Doe 2 states that during the three exams, Dr. Strauss was attempting to masturbate him.

284.     Plaintiff John Doe 2 was examined by Dr. Strauss for his yearly physical once at the Woody Hayes Sports Complex and all his other examinations occurred in the Larkins Hall Training Room.

285.     Plaintiff John Doe 2 states that the Larkins Hall Training Facility had community showers and a community sauna. After practice, these showers were filled with non-athlete men and Dr. Strauss was usually in the shower when Plaintiff John Doe 2 arrived and when he left the showers.

286.     Plaintiff John Doe 2 states that Dr. Strauss usually attended the sauna naked during the time the OSU wrestlers were using the sauna area. Dr. Strauss would only bring in a towel to the sauna and sat so he exposed his genitals as the towel would not cover him.

287.     Plaintiff John Doe 2 states that he told OSU Head Wrestling Coach Russ Hellickson that it was uncomfortable showering at Larkins Hall when the other predatory males and Dr. Strauss stared at the wrestlers.

## JOHN DOE 3

288.     Plaintiff John Doe 3 is a resident of Painesville, Ohio. He graduated from High School in 1988. While in high school, he was an OHSAA State Wrestling Champion as well as an All-Ohio Football Player.

289.    Plaintiff John Doe 3 attended OSU from the years of 1988-1994, graduating with a Bachelor's Degree in 1993 and a Masters Degree in 1994.  He competed at OSU in Varsity Wrestling for one (1) year and Varsity Football for four (4) years as a scholarship athlete.  He earned Academic All-Big Ten honors as well as Defensive Lineman of the Year.

290.    Over his career, Plaintiff John Doe 3 was examined by Dr. Strauss in excess of twenty (20) times.  In all examinations, he believes Dr. Strauss was inappropriate and/or sexually assaulted him approximately twelve (12) times.

291.    Plaintiff John Doe 3 was given unnecessary physicals that involved the fondling/groping of his genital area for ailments such as sore throat, ear ache, stingers, turf toe, and a skin disease on his right wrist.

292.    Plaintiff John Doe 3 states that during these examinations, Dr. Strauss would tell him that Dr. Strauss would need to check his lymph nodes.  Dr. Strauss would feel under his testicles, grab his testicle with his fingers, and then grab and manipulate his penis in an attempt to masturbate him on at least two (2) occasions.

293.    Plaintiff John Doe 3 states that Dr. Strauss did not wear any medical gloves during his examinations.

294.    Plaintiff John Doe 3 questioned the OSU Football Training Staff in the fall of 1990 as to why a full physical was required anytime that he saw Dr. Strauss.  He specifically questioned the OSU Football Training Staff as to why he had to have a full physical for turf toe.

295.    Plaintiff John Doe 3 states that Dr. Strauss insisted on conducting a full physical on him when he joined the OSU wrestling team, even though Dr. Strauss knew that he was the starting defensive tackle on the OSU Football Team and had just played in a bowl game approximately three (3) weeks earlier.

296.    When John Doe 3 was a member of the OSU Varsity Wrestling Team, Dr. Strauss would

shower with the OSU wrestlers and go into the sauna with the wrestlers after wrestling practice.

## JOHN DOE 4

297.    Plaintiff John Doe 4 is a resident of Loveland, Ohio.  He is a 1977 high school graduate.

While in high school, he participated in soccer, ice hockey, and was an Eagle Scout.

298.    Plaintiff John Doe 4 attended OSU from 1977-1982 and graduated with a Bachelors of

Arts in Degree Political Science in 1982.  In 1986, he received his Juris Doctorate.  While at

OSU, he participated on the OSU Varsity Soccer Team for four (4) years.

299.    Plaintiff John Doe 4 was examined by Dr. Strauss approximately five (5) times and was

sexually assaulted by Dr. Strauss on approximately three (3) different occasions.  John Doe 4

was being groped/fondled by Dr. Strauss as he was being treated for a bone bruise to the top of

his left foot.  Dr. Strauss was sitting on his stool in an examination room at the Student Health

Center and he started to examine Plaintiff John Doe 4's groin area for a hernia.  Dr. Strauss

grasped his testicles for what seemed to be an inordinate amount of time, which caused him to

believe that he must have a hernia.  After several minutes, Plaintiff John Doe 4 asked Dr. Strauss

if he in fact had a hernia, to which Dr. Strauss replied no.

300.    During subsequent examinations, Plaintiff John Doe 4 insisted that he did not have a

hernia.  However, Dr. Strauss persisted that he had to conduct a thorough examination.  During

these examinations, Dr. Strauss repeated the same fondling of Plaintiff John Doe 4's testicles as

described above and Dr. Strauss examined his penis with Dr. Strauss' face being extremely close

to his penis.

301.    Plaintiff John Doe 4 states that it was common knowledge among the OSU soccer team

that there existed irregular behavior by Dr. Strauss during medical examinations.  Plaintiff John

Doe 4 states that he believes the OSU soccer coaches were aware that these irregular medical examinations were happening on a regular basis.  In 1979 during a visit to the OSU Athletic Director Hugh Hindman's office in the Ohio Stadium, John Doe 4 told OSU Athletic Director Hugh Hindman that the OSU soccer team believed Dr. Strauss was a gay male.

## **JOHN DOE 5**

302.    Plaintiff John Doe 5 is a resident of Weston, Florida.  He graduated high school in 1983 and was a member of the High School Honor Society.

303.    Plaintiff John Doe 5 attended OSU in the years 1983-1988, graduating with a Bachelor of Science Degree in Education in 1988.  He was a student athletic trainer at Ohio State from 1983-1988.  He was assigned the following sports as a student trainer:  Football-four (4) years, Men's Swimming, Men's Diving, Men's Baseball, Men's Cross Country, Men's Track and Field- both indoor and outdoor for two (2) years.  Also, John Doe 5 worked the summer camp for the New York Jets Pro Football Team at Hofstra University in Hempstead, New York.

304.    Plaintiff John Doe 5 worked with Dr. Strauss on a daily basis for several sports during his five (5) years as a student trainer.

305.    Plaintiff John Doe 5 was examined by Dr. Strauss on approximately three (3) different occasions and was sexually assaulted by Dr. Strauss during each of these physical examinations.

306.    In the fall quarter of 1983, as a freshman, Plaintiff John Doe 5 had developed flu like symptoms and asked Dr. Strauss to examine him in the hopes of receiving medication.  He met Dr. Strauss in the Larkins Hall Training Room.  Dr. Strauss told him that he was going to conduct a full medical examination and had him remove his shirt and pants.  He thought this was odd but complied.  After looking at his throat, Dr. Strauss told John Doe 5 that he was going to examine his genitals to check for any hernias and rule out any potential sexually transmitted

diseases.  Dr. Strauss rubbed and massaged his testicles and penis in a sexual manner for what seemed like forever.  As Dr. Strauss massaged John Doe 5's penis, he asked John Doe 5 personal questions about his sex life. Dr. Strauss attempted to masturbate him.

307.     John Doe 5's second examination occurred his freshman year during winter quarter in the Larkins Hall Training Room. He complained to Dr. Strauss that his ear was blocked and he was having pain in his ear and trouble hearing.  John Doe 5 was seen by Dr. Strauss who insisted on doing a full physical.  Dr. Strauss told him that he needed to check his lymph nodes, which were also found in his groin area.  Dr. Strauss spent an inordinate/unreasonable amount of time in his groin and testicle area.  Dr. Strauss had him stand as Dr. Strauss pulled up a chair.  Dr. Strauss massaged his testicles and penis as Dr. Strauss' face was directly in front of his testicles.

308.     Dr. Strauss did not wear any medical gloves during any of John Doe 5's examinations.

309.      Plaintiff John Doe 5 later learned that several of the OSU athletes had nicknames for Dr. Strauss such as "Dr. Nuts" and "Dr. Jelly Fingers."  Also, the upperclassmen OSU student trainers and athletes would discuss Dr. Strauss' long thorough exams and his constant hernia checks.

310.     Plaintiff John Doe 5 states that several OSU athletes that he worked with would complain about Dr. Strauss' physical examinations, which included complaints about unnecessary nudity and touching during examinations.  He reported these complaints to OSU Head Trainers Billy Hill and Linda Daniel.  OSU Head Trainer Billy Hill would generally dismiss what John Doe 5 said and tell him that Dr. Strauss was just being thorough.  OSU Head Trainer Linda Daniel always took the information with genuine concern.

311.     Plaintiff John Doe 5 felt shameful and embarrassed as any complaints about Dr. Strauss' exams being overtly excessive were dismissed.  John Doe 5 was always told that Dr. Strauss was

just "being thorough" or "that's just how Dr. Strauss does his exams." All this made him feel that he was the one that was in the wrong.

312.    Plaintiff John Doe 5 felt there was a sense of deference and respect given to Dr. Strauss among the Athletic Trainers as Dr. Strauss was viewed as an "Olympic Doctor" and was considered an "expert in anabolic steroid use" as well as an Editor-In-Chief/Writer for *The Physician and SportsMedicine* magazine.

313.    Plaintiff John Doe 5 states that Dr. Strauss would take showers in the communal showers at Larkins Hall for an extended amount of time usually with the OSU wrestlers. Sometimes, John Doe 5 would have to go and try to find Dr. Strauss in Larkins Hall because he was needed in the training room. More often than not, Dr. Strauss would be in the shower or locker room area of Larkins Hall, completely naked or almost naked, reading a newspaper and watching the athletes who were showering or undressing at their lockers. However, since Larkins Hall was open to all OSU students, faculty, and staff, John Doe 5 states that other voyeuristic males were in the shower and locker area for long periods of time. Occasionally, he would see men in the bathroom stalls that appeared to be masturbating or leering into the showers at the athletes.

314.    Plaintiff John Doe 5 states that during his senior year, Dr. Strauss volunteered to help Plaintiff John Doe 5 prepare for his athletic trainer certification examination. Dr. Strauss suggested that he come over to his personal residence to prepare for the examination. He refused this request.

315.    Plaintiff John Doe 5 states that Dr. Strauss would take photos of the OSU athletes at practices, in the locker room, and at their sporting events. Dr. Strauss would tell him and the OSU athletes that he was taking the photographs for his research of the human body.

316.    Plaintiff John Doe 5 states that Dr. Strauss would offer to massage the OSU swimmers prior to the swim meet.  Dr. Strauss would massage the OSU swimmers in the locker room instead of the training room.

317.    Plaintiff John Doe 5 states that as a freshman student trainer, one of his duties was to go to the OSU Student Health Center to retrieve the prescription medication for Dr. Strauss to use for the athletes in the Larkins Hall Training Room.  Plaintiff John Doe 5 had to sign out the medications from the OSU Student Health Center and then the medications were signed in at the Larkins Hall Training Room.  Plaintiff John Doe 5 states that he transported various medications, including ANABOLIC STERIODS, from the OSU Student Health Center to the Larkins Hall Training Room for Dr. Strauss to use on OSU athletes.

## JOHN DOE 6

318.    Plaintiff John Doe 6 is a resident of San Antonio, Texas.  He graduated from Medina Buckeye High School in 1993.  While in high school, Plaintiff John Doe 6 was an OHSAA State Wrestling Champion and an All-American.

319.    Plaintiff John Doe 6 attended OSU from 1991-1996 and earned a Bachelor's Degree from the University and was on the Dean's List.  He was a five (5) year scholarship wrestler of the OSU Varsity Wrestling Team, was an All-American, and Team Captain.

320.    Plaintiff John Doe 6 states that he was examined by Dr. Strauss for a physical and/or injury/illness approximately twenty (20) times a season.  On approximately twelve (12) different occasions, Dr. Strauss sexually assaulted and/or groped him.  During approximately four (4) of John Doe's 6 sexual assaults, Dr. Strauss attempted to masturbate him.

321.    Plaintiff John Doe 6 states that he would get a yearly physical, usually at the Woody Hayes Sports Complex, but a majority of his examinations occurred in the Larkins Hall Training Room.

322.    Plaintiff John Doe 6 complained to Larkins Hall Head Athletic Trainer Vince O'Brien that he did not want another physical from Dr. Strauss.  Consequently, during his Junior and Senior years, he refused his annual physicals because of his past experiences with Dr. Strauss.

323.    Plaintiff John Doe 6 states that Dr. Strauss never wore medical gloves on any of his examinations.

324.    Plaintiff John Doe 6 states that he spoke to Head Wrestling Coach Russ Hellickson and Head Assistant Wrestling Coach Jim Jordan on multiple occasions about the voyeurism in the showers and locker room area of Larkins Hall.  Also, Plaintiff John Doe 6 states that he addressed these concerns to OSU Athletic Director Andy Geiger.  In fact, he provided OSU Athletic Director Andy Geiger drawings of a portioned locker room that would separate the wrestlers from the voyeurism at Larkins Hall.

325.    Plaintiff John Doe 6 states that he told OSU Athletic Director Andy Geiger that many athletes verbally complained about Dr. Strauss.  He told Athletic Director Geiger that these athletes had even threatened physical violence toward the male predators at Larkins Hall due to their voyeuristic behaviors.

326.    Plaintiff John Doe 6 states that Dr. Strauss prescribed him Creatine in powder form to mix with his drinks.  Dr. Strauss told him to take the Creatine powder as it would boost his athletic performance. However, Plaintiff John Doe 6 was never counseled by Dr. Strauss as to why he was being prescribed the Creatine powder or what were any potential side effects of the Creatine powder.

## JOHN DOE 7

327.    Plaintiff John Doe 7 is resident of Issaquah, Washington.  He graduated from high school in 1995.  While in high school, he was a three (3) time Wisconsin State Wrestling Champion, Wrestling Team Captain and Outstanding Wrestler Award winner.  He also was the 1995 Southern Plains Regional Freestyle Champion. He was First Team All-Conference in Football, First Team All-Area in Football, and First Team All-Conference in Baseball.

328.    Plaintiff John Doe 7 attended OSU from the years 1995-2000 and graduated with a Bachelor's Degree in Transportation and Logistics as well as Marketing in 2000.  While at OSU, he was a five (5) year scholarship member of the OSU Varsity Wrestling Team.  Also, he was 1996 Scholar Athlete, Academic All-Big Ten, 1997 Freestyle All-American, 1999-2000 OSU Most Falls Award winner, and a 1999 Michigan State Open Most Falls Award winner.

329.    Plaintiff John Doe 7 was examined by Dr. Strauss approximately ten (10) times. Dr. Strauss attempted to masturbate him approximately four (4) times when he was seen for ailments such as cauliflower ear, a knee injury, and several skin ailments.

330.    Plaintiff John Doe 7 states that his first encounter with Dr. Strauss was for his yearly physical in 1995.  During this physical, Dr. Strauss grabbed his penis, rubbed his penis, and pulled on his scrotum at the same time. He states that Dr. Strauss told him that he had to be thorough as he detected an abnormal heart murmur and was worried about a heart valve issue.

331.    Plaintiff John Doe 7 also remembers Plaintiff Nicholas Nutter telling Dr. Strauss that Plaintiff Nutter wanted to do his 1995 physical with the door open.  Later, Plaintiff Nutter told Plaintiff John Doe 7 that having the door open was a way of protecting himself from Dr. Strauss based on Plaintiff Nutter's past experiences with Dr. Strauss.

332.    Plaintiff John Doe 7 complained to OSU Head Wrestling Coach Russ Hellickson and OSU Head Assistant Wrestling Coach Ken Ramsey in the OSU wrestling room during the 1995-1996 season. Plaintiff John Doe 7 expressed his displeasure to Head Coach Hellickson and Assistant Coach Ramsey about how Dr. Strauss checked his penis and scrotum for totally unrelated injuries that had nothing to do with his scrotum or penis.

333.    During the same season, Plaintiff John Doe 7 expressed his displeasure to Head Coach Hellickson and Head Assistant Coach Ramsey concerning Dr. Strauss being allowed to shower with the OSU wrestlers.

334.    Plaintiff John Doe 7 states that Head Wrestling Coach Russ Hellickson addressed Plaintiff John Doe 7 and other OSU wrestlers in the Larkins Hall Wrestling Locker Room and said that he had discussed complaints about Dr. Strauss to OSU Athletic Administrators. Further, Coach Russ Hellickson stated that he had also addressed the sexual deviant behaviors that were taking place at Larkins Hall with the OSU Athletic Administrators.

335.    Plaintiff John Doe 7 stated that he eventually stopped seeing Dr. Strauss unless it was absolutely necessary.

336.    Plaintiff John Doe 7 believed that he was an elite high school wrestling talent and by accepting a scholarship at OSU, Plaintiff John Doe 7 was signing a scholarship offer to wrestle in the BIG 10 Athletic Conference at one of the country's elite wrestling programs. However, due to the sexually deviant behavior of Larkins Hall, Plaintiff John Doe 7 felt he had no idea he was signing paperwork to be a male stripper. He remembers at the very first practice, OSU Head Wrestling Coach Russ Hellickson and OSU Head Assistant Wrestling Coach Ken Ramsey told the wrestlers to not talk openly about their practice times in order to help keep people in Larkins Hall from watching the OSU wrestlers shower.

337.    Plaintiff John Doe 7 states that Coach Hellickson and OSU Head Coach Ramsey would even try to limit the wrestlers to exposure from men voyeuristically watching the wrestlers at Larkins Hall by frequently changing the OSU wrestling team's practice time.

338.    Plaintiff John Doe 7 states that on one occasion, Coach Hellickson argued with a man that was showering with his back to the shower while the unknown male predator stared at wrestlers' genitals.  Coach Hellickson commented, "did you get a good look?"  Then, Coach Hellickson asked the man to leave the premises.

339.    Plaintiff John Doe 7 states that there were ten (10) to thirty (30) male predators daily in the showers and sauna areas of Larkins Hall staring at the wrestlers' genitals.

340.    Plaintiff John Doe 7 states that in 1996-1997 season, the University of Minnesota Wrestling Team was practicing and losing weight in the OSU Wrestling Room in Larkins Hall. One of Minnesota's star wrestlers was practicing when a man walked in and asked if he could wrestle with the Minnesota wrestler.  The male predator while in the wrestling room at Larkins Hall started on top in the referee's position and began grinding his genital area on the Minnesota wrestler's buttocks.  This behavior went on for approximately a minute before the wrestler from Minnesota realized the male predator did not know how to wrestle but was just trying to sexually assault the Minnesota wrestler.  This incident was reported to Minnesota Head Coach Jay Robinson and OSU Head Wrestling Coach Russ Hellickson.

341.    Plaintiff John Doe 7 states that OSU Head Wrestling Coach Russ Hellickson would often state to the wrestling team that he was trying to move the OSU wrestling team to a separate facility and that the OSU Athletic Administration was aware of the sexually deviant environment at Larkins Hall.

342.    Plaintiff John Doe 7 states that he also complained about the sexually deviant environment at Larkins Hall to his Athletic Academic Counselor James Hall.

## JOHN DOE 8

343.    Plaintiff John Doe 8 is a resident of Wadsworth, Ohio. He graduated from Akron Firestone High School in 1994, where he was a two (2) time OHSAA State Wrestling Qualifier.

344.    Plaintiff John Doe 8 attended OSU from 1994-1999, and graduated with a Bachelor of Science Degree in Human Nutrition. While at OSU, he was a member of the OSU Varsity Wrestling Team for five (5) years and was a 1997 and 1998 Academic All-Big Ten Award winner.

345.    Plaintiff John Doe 8 was examined by Dr. Strauss approximately thirty (30) times and was sexually assaulted by Dr. Strauss on approximately every occasion. John Doe 8 says that on every examination by Dr. Strauss, he was told to drop his shorts for a genital examination. Moreover, Dr. Strauss masturbated and/or attempted to masturbate him on several occasions when he was only being seen for ringworm or a knee injury.

346.    Plaintiff John Doe 8 complained to OSU Head Wrestling Coach Russ Hellickson about Dr. Strauss and also complained about the sexually deviant environment of Larkins Hall.

347.    Plaintiff John Doe 8 also complained about Dr. Strauss to the Head Trainer of Larkins Hall, Vince O'Brien.

348.    Plaintiff John Doe 8 states that Dr. Strauss would shower with the OSU wrestlers for an extremely long period of time in order to voyeuristically watch the entire wrestling team shower as well as voyeuristically watch the wrestlers change in the wrestling locker room

349.    In 1999, Plaintiff John Doe 8 was on a Larkins Hall task force, which was comprised of Plaintiff John Doe 3, two gay males, and a representative from the University to represent

Larkins Hall. This task force allowed John Doe 8 to represent the student-athletes of Larkins Hall and voice their concerns.

## **JOHN DOE 9**

350. Plaintiff John Doe 9 is a resident of Tallahassee, Florida. He graduated from Clermont Northeastern High School in 1991.

351. Plaintiff John Doe 9 attended OSU for five (5) years and graduated with a Bachelor's Degree in Economics with a minor in Computer Science.

352. Plaintiff John Doe 9 was a three (3) year member of the OSU Varsity Wrestling Team. He was examined by Dr. Strauss approximately seven (7) times and he was sexually assaulted by Dr. Strauss on five (5) occasions. Dr. Strauss would manipulate his penis in different directions in order to arouse him. Plaintiff John Doe 9's penis was near erection on approximately three (3) occasions as Dr. Strauss was attempting to masturbate him.

353. Plaintiff John Doe 9 states that Dr. Strauss would have him strip down and find a medical reason to examine his genitals regardless of his reason for his medical appointment.

354. Plaintiff John Doe 9 states that every exam with Dr. Strauss was unnecessarily long, contained unnecessary groping, and Dr. Strauss never wore medical gloves.

355. Plaintiff John Doe 9 states that Dr. Strauss even requested a rectal examination related to his head/face injury and performed the rectal examination.

356. Plaintiff John Doe 9 states that there was never another person present for any treatment/appointment that he had with Dr. Strauss and that these appointments were always much less formal than any other medical appointment that he has ever attended.

357.    Plaintiff John Doe 9 further states that Dr. Strauss would talk about photography and would state that his physique would photograph well.  Dr. Strauss bragged that he often took photographs of other athletes.

358.    Plaintiff John Doe 9 remembers other wrestlers being invited to Dr. Strauss' personal residence.

359.    Plaintiff John Doe 9 states that the general locker room area, sauna, and showers in Larkins Hall were filled with creepy voyeuristic behavior.  Dr. Strauss and others male predators would time their shower and sauna visits to coincide with the end of the OSU wrestling practice.  Multiple male predators would linger for hours going in and out of the sauna, while pleasuring themselves in the shower area.  Plaintiff John Doe 9 states that it was not uncommon to walk in and observe someone masturbating while watching the wrestlers shower, sauna, or change.

360.    Plaintiff John Doe 9 states that OSU Head Wrestling Coach Russ Hellickson often spoke to the OSU wrestling team about getting a new location in order to remove the wrestlers from the sexually deviant environment of Larkins Hall.

## JOHN DOE 10

361.    Plaintiff John Doe 10 is a resident of Hillard, Ohio.  He graduated from High School in 1994.  While in high school, he was an OHSAA State Wrestling Qualifier as well as a Team Captain in Football, Wrestling, and Track.

362.    Plaintiff John Doe 10 attended OSU from the years of 1994-2007, graduating with a Bachelor's of Science Degree in 2007.  He competed at OSU in Varsity Wrestling for four (4) years.

72

363.    Plaintiff John Doe 10 during his wrestling career was examined by Dr. Strauss approximately fifteen (15) times.  In all examinations, he believes Dr. Strauss was inappropriate and/or sexually assaulted him.

364.    When Dr. Strauss was around Plaintiff John Doe 10, he would constantly try to touch him.  This would occur every time he was next to Dr. Strauss.  Further, Dr. Strauss asked him to go to his house after hours for medication, which Plaintiff John Doe 10 declined.

365.    Plaintiff John Doe 10 states that Dr. Strauss would shower for extended periods of time and leered at the OSU wrestlers while showering.

366.    Plaintiff John Doe 10 states that he complained about the sexually deviant environment of Larkins Hall to OSU Athletic Director Andy Geiger during the wrestling team's mandatory sensitivity training imposed by OSU on the wrestlers.

## JOHN DOE 11

367.    Plaintiff John Doe 11 is a resident of Hinsdale, Illinois.  John Doe 11 graduated from Mentor Lake Catholic High School in 1985.  He was a three (3) time OHSAA Wrestling Place winner, finishing fifth (5th), third (3rd), and third (3rd) respectfully.  Also, John Doe 11 was a two (2) time All-State Award winner in football.

368.    Plaintiff John Doe 11 attended OSU from 1985 -1989 and received his Bachelor of Science Degree in Education.  Plaintiff John Doe 11 was a four (4) year Varsity Letterman and scholarship athlete in Football, receiving the Ironman Award as a freshman and leading the team in tackles as a senior.

369.    Plaintiff John Doe 11 was examined by Dr. Strauss on approximately four (4) occasions and was sexually assaulted by Dr. Strauss during three of the four (4) physical examinations.

370.     During his Freshman year physical at the Woody Hayes Sports Complex, Plaintiff John Doe 11 entered the middle of the three examination rooms.  Dr. Strauss asked Plaintiff John Doe 11 to get undressed.  Dr. Strauss pulled up a stool so his penis was at Dr. Strauss' eye level.  Dr. Strauss positioned his face so that he was inches away from John Doe 11's penis.  John Doe 11 could feel Dr. Strauss' breath on his genital area. Dr. Strauss massaged Plaintiff John Doe 11's testicles in his hand and began massaging Plaintiff John Doe 11's penis with his other hand. Plaintiff John Doe 11's penis became erect and Dr. Strauss placed John Doe 11's penis in his mouth.  John Doe 11 pulled away and Dr. Strauss told him to not worry that his reaction/erection was normal as Dr. Strauss had examined his brother in the past.

371.     Plaintiff John Doe 11 saw Dr. Strauss for two (2) more examinations at which Dr. Strauss fondled Plaintiff John Doe 11's scrotum.

372.     Plaintiff John Doe 11 told Head Athletic Trainers Billy Davis, Mike Hill, and Mike Bordner to keep "Dr. Jelly Fingers" away from him as he didn't want any medical examinations from Dr. Strauss.

373.     Consequently, during his fourth (4th) examination, Plaintiff John Doe 11 walked out of the examination room after realizing that Dr. Strauss was going to be the Physician conducting the examination.

### JOHN DOE 12

374.     Plaintiff John Doe 12 is a resident of Carlsbad, California.  He is a 1996 graduate of River Ridge High School, where he was a Florida State High School Wrestling Champion and Runner-Up, a four (4) sport varsity letterman, Senior class president, and graduated with a 3.89 grade point average.

375.    Plaintiff John Doe 12 attended OSU from 1996-2001, graduating in 2001 as a double major with Bachelor Degrees in Transportation and Logistics as well as Marketing.  Also, he was a five (5) year member of the OSU Varsity Wrestling Team and four (4) year scholar athlete award winner.

376.    Plaintiff John Doe 12 states that he saw Dr. Strauss approximately four (4) times for physical sickness/injury and Dr. Strauss sexually assaulted him on two (2) occasions.

377.    Plaintiff John Doe 12 states that he saw Dr. Strauss during the fall of the 1996 wrestling season.  Dr. Strauss conducted his initial physical and seemed overly thorough during the hernia portion of the physical, which lasted an excessively long time.

378.    Plaintiff John Doe 12 states that he had to see Dr Strauss a couple other times for injuries and skin conditions, etc.  During one of the visits, he distinctly remembers wondering why he was being checked for a hernia when his ailment was unrelated to his genitals.  During this examination, Dr. Strauss groped his scrotum for approximately seven (7) or eight (8) minutes.

379.    Plaintiff John Doe 12 states that Dr. Strauss did not wear any medical gloves during any of his examinations.

380.    Plaintiff John Doe 12 states the OSU wrestling locker room in Larkins Hall was located in the public locker room area for all students and staff of OSU.  On numerous occasions throughout his five (5) year tenure at OSU, there were non-athletes, definitely older than a typical undergraduate student that would shower with the wrestlers in an open shower.  At times these male predators would remain in the shower for upwards of thirty (30) minutes or more.  Also, on multiple occasions, Plaintiff John Doe 12 saw the male predators showering in very unique ways. For example, on all fours shooting the water stream into their buttocks, looking up

at the others in the shower, or some that would lather their groin for minutes at a time while showering next to an OSU wrester.

381. Plaintiff John Doe 12 states the sauna was located at the end of the shower and had a glass window in the door. It would be common that there would be the same male predators sitting in the shower naked, while watching through the window at the other men showering. There were numerous occasions that OSU wrestlers addressed them and told them to leave the shower or sauna. These situations became confrontational and heated on multiple occasions.

382. Plaintiff John Doe 12 was aware of multiple wrestlers addressing the Larkins Hall environment with the OSU wrestling coaching staff and the coaching staff addressing it with the athletic department. Plaintiff John Doe 12 states that the coaches were very frustrated with the situation at Larkins Hall. The OSU wrestling coaches promised a change in conditions and facility for the entire five (5) years that he was at OSU.

383. Plaintiff John Doe 12 states that the OSU wrestling team even changed their practice times in Larkins Hall in order to try to avoid the male predators.

384. Plaintiff John Doe 12 states that he knew of other OSU wrestlers that had complained to the OSU Athletic Administration regarding the sexually deviant environment at Larkins Hall.

## JOHN DOE 13

385. Plaintiff John Doe 13 is a resident of Maple Glen, Pennsylvania. He graduated from Huntington High School in 1990, where he was a two-time (2x) West Virginia State Wrestling Champion and a High School All-American.

386. Plaintiff John Doe 13 attended OSU from 1990-1995 and graduated with a Bachelor of Science Degree in Biology in 1995. While at OSU, he was a five (5) year member of the OSU

Varsity Wrestling Team.  He was a two-time Big Ten scholar athlete, a four-time (4x) OSU

Scholar Athlete, and a varsity award winner.

387.    Plaintiff John Doe 13 states that he saw Dr. Strauss for physical sickness/injury between

thirty (30) and forty (40) times and was sexually assaulted by Dr. Strauss over thirty (30) times.

Dr. Strauss conducted inappropriate genital exams, lymph node checks, chest palpations, digital

rectal exams, unnecessary hernia exams, and unnecessary Heimlich maneuvers on him.

388.    Plaintiff John Doe 13 states that Dr. Strauss went to his apartment and sexually abused

him to the point of near ejaculation as Dr. Strauss physically massaged and manipulated Plaintiff

John Doe 13's penis for approximately ten (10) minutes.

389.    Plaintiff John Doe 13 states that Dr. Strauss sexually abused him to the point of erection

or near erection numerous times in the Larkins Hall Training Room.  In addition, on numerous

occasions Dr. Strauss tried to masturbate him in the Larkins Hall Training Room.

390.    Plaintiff John Doe 13 further states that Dr. Strauss conducted unnecessary digital rectal

exams in the Larkins Hall Training Room.

391.    Plaintiff John Doe 13 states that Dr. Strauss conducted examinations on him in exchange

for a letter of recommendation for him to attend medical school.

392.    Plaintiff John Doe 13 states that Dr. Strauss regularly showered with the wrestlers and

voyeuristically watched the wrestlers in the showers and locker room at Larkins Hall.

393.    Plaintiff John Doe 13 states that every year he complained to OSU Head Wrestling Coach

Russ Hellickson regarding the sexually hostile environment at Larkins Hall.

## JOHN DOE 14

394.    Plaintiff John Doe 14 is a resident of Perkiomenville, Pennsylvania.  He graduated from

Cranbrook Academy in 1988 and was a two-time member of the Michigan High School Ice

Hockey State Championship Team, New Jersey All County Ice Hockey in 1986, and Team Captain of Bergen Catholic High School Ice Hockey Team as a Sophomore in 1985.

395.     Plaintiff John Doe 14 attended OSU from 1988-1993 and graduated with a Bachelor of Science Degree in Biology in 1993.  He was a two (2) year member of the OSU Varsity Men's Ice Hockey Team.

396.     Plaintiff John Doe 14 states that he saw Dr. Strauss for physicals or sickness/injury five (5) times and was sexually assaulted by Dr. Strauss on one (1) occasion.

397.     Plaintiff John Doe 14 states that he had a torn/strained calf muscle.  He called Dr. Strauss and asked to be evaluated.  Dr. Strauss instructed Plaintiff John Doe 14 to come to his house. Plaintiff John Doe 14 had a teammate drive him to Dr. Strauss' residence. The teammate stayed in the car, while he went inside Dr. Strauss' residence.  While in his kitchen, Dr. Strauss pulled up a chair in the center of his kitchen and asked him to stand in front of him.  Plaintiff John Doe 14 was wearing shorts, no socks, and his injured calf muscle was fully visible.  Dr. Strauss asked him to remove his shorts and underwear.  He asked why and Dr. Strauss replied that he needed to examine his lymph nodes.  Dr. Strauss then touched and moved his penis and testicles repeatedly in an attempt to masturbate him.  Then, Dr. Strauss made a gesture with his hand upward for Plaintiff John Doe 14 to pull up his underwear and shorts.  Dr. Strauss concluded that he had a torn or strained calf muscle.

398.     Dr. Strauss was not wearing medical gloves during this above-mentioned examination.

399.     During an annual physical, when Plaintiff John Doe 14 dropped his shorts for the exam, Dr. Strauss commented to John Doe 14 that he like his underwear, in front of  three (3) medical students.  Further, Dr. Strauss commented that Plaintiff John Doe 14 looked great and he was

78

more cut. All of these comments occurred in the process of his medical exam when he had his shorts down.

400.    Plaintiff John Doe 14 states that while in the varsity ice hockey locker room, Dr. Strauss showed him photographs that Dr. Strauss had taken of his hockey teammates.  Dr. Strauss showed him a "favorite" picture, which was a picture of one of his teammates, shirtless and leaning over tying his skate laces.  Plaintiff John Doe 14 states that Dr. Strauss would take pictures of the players in the varsity ice hockey locker room.

## JOHN DOE 15

401.    Plaintiff John Doe 15 is a resident of Ottawa Hills, Ohio.  He is a 1987 graduate of Toledo Sylvania High School where he was a four (4) year varsity hockey letterman, and the only starting Freshmen on a top five (5) ranked State of Ohio hockey team, Co-Captain of the Varsity Hockey Team his Senior year, and part of the State of Ohio "Frozen Four" State Hockey Championships in his Junior and Senior years. He received All-District Team Nominations in his Junior and Senior years.  Post high school, he played one (1) year of Junior Hockey in St. Catherines and Caledon Ontario.

402.    Plaintiff John Doe 15 states that he attended OSU from 1998-1992.  He received his Bachelor of Science Degree in Business/Economics from the University of Toledo in 1994. While at OSU, he participated as a member of the OSU Varsity Men's Hockey Team for one (1) season.

403.    Plaintiff John Doe 15 states that he was seen by Dr. Strauss for physical sickness/injury not less than four (4) times and was sexually assaulted on at least two (2) occasions.

404.  In August 1988, Plaintiff John Doe 15 states that he began training camp as a walk-on for the OSU Varsity Hockey Program.  During that time period, he was examined by Dr. Strauss for

a routine physical as part of the protocols of the hockey training camp. At the time of the examination, he entered the private room to be examined by Dr. Strauss. He walked into the room and Dr. Strauss was sitting on a medical stool. Dr. Strauss called Plaintiff John Doe 15 toward him and placed Plaintiff John Doe 15 in front of him. Dr. Strauss went through the normal protocol of medical questions and then asked him to drop his pants. When he dropped his pants, Dr. Strauss took both of his hands in a cupping fashion, as if he was holding a baby bird, and cupped John Doe 15's scrotum. When he slightly twitched, Dr. Strauss stated, "oh you're a ticklish one, are you? Well don't worry Doc Strauss has soft hands." At that point, Dr. Strauss continued to cup John Doe 15's scrotum with one hand and then began to manipulate his penis for the next few minutes in an attempt to masturbate him. Eventually, he pulled back and pulled his pants back up. At that point, Dr. Strauss stated that he was finished with the exam and Plaintiff John Doe 15 left the room.

405. Plaintiff John Doe 15 states that Dr. Strauss did not wear medical gloves during any of his examinations.

406. Plaintiff John Doe 15 states that Dr. Strauss would occasionally shower in the hockey team locker room and voyeuristically watch the hockey players.

407. Plaintiff John Doe 15 remembers having dinner at Dr. Strauss' home with another hockey player. He recalls awkward conversations which were not a normal athletic advisor/athlete interface, but rather inappropriate conversations.

408. Plaintiff John Doe 15 recalled that on several occasions in the hockey team locker room, the hockey players discussed their personal encounters with Dr. Strauss in front of OSU Assistant Hockey Coaches Bill Mackenzie and Paul Pooley.

**JOHN DOE 16**

409.    Plaintiff John Doe 16 is a resident of Louisville, Ohio.  He graduated from Louisville High School in 1988.

410.    Plaintiff John Doe 16 attended OSU from 1988-1992 and graduated with a Bachelor of Science of Allied Health.  While at OSU, he was a three (3) year member of the Varsity Wrestling Team, a letter winner, and an academic scholar athlete.

411.    Plaintiff John Doe 16 states that he saw Dr. Strauss for a physical and sickness/injury approximately twelve (12) times and was sexually assaulted approximately six (6) times. On at least four (4) of his exams, Dr. Strauss manipulated his penis to a point where Plaintiff John Doe 16 was near erection and Dr. Strauss was attempting to masturbate him.

412.    Plaintiff John Doe 16 states that Dr. Strauss never wore any medical gloves during his examinations.

413.    Plaintiff John Doe 16 states that Dr. Strauss frequently showered with the wrestlers and would voyeuristically stare at the wrestler.

414.    Plaintiff John Doe 16 states that the Larkins Hall showers and sauna area was a hostile sexual environment where male predators leered at the wrestlers.

415.     Plaintiff John Doe 16 states that Dr. Strauss attempted to groom the wrestlers by being at a majority of the practices and workouts.

**JOHN DOE 17**

416.    Plaintiff John Doe 17 is a resident of Hilliard, Ohio.  He graduated from Westerville South in 1986 and was the school record holder in numerous swimming events, state swimming finalist multiple years, Swim Team Captain, and Senior Class President.

417.    Plaintiff John Doe 17 attended OSU from 1986-1991 and graduated with a Bachelor's

Degree in Production Operation Management.  Plaintiff John Doe 17 was a five (5) year member

of the Men's Swimming Team.  He was a multiple year Big Ten Finalist, Scholar Athlete, Team

Captain, and set numerous meet and pool records.

418.    Plaintiff John Doe 17 states that was seen by Dr. Strauss approximately fifty (50) times

for physical and sickness/injury Dr. Strauss sexually assaulted him approximately forty (40)

times.  Dr. Strauss manipulated Plaintiff John Doe 17's penis to near erection on approximately

ten (10) occasions as Dr. Strauss was attempting to masturbate him.

419.    Plaintiff John Doe 17 states that Dr. Strauss would make him take his pants down and

play with his genitals for any sort of examination, even for complaints such as a sore throat.

420.    Plaintiff John Doe 17 states that Dr. Strauss would come into the locker room after OSU

swim practice and voyeuristically watch the swimmers while they changed.  Also, occasionally,

Dr. Strauss would shower with the OSU swimmers.  Sometimes, Dr. Strauss would be in the

swimming locker room naked reading the newspaper.

421.    Plaintiff John Doe 17 complained to Swimming Head Coach Dick Sloan and Swim

Coach Bill Wadley.  As a Captain, he voiced his concerns as well as those of his other teammates

to his OSU swim coaches.

422.    Plaintiff John Doe 17 states that Dr. Strauss would come into the OSU swim locker room

when the swimmers would shave before meets.  Dr. Strauss would take a lot of pictures while the

OSU swimmers shaved.  Later, Dr. Strauss would joke that the pictures were so provocative, that

his film was returned because the photo shop would not develop the pictures for him.

## JOHN DOE 18

423.     Plaintiff John Doe 18 is a resident of Atlanta Georgia.  He graduated from Harold Richards High School.

424.     Plaintiff John Doe 18 attended OSU from the years 1995-1999 and was a four (4) year scholarship member of the OSU Football Team.

425.     Plaintiff John Doe 18 states that he saw Dr. Strauss approximately five (5) times for physical sickness/injury and Dr. Strauss sexually molested him on all five (5) occasions.  All of Plaintiff John Doe 18's examinations occurred in the Woody Hayes Football Complex.

426.     Plaintiff John Doe 18 states that Dr. Strauss failed to wear medical gloves during any of his examinations.

## JOHN DOE 19

427.     Plaintiff John Doe 19 is a resident of North Carolina.  He is a 1995 graduate of Walsh Jesuit High School in Akron, Ohio.

428.     Plaintiff John Doe 19 attended OSU from the years 1995-1997 and was a two (2) year member of the OSU Varsity Wrestling Team.  In 1995-1996, John Doe 19 received OSU scholar athlete honors.

429.     Plaintiff John Doe 19 states that he saw Dr. Strauss approximately seven (7) times for physical sickness/injury and Dr. Strauss sexually assaulted him on approximately five (5) occasions.  Also, Dr. Strauss attempted to masturbate him on at least two (2) occasions and both occasions occurred in the Larkins Hall Training Room.

430.     Plaintiff John Doe 19 states that during his physical, Dr. Strauss had him get undressed. Dr. Strauss would start the examination at Plaintiff John Doe 19's head and neck and work his way down.  Dr. Strauss would touch most of his body as it felt like a rub down.  Then, Dr.

Strauss would sit on a stool right in front of his body.  Dr. Strauss grabbed his penis with one hand and his testicles with the other.

431.    Plaintiff John Doe 19 states that during his first physical, Dr. Strauss had him turn around spread his buttocks and cough.

432.    Plaintiff John Doe 19 states that Dr. Strauss would frequently shower with the wrestlers in Larkins Hall and wash his private area until it was all covered in soap.

## FACTS

433.    The Plaintiffs hereby incorporate by reference the allegations set forth and contained in Paragraphs One (1) through Four Hundred and Thirty-Two (432) as if fully written herein.

434.    Defendant OSU employed Dr. Richard Strauss, M.D., as a faculty member from approximately September 1978 until approximately March 1, 1998.

435.    In approximately September 1978, Dr. Strauss started with OSU as an Assistant Professor in the College of Medicine.  Months later, Dr. Strauss was volunteering with the University Athletics Department as a team physician for several teams located in Larkins Hall.

436.    By approximately 1980, Dr. Strauss was serving as an Associate Director of the Sports Medicine program.

437.    By approximately 1981, Dr. Strauss began an appointment in the Athletics Department, including medical responsibilities at the Sports Medicine Clinic located in the University's Student Health Services.

438.    Over the years, Dr. Strauss' responsibilities as a team physician expanded beyond Larkins Hall to other athletic facilities, which included: the Woody Hayes Athletic Center, Ernie Biggs Athletic Training Facility, and St. John Arena.  Moreover, Dr. Strauss treated patients at Student Health Services.

439.    Dr. Strauss was granted tenure by OSU as an associate professor in approximately 1983.

440.    Dr. Strauss was granted a full professor with tenure by OSU in approximately 1992.

441.    In addition to his above duties, in approximately 1994, Dr. Strauss also began a part-time appointment treating students on the third floor of Wilce Student Health Center.

442.    In approximately March 1998, Dr. Strauss voluntarily retired and was granted Emeritus Status by the OSU Board of Trustees in the School of Public Health.  Dr. Strauss' Emeritus Status was bestowed upon him despite the lack of review or approval from the Dean of the College of Medicine and Public Health.

443.    Over his career, Dr. Strauss treated male student-athletes in the following sports: swimming, diving, wrestling, gymnastics, fencing, lacrosse, hockey cheerleading, volleyball, soccer, track, golf, baseball, tennis, water polo, and football

444.    During the above stated times and/or years and while working for Defendant OSU, Dr. Strauss sexually abused the Plaintiffs and other OSU Students under the guise of medical treatment during their medical examination in one or more of the following ways:

        a.      Dr. Strauss extremely manipulated or stimulated his student-patient's genitals, which included unwanted oral sex, anal digital penetration, masturbation, attempted masturbation, and fondling that caused ejaculation or near ejaculation;

        b.      Dr. Strauss fondled the student-patient to the point of erection or near erection;

        c.      Dr. Strauss performed prolonged and/or medically unnecessary genital and rectal exams;

        d.      Dr. Strauss committed other inappropriate and abusive practices toward his student-patients such as unnecessary nudity of the student-patient, excessive touching and/or groping of the student-patient, verbal commentary and inappropriate questions, lack of

85

examination gloves, inappropriate physical position and/or invasion of space of the student-patient, performing treatments outside of a clinical setting, and "quid pro quo" arrangements with the student-patient; and

       e.     Dr. Strauss inappropriately showered alongside student-patients, loitered in student-athletes locker rooms, engaged in voyeuristic behavior, and initiated fraternization with student-patients by calling their residences, inviting them to lunch/dinner and paying for their meals, and asking to take pictures of the student-patients to help them start a modeling career.

445.    Strauss committed the above-mentioned acts of sexual abuse and sexual harassment consistently on an almost daily basis as an OSU faculty member and OSU athletic team physician.

446.    As set forth below, Plaintiffs as student-patients were vulnerable to Strauss' sexual abuse and the student-patients were not able to identify Strauss' conduct as sexual abuse when it occurred.

447.    Plaintiffs were treated by Dr. Strauss in his official capacity as an OSU Team Physician and/or medical doctor working for OSU.

448.    Plaintiffs had little and/or no experience with medical doctors and/or examinations without their parents being present. Plaintiffs were taught to respect their elders and were under the belief that an OSU Team Physician and/ or medical doctor working for OSU had their best health interest in mind during their examination.

449.    The Plaintiffs who were OSU athletes attributed and/or rationalized Dr. Strauss' inappropriate behavior as being the thoroughness needed for participation in NCAA Division I Athletics, which said Plaintiffs knew they had to undergo a pre-season physical in order to participate.

450.    Plaintiffs were sexually assaulted and/or abused by Dr. Strauss under the guise of legitimate medical examinations.

451.    Plaintiff OSU Athletes were compliant with the Dr. Strauss as their OSU Team Physician in order to regain their good health to compete, in order to be cleared to compete, and/or represent OSU to the best of their ability.

452.    Plaintiffs OSU Athletes were not educated nor taught that male sexual abuse could exist even within the confines of the OSU Athletic Department.  Further, male sexual abuse was not a commonly acknowledged problem or commonly discussed among non-educators or people outside the medical field.

453.    Dr. Strauss preyed upon the Plaintiffs with his superior medical knowledge and was able to dispel any of the Plaintiffs' objections with this knowledge.  Plaintiffs did not have the education and/or experience in the medical field to limit Dr. Strauss' physical contact during their examinations.

454.    Plaintiffs believed and trusted OSU.  Plaintiffs believed OSU would protect, inform, and/or remove them from harmful situations, even if it involved their Team Physician and/or an OSU medical doctor. Plaintiffs attended OSU with the expectation that the University would consistently provide them with a safe and supportive environment that would help them thrive.

455.    Plaintiff OSU Athletes believed that accusing an OSU Professor and/or Team Physician of committing sexual assault would risk their status on the team and/or their athletic scholarship as well as their status as a student at OSU.   The non-athletes Plaintiffs believed that accusing an OSU Professor and/or Team Physician of committing sexual assault would risk their status as a student at OSU.

456.    Plaintiff OSU Athletes feared being ridiculed and/or ostracized if they complained to their teammates and the teammates failed to report similar experiences.  Plaintiffs OSU students non-athletes feared being ridiculed and/or ostracized if they complained to other students, who did not have similar experiences.

457.     Plaintiffs had no options in their treatment.  OSU provided their medical staff and facilities.  Plaintiffs needed to see Dr. Strauss not only to heal quickly, but also, to save time, and/or money, as well as to be cleared to compete for OSU.

458.    OSU led Plaintiffs to believe that Strauss' sexually abusive examinations, methods, and statements were medically acceptable behavior and/or practices.

459.    As previously alleged not until 2019, did Plaintiffs have a reasonable basis for believing that OSU had actual knowledge that Dr. Strauss was sexually abusing male students in a clinical setting.

460.    As previously alleged not until 2019 did Plaintiffs have a reasonable basis for believing that OSU concealed or remained deliberately indifferent to the substantial risk that Dr. Strauss was sexually abusing them and other OSU male students.

461.    As previously alleged, not until 2019, did Plaintiffs have any reasonable way of knowing that OSU had actual knowledge that Dr. Strauss was sexually abusing male student-athletes and students in a clinical setting.  Plaintiffs had no way of learning what and when OSU knew about Dr. Strauss and/or how OSU chose to permit continued sexual abuse by Dr. Strauss.  Plaintiffs could not have exercised reasonable due diligence that would have revealed how OSU's acts and omissions caused Plaintiffs to suffer independent injuries from the injuries caused by Dr. Strauss.

462.    OSU had a deliberate indifference toward Dr. Strauss' conduct as student-athletes, students, and a few OSU staff reported and referred complaints about Dr. Strauss to various OSU officials and employees throughout Dr. Strauss' career but OSU did nothing.

463.    At all relevant times in regard to this Complaint, and on information and belief, OSU staff and/or employees with authority to stop Dr. Strauss' access to patients failed to prevent Dr. Strauss from sexually abusing patients in a clinical setting, and/or implement other corrective measures as OSU had actual knowledge that there was a substantial likelihood that Strauss was sexually assaulting and abusing male student-athletes and male students.  Moreover, OSU had actual knowledge that Dr. Strauss posed a substantial risk of sexual abuse as early as 1979.

464.    OSU employees in the Sports medicine program and the Athletics Department had actual knowledge that Dr. Strauss was conducting prolonged genital exams and that Dr. Strauss refused to allow athletic training staff to be present during such exams.

465.    OSU, through its own administrators, faculty, and staff, had actual notice of Dr. Strauss' sexual abuse of male student-athletes and students.  Yet, OSU denied, dismissed, disregarded, minimized, refuted, silenced, and even concealed complaints about Dr. Strauss' sexual misconduct.  Even though OSU had evidence that Dr. Strauss was a substantial risk to their male student-athletes and male students, OSU failed to act.  On Plaintiffs information and belief, OSU willfully allowed Dr. Strauss to prey amongst its male student-athletes and male students, even though many high ranking officials such as Athletic Directors, Assistant Athletic Directors, Associate Athletic Directors, Head Team Physicians, Team Physicians, and Athletic Trainers could have taken action to prevent this systemic sexual abuse.

466.    Further, nurses at Student Health Services made various complaints regarding Dr. Strauss.  These complaints were that Dr. Strauss showed up unannounced to treat patients,

performed prolonged examinations behind closed doors, and failed to chart and/or fill out medical records, which was and continues to be a standard medical practice in order to document a patient's medical history and provide follow-up care.

467.     Plaintiffs believe this lack of medical documentation is troubling and OSU allowed Dr. Strauss to continue to disregard charting and/or filling out of important medical documentation. This lack of documentation allowed Dr. Strauss to misrepresent the nature of a patient's visit and/or allowed Dr. Strauss to deny whether he even examined the said patient.

468.     OSU also failed to direct Strauss to stop showering and/or sharing a locker room with their male student-athletes, failed to direct a third person from the training staff to be present when treating their male student-athletes, failed to properly investigate any of reports and/or rumors, and failed to have a meaningful sexual abuse policy for its students.

469.     Simply put, OSU failed its male student-athletes and male students from the years 1979-1998 as OSU had actual knowledge that their employee and faculty member, Dr. Strauss, was a sexual predator and OSU was deliberately indifferent to these facts.

470.     Additionally, OSU failed to address the sexual harassment in its athletic facility at Larkins Hall.

471.     Larkins Hall was home to many sports such as swimming, diving, gymnastics, fencing and wrestling.

472.     In Larkins Hall, the OSU Varsity Wrestlers were victims of a harassing environment that allowed OSU's faculty, staff, and students to voyeuristically leer and/or stare at these wrestlers as they showered or used the sauna facilities.

473.     Further, male on male sexual interactions were frequent in areas of Larkins Hall that were frequented by the OSU wrestling team.  There were instances of male on male sexual encounters

90

in the bathroom, the sauna, the private winding stairwell entrance to the wrestling room, the wrestling room, and the bathroom in the hallway outside of the wrestling room.

474.    The OSU Wrestling Coaches repeatedly tried to secure a separate shower facility for their wrestlers and/or move their wrestlers into a separate facility.  Further, in approximately 1995, two wrestlers approached OSU Athletic Director Andy Geiger with schematic drawings to separate the wrestlers into their own space. OSU Athletic Director reported to the wrestlers that these plans would be too expensive.  As a concession, the OSU Athletic Department Andy Geiger cleaned the wrestling locker room carpets that week.

475.    The wrestling coaches consistently asked for better accommodations as the Larkins Hall sexual harassment environment seriously impacted the psyche and morale of the OSU Wrestling Team.  The OSU wrestling coaches would even address the team as to this issue and continually informed the wrestlers that the OSU wrestling coaching staff was doing everything the staff could do to remove the team from the sexual harassment.

476.    Dr. Strauss was a part of the sexual harassment environment of Larkins Hall.  Dr. Strauss took long showers with the wrestling team.  During these showers, Dr. Strauss would voyeuristically stare at the wrestlers.  After his shower, Dr. Strauss would enter the wrestling locker room and position himself to leer at the wrestlers as he patted himself dry.  Additionally, he would use the sauna facilities with the wrestlers and voyeuristically watch them.  Dr. Strauss' showering obsession was to the point that he would sometimes reduce his examination times to allow him to shower.  Moreover, many wrestlers saw Dr. Strauss take more than one shower in a short amount of time, which allowed Dr. Strauss to voyeuristically gaze at his "favorite wrestlers."

477.    OSU had actual knowledge that their OSU Varsity Wrestling Team was being sexually harassed in Larkins Hall and OSU was deliberately indifferent to these facts.  Even though OSU knew of Larkins Hall's sexually hostile environment, OSU took zero steps to protect their student-athletes.

478.    OSU had actual knowledge that their employee and faculty member, Dr. Strauss, was showering and using the wrestling locker room as well as other male sports' locker rooms in Larkins Hall and OSU was deliberately indifferent to these facts.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION – VIOLATIONS OF TITLE IX, 20 U.S.C. §1681(a), *et seq.*

479.    The Plaintiffs hereby incorporate by reference the allegations set forth and contained in Paragraphs One (1) through Paragraphs Four Hundred and Seventy-Eight (478) as if fully written herein.

480.    Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1631(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…."

481.    Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106.34 C.F.R. § 106.86(b) provides:"…A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

482.    As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

483.    Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment, including sexual assault, by school employees, students, and third parties.

484.    Sexual harassment is defined as unwelcome conduct of sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature when either:

   a.        the conduct is made as a term or condition of an individual's employment, education, living environment or participation in a University community;

   b.         the acceptance or refusal of such conduct is used as the basis or a factor in decisions affecting an individual's employment, education, living environment, or participation in a University community;

   c.        the conduct unreasonably impacts an individual's employment or academic performance or creates an intimidating, hostile or offensive environment for that individual's employment, education, living environment, or participation in a University community.

485.    At all relevant times contained herein, OSU received federal financial assistance. As a result, OSU is subject to Title IX 20 U.S.C. §1681(a), *et seq*., OSU owed Plaintiffs duties to act prudently and with reasonable care, and otherwise to promptly investigate all allegations of sexual harassment, sexual assault, and sexual abuse regarding Dr. Strauss as he was an OSU employee, faculty member, and Team Physician.

486.    OSU subjected the Plaintiffs and other OSU students to Dr. Strauss, who sexually molested, assaulted, abused, and sexually harassed the Plaintiffs.  This included, but is not limited to, the following:  performing unwanted oral sex, fondling of their testicles, fondling of

their penises, digitally penetrating their anuses, rubbing his erect genitals on their bodies during

an examination, voyeuristically staring at them while they showered, making sexual comments

and other inappropriate comments toward them, calling them at their residences, inviting them

and taking them to lunch/dinner, and asking the Plaintiffs to take semi-nude photographs. All of

these actions were all acts of sexual discrimination under Title IX.

487.  OSU had actual knowledge of the serial and consistent sexual molestation, assault, abuse,

and harassment and permitted it to continue unchecked throughout Dr. Strauss' employment.

488.  From approximately 1979-1998, male student-athletes, male students, and coaches

conveyed complaints and concerns regarding Dr. Strauss' inappropriate sexual conduct to OSU

administrators and employees.

489.  Given the magnitude of Dr. Strauss' abuse-involving students and student athletes he

evaluated and treated over the span of two decades, it would implausible for OSU to claim that it

did not know about Dr. Strauss' sexual abuse.

490.  OSU was required to promptly investigate and address Plaintiffs' (and other OSU

students') allegations, reports and/or complaints of other unwelcome, inappropriate touching and

comments by Dr. Strauss, but OSU did not do so.

491.  OSU created and was deliberately indifferent to a sexually hostile culture withing its

athletic and student health programs, by, among other things:

     a.  Mishandling students' reports about Dr. Strauss' conduct and/or discouraging

     students from reporting Dr. Strauss's conduct:

     b.  Failing to promptly and appropriately investigate, remedy, and respond to

     complaints about Dr. Strauss' conduct;

c.      Promoting Dr. Strauss and increasing his access to OSU students, despite students' complaints about Dr. Strauss' conducts;

d.      Failing to adequately supervise Dr. Strauss, after learning that he posed a substantial risk to the safety of male students and student-athletes;

e.      Failing to take corrective action to prevent Dr Strauss from sexually harassing other students;

f.      Requiring student-athletes to see Dr. Strauss for annual physicals and medical treatment in order to participate in university sports to maintain their athletic scholarships, even after student-athletes complained to athletic directors, coaches, and trainers about the ways Dr. Strauss touched them during medical examinations;

g.      Threatening male athletes' participation in OSU sports if they refused to get physicals and/or medical treatment from Dr. Strauss;

h.      Joking about Dr. Strauss' conduct with other student-athletes; and

i.      Falsely representing to at least one student who reported sexual harassment by Dr. Strauss that there had been no prior complaints about Dr. Strauss and that OSU Student Health had only received positive comments about Dr. Strauss;

492.    OSU willfully allowed Dr. Strauss to prey amongst its male student-athletes and male students, even though many high-ranking officials such as Athletic Directors, Assistant Athletic Directors, Associate Athletic Directors, Head Team Physicians, Team Physicians, and Athletic Trainers could have acted to prevent this systemic sexual abuse.

493.    OSU failed to respond promptly and adequately to address the sexual misconduct of Dr. Strauss and to protect its male student-athletes and male students, which is a blatant violation of Title IX.

95

494.    OSU, through its acts and omissions, acted with deliberate indifference to the sexual molestation, assault, abuse, and harassment that the Plaintiffs as well as other male OSU students endured.  OSU failed to respond to the sexual misconduct of Dr. Strauss and their inaction was clearly unreasonable in light of the known circumstances.

495.    OSU's failure to promptly respond, investigate, and act to investigate complaints and then remedy the situation created by their employee, faculty member, and Team Physician, Dr. Strauss, caused the Plaintiffs to experience further sexual molestation, assault, abuse, and harassment and/or made the Plaintiffs more vulnerable to it into the future.

496.    OSU's failure to promptly respond, investigate, and act to investigate complaints and then remedy the situation created by their employee, faculty member, and Team Physician, Dr. Strauss, created a sexually hostile environment that effectively denied Plaintiffs access to educational opportunities and benefits at OSU, including appropriate medical care.  OSU's deliberate indifference was so severe, pervasive, and objectively offensive that it deprived the Plaintiffs of access to the educational opportunities or benefits provided by OSU.

497.    As a direct and proximate cause of OSU's blatant violation of Title IX as well as the rights bestowed to Plaintiff's under Title IX, Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life, which will continue into the future.  Also, Plaintiffs were prevented from and continue to be prevented from obtaining the full enjoyment of life.  Plaintiffs have sustained and continue to sustain loss of earnings and earning capacity.  Finally, Plaintiffs have incurred various personal expenses.

498.     OSU's creation of and deliberate indifference to the sexually hostile culture within its athletic and student health programs substantially increased the risk that Plaintiffs and other OSU students would be sexually harassed.

499.     The sexual harassment that Plaintiffs suffered was so severe, pervasive and objectively offensive that it effectively barred their access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

## **LARKINS HALL**

500.     The Plaintiff OSU wrestlers mainly trained in their respective sport in Larkins Hall. As such, these Plaintiff OSU wrestlers were entitled to use the athletic facilities at Larkins Hall free from sexual molestation, assault, abuse, and harassment.

501.     OSU owed these Plaintiffs a duty to investigate and remedy the conditions that made Larkins Hall a sexually hostile and abusive environment.

502.     OSU had actual knowledge of the hostile sexual environment at Larkins Hall.  The Athletic Director, Assistant Athletic Directors, Associate Athletic Directors, and/or Building Supervisor had actual knowledge of the hostile environment and these individuals had the authority to take corrective action as individuals using the facility were required to be students, faculty, staff, and/or employees of OSU.  Yet, these individuals failed any opportunity to rectify the hostile environment at Larkins Hall.

503.     Also, OSU was deliberately indifferent to this hostile environment even though OSU exercised control over Larkins Hall.  In fact, this environment was so severe, pervasive, and objectively offensive that it deprived the Plaintiff wrestlers of access to their educational opportunities and/or benefits provided by OSU.

504.     Numerous complaints were made by the Plaintiff wrestlers to the former OSU Wrestling Coaches. Athletic Director, an Assistant Athletic Director, and other high-ranking OSU employees. These complaints included but were not limited to the following:

a.   Dr. Strauss was ogling and gawking male student athletes at Larkins Hall while they showered or were in the locker room;

b.   Dr. Strauss was showering with male student athletes for hours at a time, several times a day;

c.   Dr. Strauss was making sexual comments and other inappropriate comments to the male students. In addition, he was calling them at their residences inviting them to dinner, asking them to take semi-nude photographs, and inviting them to his home;

d.   Larkins Hall was a toxic, sexualized place where male voyeurs gathered to gawk and stare and masturbate as the male student athletes showered or stood naked in the locker room, and

e.   Male OSU students were openly having sex with each other on the stairwells and other places in Larkins Hall.

**SECOND CAUSE OF ACTION - VIOLATIONS OF TITLE IX, 20 U.S.C. §1681(a), *et seq*.**

**Deliberate Indifference to Prior Sexual Harassment**

505.     Plaintiffs incorporate by reference the allegations set forth and contained in Paragraphs One (1) through Paragraphs Five Hundred and Four (504) as if fully written herein.

506.     Before Dr. Strauss sexually harassed the Plaintiffs, OSU had actual knowledge of Dr. Strauss's prior sexual harassment of male students at OSU.

507.     Based on Dr. Strauss's prior conduct, OSU had actual knowledge of the substantial risk that Dr. Strauss would sexually harass other male students at OSU.

508.    OSU officials, with the knowledge described above, had the authority to address the risk

posed, by Dr. Strauss, and had the authority to take corrective measures by, among other things,

closely supervising Dr. Strauss, not allowing him to shower with student-athletes, or terminating

his employment.

509.    OSU's failure to address the substantial risk posed by Dr. Strauss, given prior complaints

and reports about his inappropriate conduct, was clearly unreasonable in light of the known

circumstances.

510.    By its acts and omissions, OSU was deliberately indifferent to the substantial risk that Dr.

Strauss would sexually harass other male students at OSU.

511.    As a result of OSU's deliberate indifference, Plaintiffs were subjected to severe sexual

harassment by Dr. Strauss, including sexual assault in the guise of medical care.

512.    The sexual harassment that Plaintiffs suffered was so severe, pervasive, and objectively

offensive that it deprived Plaintiffs of access to educational opportunities and benefits, including

a safe educational environment and appropriate medical care.

513.    As a direct and proximate result of OSU's deliberate indifference to Dr. Strauss's prior

sexual harassment of OSU, which violated Title IX, Plaintiffs have suffered and continue to

suffer damages and injuries.

### THIRD CAUSE OF ACTION - FRAUDULENT CONCEALMENT
### BY THE OHIO STATE UNIVERSITY

514.    The Plaintiffs hereby incorporate by reference Paragraph One (1) through Paragraphs

Five Hundred and Thirteen (513) as fully written herein.

515.    Plaintiffs hereby allege that OSU committed Fraudulent Concealment by committing

Fraud, as previously described in detail in this Amended Complaint and also described hereafter.

OSU concealed the existence of Plaintiffs' claims, by making material representations to Plaintiffs involving past or existing facts at the time of Dr. Strauss' sexual assaults, by representing, insinuating or doing the following:

      a.      Defendant Strauss' examinations were "medically appropriate"; and

      b.      Defendant Strauss' conduct was "not sexual abuse"; and

      c.      Continuing to employ Dr. Strauss as a medical doctor thereby representing that Strauss was not a sexual deviant despite actual and/or constructive knowledge that he was a sexual deviant who engage in acts of sexual abuse at the OSU Student Health Center, Larkins Hall, and other buildings at the OSU campus.

516.    These material representation(s) to Plaintiffs were false, in that OSU had actual knowledge of sexual abuse by Dr. Strauss from other students and student athletes on the OSU campus and knew that the appropriateness of his "treatment(s)" had been questioned in the past. Further, OSU continued to employ Dr. Strauss, thereby providing him unfettered access to hundreds of males including Plaintiffs.

517.    OSU made the material representations(s) with the intent that the material representation(s) should be acted upon by each Plaintiff, and that each Plaintiff should believe the following:

      a.      That the "treatments" were in fact "treatments;"

      b.      That the "treatment(s)" or examinations were proper, appropriate, and legitimate;

      c.      That he had not been sexually assaulted;

      d.      That he should believe Dr. Strauss was a legitimate doctor who did not commit sexual assault; and

     e.      That he should not reasonably believe and not be aware of a possible lawsuit or cause of action that he might have against OSU.

518. Plaintiffs acted in reliance upon the material representations(s), in that the Plaintiffs reasonably believed the following:

     a.      That the "treatments" were in fact "treatment";

     b.      That the "treatment" or examinations were proper, appropriate, and legitimate;

     c.      That they had not been sexually assaulted;

     d.      That they should continue the "treatment(s);"

     e.      That Dr. Strauss was a legitimate doctor who did not engage in sexual assault;

     f.      That they did not have and were not aware of a possible lawsuit or cause of action that they had against OSU.

519. Plaintiffs thereby were injured, in that Plaintiffs suffered in the following ways:

     a.      Plaintiffs could not stop the sexual assault;

     b.      Plaintiffs continued to undergo the "treatment(s)" or examinations resulting in sexual assaults; and

     c.      Some Plaintiffs suffered related physical manifestations thereof, such as sleep deprivation, physical illness, severe emotional distress, loss of familial relationships, loss of enjoyment of life. In addition, some Plaintiffs will continue to suffer pain of the mind and body, and will continue to be prevented from performing daily activities and obtaining full enjoyment of life. Further, some Plaintiffs will continue to sustain loss of earnings and earning capacity.

520.    OSU concealed the fraud as to Dr. Strauss by making fraudulent material representations to Plaintiffs that were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of this fraud as to Dr. Strauss.

521.    OSU continued to employ Dr. Strauss as a medical doctor thereby representing that Strauss was not a sexual deviant despite actual and/or constructive knowledge that he was a sexual deviant who engaged in acts of sexual abuse on OSU students at the OSU Student Health Clinic, Larkins Hall, and other buildings on the OSU campus.

522.    Dr. Strauss published the following articles in regards to Anabolic Steroids while employed at OSU:

    a.    **Side Effects of Anabolic Steroids in Weight-Trained Men**
          Richard H. Strauss, J.E. Wright, G.A. Finerman, D.H. Catlin.
          Phys Sportsmed, December, 1983

    b.    **Anabolic Steroids**
          Richard H. Strauss.
          Clinical Sports Medicine.  July, 1984

    c.    **Anabolic Steroid Use and Perceived Effects in Ten Weight-Trained Women Athletes**
          Richard H. Strauss, M.T. Liggett, R.R. Lanese.
          The Journal of the American Medical Association (JAMA), May, 1985

    d.    **Controlling the Supply of Anabolic Steroids**
          Richard H. Strauss.
          Phys Sportsmed, May 1987

    e.    **Selected Psychological Characteristics of Anabolic-Androgenic Steroid Users**
          M.S. Bahrke, J.E. Wright, J.S. O'Connor, Richard H. Strauss, D.H. Catlin.
          New England Journal of Medicine, September. 1990

    d.    **Anabolic Steroids in the Athlete – Annual Review of Medicine**
          1991 – Paper adopted in part from the authors' chapter "Drugs in Sports" in Sports Medicine, edited by Richard H. Strauss Philadelphia: Saunders (1991) 2nd Edition

    e.    **Endrocrine Effects in Female Weight Lifters Who Self-Administer Testosterone and Anabolic Steroids**

102

W.B. Markley, Richard H. Strauss, D.J. Leizman, M. Liggett, L.M. Demers, November, 1991

    f.    **Psychological Moods and Subjectivity Perceived Behavioral and Somatic Changes Accompanying Anabolic-Androgenic Steroid Use**
M.S. Bahrke, J.E. Wright, Richard H. Strauss, D.H. Catlin.
American Journal of Sports Medicine, November – December 1992

523.    Dr. Lombardo, OSU head team physician, authored or co-authored the following articles in regards to Anabolic Steroids while employed at OSU:

    a.    **The Effects of Anabolic Steroids and Strength Training on the Human Immune Response**
Calabrese LH, Kleiner SM, Barna BP, Skibinski CL, Kirkendall DT, Lahita RG, John A. Lambardo
Medicine and Science in Sport and Exercise August 1989

    b.    **Anabolic-Androgenic Steroids**
JA Lombardo NIDA Research Monograph 1990

    c.    **Anabolic Steroids in Athletes**
Yesalis CE, Wright JE John A. Lombardo
Wien Medizinishe Wochenschrift 1992 German

    d.    **Psychiatric Effects and Psychoactive Substance Use in Anabolic-Androgenic Steroid Users**
Malone DA Jr., Dimeff RJ, John A. Lombardo, Sample RH Clinical Journal of Sports Medicine 1995

    e.    **Steroids and Steroid-Like Compounds**
Blue, JG, John Lombardo
Clinics in Sports Medicine Journal 1999 July

    f.    **Performance-Enhancing Supplements**
Pecci MA, John A. Lombardo
Physical Medicine and Rehabilitation Clinics of North America November 2000

    g.    **Supplements and Athletes**
John A. Lombardo
Southern Medical Journal September 2004

524.    Numerous Plaintiffs state that they received and/or witnessed Dr. Strauss administering steroids and/or performance enhancing drugs to athletes at OSU in order for the athletes to "get

an edge." These drugs include but are not limited to: Ephedrine, Creatine, Clenbuterol, and "Animal Juice," a name given to an unknown substance that's label stated, "for animal use only." Plaintiffs state that not only did Strauss regularly administer Anabolic Steroids, but athletes at OSU were also able to receive injections of Corticosteroids like Decadron in order to immediately cure the athletes' pain and keep the OSU athletes running at a high level at all times.

525.    Numerous Plaintiffs state that Dr. Strauss told athletes that the substance would boost their athletic performance. However, rarely was any OSU athlete ever taking any of these drugs listed above, counseled by Dr. Strauss as to any potential side effects that the steroid and/or performance enhancing drug might have. In fact, in a 1983 article titled Social Factors in Wrestlers' Health Problems, written by Dr. Strauss and published in *The Physician and Sportsmedicine,* Dr. Strauss discussed that wrestlers were highly motivated by social pressures to win. Further, he stated, "[w]restlers tend to take seriously only those health problems that prevent participation, regardless of the long-term consequences."

526.    On information and belief, Plaintiffs state that Dr. Strauss was receiving the steroids and/or performance enhancing drugs that he distributed from the OSU Athletes from the OSU Student Health Center.

**FOURTH CAUSE OF ACTION – VIOLATIONS OF TITLE IX 20 U.S.C. §1681(a), *et seq*.**
**Unlawful Retaliation Claim**

527.    The Plaintiffs hereby incorporate by reference the allegations set forth and contained in Paragraphs one (1) through Paragraphs Five Hundred and Twenty-Six (526) as if fully written herein.

528.     Retaliatory conduct is within the broad prohibition of discrimination made unlawful by Title IX.

529.     In March of 2018, Michael DiSabato was one of the original whistleblowers as to Dr. Strauss and OSU's complicit role in covering up the sexual environment at OSU.  He disclosed to OSU and the public the rampant sexual molestation, assault, abuse, and harassment that had occurred at OSU by Dr. Richard Strauss.

530.     In approximately April 2018, due to Michael DiSabato being a whistleblower as set forth above, he received a refund of $1,500 from OSU personnel for six (6) tickets that he purchased at the John Hick's fundraiser Unlimited Love so that Michael DiSabato and his guests could attend an OSU Spring Football Practice and meet Coach Urban Meyer.

531.     OSU had knowledge of Whistleblower Michael DiSabato's reports and disclosures of the rampant sexual molestation, assault, abuse, and harassment to the extent that in May of 2018 OSU hired an independent law firm, Perkins Coie L.L.P. of Seattle, Washington, to investigate the allegations of Michael DiSabato.

532.     In Spring of 2018, OSU personnel hung up a picture of the Whistleblower Michael DiSabato in the OSU Steelwood Athletic Training Facility, which housed the OSU Wrestling Team, OSU Fencing Team, OSU Gymnastics Team, and the Ohio Regional Olympic Training Center for Wrestling.  The picture of Whistleblower DiSabato was intentionally placed in a noticeable area to inform everyone to avoid Whistleblower DiSabato and not to let Whistleblower DiSabato into the facility.  Such photo served notice and was equivalent to a "wanted poster."  Also, upon information and belief, the OSU Wrestling Team talked about Whistleblower DiSabato in team meetings.

533.    In July 2018, Matt Finkes, Director of Development for the OSU Wexner Medical

Center, Executive Director of the Gold Pants Club, former OSU Football player and second

cousin to former OSU Wrestling Head Assistant Coach Jim Jordan, gave a public interview on

Columbus radio station QFM 96.3.  During this interview, Matt Finkes, an OSU employee tried

to paint a derogatory picture of the Plaintiffs and similarly situated Plaintiffs as he stated that the

reports concerning Dr. Strauss and OSU were a money grab as "guys saw dollar signs and are

going for it."  Also, OSU employee, Matt Finkes, pointed out that he did not think OSU is

"gonna roll over the same way" as Michigan State had done.  Further, during his interview, OSU

employee Matt Finkes stated that "voices are being muted by Mike DiSabato and all these guys

that are coming out taking away from guys that might actually be abused."  Finally, OSU

employee Matt Finkes stated that people needed to look through a prism of facts and "this is way

out of bounds."

534.    In the summer of 2018, OSU employees, faculty, staff, former employees of OSU,

friends and/or benefactors of OSU emailed, texted, and/or called some of the Plaintiffs and

similarly situated Plaintiffs in order to get the Plaintiffs and similarly situated Plaintiffs to not

reveal their individual stories and/or to silence them.  These individuals include, but are not

limited to the following:  Former OSU Head Wrestling Coach Russ Hellickson, Former Head

Assistant Wrestling Coach Jim Jordan, Former OSU National Champion Wrestler and OSU

Business Licensee, Tommy Rowlands, Current OSU Head Wrestling Coach Tom Ryan, and

OSU's Director of Development for the OSU Wexner Medical Center, Executive Director of the

Gold Pants Club, former OSU Football player and second cousin to former OSU Head Assistant

Coach Jim Jordan, Matt Finkes.  These listed individuals called, texted, and emailed numerous

former athletes of the OSU Wrestling team in the hopes of accessing the damage to OSU and/or

themselves as well as attempting to continue the cover-up of Dr. Strauss and the sexually deviant culture and environment at OSU from 1979-1998. In fact, there was an active campaign to silence and intimidate Whistleblower DiSabato and any other Plaintiffs that stepped forward in regards to Dr. Strauss, the sexually deviant culture and environment at OSU from 1979-1998, and the cover-up by OSU personal officials who knew about Dr. Strauss' sexual harassment.

535.    Further, OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU emailed, texted, and/or called some of the Plaintiffs and similarly situated Plaintiffs in order to assess the extent of the damage that Defendant OSU could face in a possible lawsuit.

536.    Former OSU Head Assistant Wrestling Coach Jim Jordan and current U.S. Congressman used a public relations firm, Shirley & Banister Public Affairs to distribute statements and set up a website presenting support for Congressman Jordan as there were public allegations by some OSU wrestlers that when Congressman Jim Jordan was the OSU Head Assistant Wrestling Coach, the wrestlers had told him about Dr. Strauss and how Dr. Strauss was conducting physical and medical examinations on the wrestlers. Former OSU Head Wrestling Coach Russ Hellickson and Congressman Jim Jordan directed former OSU wrestlers to call the above public relations firm to issue statements in support of Jim Jordan and/or recant their previously given press statements regarding Dr. Strauss, the sexually deviant culture and environment at OSU from 1979-1998, and the cover-up by those who knew about it. Simply put, former OSU wrestlers were being asked to stay silent.

537.    Congressman Jim Jordan and a local sports agent, who represents a former OSU Football Player, Bret Adams called Whistleblower/Plaintiff Mark Coleman's elderly parents in order to have Plaintiff Coleman's elderly parents apply pressure to Plaintiff Coleman to recant his

previous statement made to a Wall Street Journal reporter regarding Former OSU Head Assistant Coach Jim Jordan. Plaintiff Coleman had stated to this reporter, "[t]here's no way unless he's got dementia or something that he's got no recollection of what was going on at Ohio State." Also, a number of unknown individuals were conversing with Plaintiff Coleman's ex-girlfriend and mother of his child about applying pressure to Plaintiff Coleman to recant his previous statements and separate himself from Whistleblower DiSabato. Eventually, Plaintiff Coleman met with sports agent, Bret Adams and the mother of his child to sign a previously prepared statement to recant the previous statements Plaintiff Coleman had given to the Wall Street Journal reporter.

538.    On information and belief, OSU has not taken disciplinary action against any of these OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU that emailed, texted, and/or called some of the Plaintiffs and similarly situated Plaintiffs. As such, OSU has ratified these individuals' actions and independently violated Title IX.

539.    As a direct and proximate result of OSU's retaliation, the Plaintiffs are aware of other similarly situated males who have failed to come forward for fear of retaliation from OSU. Plaintiffs are aware of many of their teammates that have chosen not to join this lawsuit due to the retaliation by OSU and its employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU.

540.    As a direct and proximate result of OSU's retaliation, the Plaintiffs have suffered and continued to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame humiliation, loss of self-esteem, and loss of enjoyment of life.

541.    As a direct and proximate cause of OSU's violation of Plaintiffs rights under Title IX, the

Plaintiffs were prevented and continue to be prevented from obtaining the full enjoyment of life,

and have sustained and continue to sustain loss of earnings and earning capacity, and incurred

various personal expenses.

## FIFTH CAUSE OF ACTION – VIOLATION OF SECTION 1983 (42 U.S.C. § 1983)

542.    The Plaintiffs hereby incorporate by reference the allegations set forth and contained in

Paragraphs One (1) through Paragraphs Five Hundred and Forty-One (541) as if fully written

herein.

543.    Plaintiffs enjoys protections under the Fourteenth Amendment of the United States

Constitution.

544.    Plaintiffs enjoy the constitutionally protected Due Process right to be free from invasion

of bodily integrity through sexual assault, battery, molestation, and harassment under the

Fourteenth Amendment to the United States Constitution.

545.    At all times herein, Ohio State and its employees, agents, and/or representatives were

acting under color of law, to wit, under color of statutes, ordinances, regulations, policies,

customs, and usages of The Ohio State University and State of Ohio.

546.    The acts as alleged throughout this Complaint demonstrate a violation of these

constitutionally protected rights, which were clearly established at the time of the acts and of

which OSU had knowledge.

547.    OSU had the ultimate responsibility and authority to train and supervise its employees,

agents, and representatives, in the appropriate manner of preventing, detecting, investigating and

reporting sexual abuse, assault, and molestation and as a manner of custom, policy, and/or

practice failed to do so with deliberate indifference.

548.    At all times pertinent herein, OSU acted in supervisory role to Dr. Strauss.

549.    By failing to prevent the repeated sexual assaults, abuse, and molestation and other sexual deviant acts upon the Plaintiffs, and by failing to appropriately respond to numerous reports of Dr. Strauss' sexual assault, abuse, and molestation in a manner that was clearly unreasonable it amounts to deliberate indifference for which, OSU is liable to Plaintiffs pursuant to 42 U.S.C. §1983.

550.    OSU is also liable to Plaintiffs under 42 U.S.C. §1983 for maintaining customs, policies, and practices that deprive Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

551.    As a direct and proximate result of OSU's violation of Plaintiff's rights under 42 U.S.C. §1983, Plaintiffs have suffered and continue to suffer emotional distress, physical manifestation of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life; were prevented and continue to be prevented from obtaining the full enjoyment of life; and have incurred various personal expenses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that this Honorable Court:

a.    Enter judgment in favor of Plaintiffs on their First, Second, Third and Fourth causes of action under Title IX 20 U.S.C. §1681(a), *et seq*. against Defendant The Ohio State University;

b.    Declare Defendant The Ohio State University's conduct in violation of Title IX of the Education Amendments of 1972;

c. Declare Defendant The Ohio State University's conduct in violation of 42 U.S.C. §1983;

d. Award Plaintiffs compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiffs' medical and other expenses incurred as a consequence of the sexual abuse and/or harassment, OSU's deliberate indifference, OSU's fraudulent concealment, and OSU's unlawful retaliation; damages for deprivation of equal access to the educational opportunities and benefits provided by OSU; and damages for past, present, and future emotional pain and suffering, ongoing mental anguish, loss of past, present and future enjoyment of life, and loss of future earnings and earning capacity;

e. Award Plaintiffs pre-judgment and post-judgment interest;

f. Award Plaintiffs their court costs and expenses, including attorney's fees, pursuant to 42 U.S.C. § 1988 (b); and

g. Grant such other relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues in the above-mentioned Complaint.

Respectfully Submitted,

/s/ *J.C. Ratliff*

J.C. Ratliff (0027898)
Rocky Ratliff (0089781)
200 W. Center St.
Marion, Ohio 43302
Tel: 740-383-6023
Fax: 740-383-2066
Email: attorney.ratliff@gmail.com